Argued February 7, decided May 19, 1908; re-argued August 4, decided January 5, 1909.

# HOUGH v. PORTER.

[95 Pac. 732; 98 Pac. 1083.]

PARTIES—JOINDER.

1. Where, in a suit to determine water rights in a stream for irrigation purposes, the determination of the rights of the litigants could not otherwise have been had with reasonable accuracy, nor the decree, when entered, effectively enforced, without the presence of other parties, the court was authorized to direct that they be brought in and made parties, under Sections 41, 394, B. & C. Comp., providing that, when complete determination of a controversy cannot be had without the presence of other parties, the court shall cause them to be brought in.

RIGHTS IN STREAM—ACTION—PARTIES—JOINDER.

2. Where a diversion or use of water of a stream in controversy or any of its branches by any of the defendants affects the interest of each of the plaintiffs, all are interested in the relief demanded and may join as plaintiffs to secure protection of their rights; and same rule determines who may be made defendants.

COMPLAINT.

3. Where, in a suit to determine irrigation rights, the complaint sufficiently charged an unlawful interference with plaintiffs' rights in the stream by defendant P., and then alleged that all the other defendants had, or claimed to have, some rights or interests in the waters of the stream, the exact nature of which was to the plaintiffs unknown, but that defendants' interests, if any, were inferior to the rights of plaintiffs in such waters, the complaint sufficiently pleaded a cause of action against all the defendants under Section 394, B. & C. Comp., providing that any person may be made a defendant who has or claims an interest in the controversy adverse to plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein. ·

PARTIES—NEW PARTIES.

4. A statute giving a court discretionary power to require all interested to be made parties, implies the power necessary to carry orders and references thereto into effect.

JUDGMENT—CONCLUSIVENESS—PARTIES OF RECORD.

5. The failure on the part of some defendants affirmatively to assert their rights, cannot affect the interests of others in the proceedings, but will preclude those in default from subsequently asserting their claims as to matters in controversy, against the rights there determined.

RIGHTS OF DEFENDANTS INTER SE—DETERMINATION.

6. Section 391, B. & C. Comp., abolishes cross-bills, but provides that, in actions at law, where defendant is entitled to relief arising out of facts requiring the interposition of a court of equity and material to his defense, he may, on filing his answer therein, also as plaintiff file a complaint in equity in the nature of a cross-bill, on which the issues may thereafter be tried as in a suit in equity. *Held*, that under such section, in a suit in equity to determine irrigation rights, defendants were entitled to set up their claims *inter se* in their answers, and have the same adjudicated on such notice as the court may prescribe.

SAME—TRIAL OF ISSUES.

7. The right of defendants to an adjudication of their rights·*inter se*, is limited to proceeding where the cause of the suit is one arising out of or having reference to the subject-matter thereof.

PROCESS—IN ANCILLARY PROCEEDINGS.

8. Defendant, desiring an adjudication of his claim against his co-defendants, may cause summons to be issued under the original title of the suit, and have the same served on his co-defendants, with a copy of his answer, or he may have served a copy of the order of the court, requiring his co-defendants to appear and respond to the affirmative matter in the answer, within the time therein specified.

RIPARIAN OWNERSHIP.

9. There is no such thing as prior riparian ownership so far as distribution of water for irrigation purposes between riparian owners is concerned ; the rights of a riparian owner to the waters being a variable one, depending on use by other proprietors.

WATERS AND WATER COURSES—DIVERSION—EXTENT.

10. More explicit evidence is required for the determination of water rights between riparian owners than under other claims of right, and in some instances, where the acreage is large and water scarce, a distribution by the rotation method, or by periods of time, rather than by a division of its quantity, may become necessary.

APPROPRIATION OF WATERS.

11. Act Cong. July 26, 1866, c. 262, § 9, 14 Stat. 253 (U. S. Comp, St. 1901, p. 1437), relative to the appropriation of water, was merely a recognition of rights existing at the time, rather than the creation of a new one.

STATUTES—TITLE OF ACT.

12. The title to an act of Congress is not required to embrace all its provisions, for which reason it is necessary to look to the body of the act to ascertain the intention thereof.

PRIOR APPROPRIATION.

13. It is necessary to the procurement of title to lands under the desert land act [Act. Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548)] that the inception of the title to the water located for such purposes depend upon a *bona fide* prior appropriation.

DEDICATION—WHAT CONSTITUTES.

14. A dedication is the devotion or giving of property for some proper object and in such manner as to conclude the owner.

DEEDS—"RESERVATION."

15. A "reservation" is something extracted from the whole *res* covered by the general terms of the grant, lessening the thing granted from what it would otherwise have been.

PUBLIC LANDS—EXTENT OF TITLE.

16. In order to determine the extent, under the law, of a title included in a conveyance from the government, whether by grant, patent, or otherwise, we must take into consideration all acts in force at the time affecting the public domain, in order to ascertain what interests remain subject to transfer.

PUBLIC LANDS—GRANT—RESERVATION.

17. A reservation of any interest in lands by a legislative enactment is as effective, as a matter of law, as if expressly stated in the grant, patent, or instrument through which title may be asserted.

PUBLIC LANDS—CONVEYANCE—RESERVATIONS.

18. Our form of government necessarily gives rise to rights and privileges unknown to the common law, and accordingly not covered by the terms in general use under it, for which reason it is not important by what term such reserved interests in land may be designated.

PUBLIC LANDS—DISPOSAL—RESERVATIONS.

19. The government cannot, by legislation, determine for any state, after its admission, what its legislation relative to riparian or other water rights shall be, but may dispose of its public lands and all rights incident thereto in such manner as it may deem best, and either at the same time, or by separate acts, make such reservations therefrom, by grant, dedication, or otherwise, as it may see fit.

DISPOSITION OF RIPARIAN INTERESTS.

20. The water flowing over the public domain is a part thereof, and the general government may grant or otherwise dispose of its riparian interest separate from the rest of the estate.

ACQUIREMENT OF WATER RIGHTS.

21. Under the desert land act [Act Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548)] no limit is fixed as to the time a right to the acquirement of a water right may be exercised, except that he who first diverts and applies it to a beneficial use is given the better right thereto.

CONVEYANCE—RIGHTS OF GRANTEE.

22. Any one acquiring title to any part of the public domain subsequent to the date of Act. Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), accepted it, with title thereto, with full knowledge of law in force at the time and subject to the full import thereof.

DEDICATION—SUPPLEMENTARY ACTS.

23. Acts by which reservations or dedications by legislative enactments are required to be expressly stated in the instrument of conveyance are supplementary only, and, while convenient for record, add nothing to the legal effect of such reservations therein.

POWER OF GRANTOR.

24. Like any other grantor, the federal government can convey no greater title than it has.

DEDICATION—EXTENT—EFFECT.

25. The extent and legal effect of a dedication, as well as the manner in which the recipient of the benefits to accrue therefrom shall exercise the rights bestowed, must be determined from the instrument making such dedications, by construing such act in conjunction with the conditions then existing which give rise to the dedication.

RESERVATIONS — APPROPRIATION FOR IRRIGATION AS EFFECTED BY DESERT LAND ACT.

26. The legal effect of the language in Act Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), namely, "There shall be and remain and be held free for the appropriation and use of the public for irrigation," etc., constitute a reservation and dedication to the public of all interest, riparian or otherwise, held at the time by the national government, so far as such interests affect the uses for irrigation and other purposes there enumerated, from which it follows that this act abrogated the common law rule respecting riparian rights as to all lands settled upon or entered after March 3, 1877.

STATUTES—CONSTRUCTION—PRESUMPTIONS.

27. In construing legislative acts respecting the disposal of public lands, it must be presumed that the best possible results for all concerned were

intended by the legislative body and, where practicable, such construction should be applied as makes such intent effective.

DESERT LAND ACT—OPERATION AND EFFECT—RIPARIAN RIGHTS.

28. While the legal effect of the desert land act [Act Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548)] was to abrogate the modified doctrine of riparian rights as to all lands to which title has been acquired after the enactment thereof, it does not go so far as to affect the rights originally giving rise to the doctrine of riparian rights ; that is, for domestic and stock requirements.

RIGHTS OF RIPARIAN OWNER.

29. Every riparian owner, therefore, regardless of the date of settlement, is entitled to the quantity of water reasonably essential to his domestic use and for the watering of his stock, including sufficient supply for the proper irrigation of such garden produce as may be essential to the proper sustenance of his family.

SETTLEMENT ON LANDS ON STREAM—APPROPRIATIONS.

30. Settlement upon land bordering upon or through which a stream may flow, or to which a natural source of water supply may be adjacent, or upon which it may be situated, is in itself notice that sufficient water for domestic uses and requirements incident thereto are and will continue to be demanded; but, to constitute an appropriation for mining, irrigation, or power purposes, some steps towards a diversion thereof, or other good and sufficient notice, is necessary.

RIPARIAN RIGHTS.

31. The references in the Code to riparian rights constitute a recognition of whatever riparian rights the landed proprietor may have, but do not attempt to define, nor to in any manner establish any rule respecting such interests. The case of Sturr *v.* Beck, 133 U. S. 541 (10 Sup. Ct. 350: 33 L. Ed. 761), together with Oregon cases, examined, and *held*, not in conflict with the conclusions here reached.

DECISIONS OF APPELLATE COURTS—EXTENT OF, AS PRECEDENTS.

32. Decisions of an appellate court are precedents only to the extent of the points presented to the court, and considered, and there determined by it.

WATER AND WATER COURSES—ARTIFICIAL CHANNELS—APPROPRIATION.

33. After high-water channels are artificially opened, and after they, together with the cuts dug connecting them with the main stream, have been used by the parties opening them and by their successors in interest, and such use is acquiesced in and recognized as branches of the main creek by others on the main stream and its tributaries and branches, for the period prescribed by the statute of limitations, they become natural channels, and owners of lands adjacent thereto are in law entitled to the same consideration and to the same rights in respect thereto as are those on the main and unquestioned channel.

WATERS AND WATER COURSES—WHAT CONSTITUTE..

34. Where the water spreads, having no well-defined current, as into a marsh, it cannot be deemed a water course, and accordingly does not come within any rule permitting a claim thereto as a riparian owner.

WATER AND WATER COURSES—DIVERSION.

35. Where a channel has been closed, artificially or otherwise, and the water diverted therefrom during the low-water season of each year for 10 years, it loses its riparian character for that portion of each year for which the obstruction and deprivation of the water thereof occurred.

51 OR.—— 11

WATERS AND WATER COURSES—APPROPRIATION FOR IRRIGATION—RIGHTS
OF RIPARIAN OWNERS.

36. Evidence examined, and *held* that, while the relative rights of the
parties for irrigation purposes are to be awarded in accordance with the re-
spective dates of appropriation for irrigation purposes, these rights are sub-
ject to the right of each of the riparian proprietors to insist upon a continu-
ous flow of sufficient water to meet their domestic demands, together with
such additional supply for the watering of a reasonable number of stock for
each, the depletion of which stream shall not be sufficient that it may become
stagnant or injurious to the health of those or their stock using it.

APPEAL AND ERROR—REVIEW—SUFFICIENCY OF EVIDENCE—REMAND
FOR FURTHER TESTIMONY.

37. Where the testimony before the appellate court is not ample for a de-
termination of the quantity to be left in the stream properly to supply the
domestic and other natural wants and necessary requirements of the riparian
owners along the controverted stream, the appellate court may determine
other points upon which the testimony is adequate for the purpose, and re-
mand the cause to the court below with permission to take further evidence
and to enter a supplemental decree determining the continuous flow neces-
sary to the full protection of the riparian interests of the parties to the suit.

APPROPRIATION—PRIORITIES.

38. The surplus waters remaining after the domestic and stock demands
of riparian owners on all lands entered subsequent to March 3, 1877, are sub-
ject to appropiation, and rights thereto vest in the order of time in which the
water has been diverted and applied to a beneficial use.

"MINER'S INCH" DEFINED.

39. The word "inch," as used with reference to water for irrigation pur-
poses, is estimated on the basis of 40 inches to one "second foot."

"DUTY OF WATER."

40. The term "duty of water," as used with reference to water for irriga-
tion purposes, means the quantity essential to the irrigation of any given
tract.

"HEAD OF WATER."

41. The term "head of water," as used with reference to water for irriga-
tion purposes, is the quantity entering the intake of any canal or ditch.

IRRIGATION—APPROPRIATION.

42. Testimony as to duty of water examined, and *held*, that from one-
third to two-thirds of an inch per acre, estimated on basis of 40 inches to one
"second foot," is ample for the irrigation of the lands involved.

APPROPRIATION—METHOD.

43. No certain method is essential to a valid appropriation of water. An
effective diversion may be made, without ditches, by construction of dams in
the slough or other channels, thereby subirrigating the lands, or by overflow-
ing them, or by any process which may result in the successful application of
the water to a beneficial use.

APPROPRIATION—METHOD OF USE.

44. The water must be used in such manner, and such economical methods
must be adopted in its application to uses desired, as will secure the greatest
duty available, even though it becomes necessary to change at considerable ex-
pense the old methods, which had their origin when there was but little de-
mand and the supply correspondingly abundant.

APPROPRIATION—LIMIT OF RIGHT.

45. Beneficial use by and needs of the appropriator, and not the quantity originally diverted, nor the capacity of ditches constructed for the purpose, determines the limit of his rights.

APPROPRIATION - TACKING.

46. The right of an appropriator of water cannot be tacked to that of a mere squatter upon public lands, who, while he may have applied the water in the irrigation of the land subsequently owned by such subsequent appropriator, has abandoned it.

APPROPRIATION—TRANSFER OF RIGHT.

47. But a mere squatter upon public lands may acquire such an interest in the right to the possession thereof that he may, even by parol, transfer his rights therein to another, in which event the rights of the purchaser thereof, claiming under the doctrine of prior appropriation, relate back to the time of the original diversion.

APPROPRIATION OF SQUATTER—CONVEYANCE OF INTEREST.

48. A mere claim of right to the land held by a squatter, if accompanied by a diversion and application of the water in the reclamation thereof, is sufficient to entitle him to convey to another his interest in the water right, together with such interest as he may have in the land to which the water may be appurtenant.

SWAMP LANDS—WATER RIGHTS FOR.

49. The fact that lands may have originally been swamp lands, and reclaimed, and title acquired thereto as such, does not preclude the owner from acquiring a water right for the irrigation thereof.

IRRIGATION—RECLAIMED SWAMP LANDS.

50. When lands are shown to be swamp, and reclaimed as such, it will be presumed that prior to its reclamation no irrigation thereof was necessary; but when, once reclaimed, if in an arid district, it comes within the same rule , and the same law respecting irrigation and riparian rights as applies to other agricultural lands in the vicinity.

APPROPRIATION—PRIORITIES—DITCHES.

51. A party claiming as an appropriator cannot, for the purpose of establishing a right prior to another, avail himself of a ditch constructed for drainage, unless it appears that such ditch was, at the time of and prior to the inception of other rights, intended for irrigation purposes as well.

APPROPRIATION—PRIORITIES.

52. Where a person files on land under the desert land act (Act Cong. March 3, 1877, c. 107, 19 Stat. 377 [U. S. Comp. St. 1901, p. 1548]), and makes the affidavit required to the effect that the lands are desert in character and unreclaimed, he will not be permitted to assert a right to water for the irrigation as having been initiated prior to the date of such entry.

APPROPRIATION—FAILURE TO USE WATER DIVERTED.

53. Where an appropriator fails to use the full amount of water diverted, and for an unreasonable time delays increasing his use, any subsequent increase in either a diversion or use thereof is made subject to the intervening rights.

APPROPRIATION—CHANGE IN METHOD.

54. Where water has been appropriated and applied in the irrigation of a tract of land, and after, and during a long period of use in a certain manner in a certain locality, other rights in the stream attach, such a change in the appropriation may not be made, either of the point of diversion or of the

place of its use, where to make such change will substantially prejudice the interests of such other appropriators.

APPROPRIATION.

55. When, for the purpose of diverting water for a beneficial use, a ditch is commenced, and within a reasonable time the work thereon is prosecuted to completion, and water turned into it and applied to the use therein, the right to the appropriation, to the extent of the quantity diverted and applied, relates back to the commencement of the work.

APPROPRIATION—TENANTS IN COMMON—DETERMINATION OF RIGHTS.

56. When parties claim their rights through the same diversion and from the same ditch, through which the appropriation was originally made by them or by their predecessors in interest, they are tenants in common ; and where, in a suit with others on the stream involving rights thereon, no issues are framed between such tenants in common, their relative rights may be left undetermined, and only their rights as against other parties to the suit will be decreed.

DIVERSION—APPROPRIATION.

57. When tenants in common claim a water right by reason of the construction of a canal, and subsequently the water is permitted to flow down the channel and is elsewhere diverted, the inception as well as the limit of their rights, as against intervening appropriators, are determined by the capacity of the canal mentioned, and not by any subsequent diversion, either in place or in time.

IRRIGATION—CHANGE OF METHOD.

58. Parties owning the right to use water may change the method of conveying it to the point of use, if such change does not materially prejudice others' rights ; and in doing so any dry ravine, gulch, or hollow, as well as the natural channel of a stream, may be used by the appropriator of water in its transmission to the place of use.

APPROPRIATION—METHOD OF USE.

59. Where water is conveyed through any natural channel or water course, the user or users may, when practicable to do so without substantial prejudice to others' rights, let the water thus diverted commingle and take it out at some other point.

DIVERSION—CHANGE OF METHOD—LOSS BY EVAPORATION.

60. Where a right to the use of water is acquired through and by the construction of a ditch tapping any source of water supply, and the users thereafter elect to take the water thus diverted from other points on the stream, due allowance must be made for loss by evaporation, including such loss as may occur under different methods of use and distribution, which loss must, so far as practicable of ascertainment, be deducted from the quantity awarded under the original diversion and method of use.

APPROPRIATION—BENEFICIAL USE.

61. A *bona fide* intention to devote water to a beneficial use may comprehend the use to be made by or through other persons and upon lands other than those of the appropriator.

APPROPRIATION—METHOD.

62. Rights, as against third persons, to the use of water may be initiated through a ditch heading upon and tapping the source of water supply upon the lands of another, from whom no easement has been acquired, but which may by the owner of such land be revocable, and none but the owner of the premises across which the ditch is constructed are in a position to complain, and where such owner makes no issue and offers no proof thereon this feature will be disregarded.

WASTE WATER—APPROPRIATION.

63. Where water is claimed as the "waste" waters from the farm of an adjacent water user, all the water in excess of that caused by and resulting from seepage is but the quantity diverted by such appropriator in excess of his needs, and accordingly in excess of the quantity to which he may be entitled, and the person receiving and applying the excess to a beneficial use acquires a vested right therein, as would an appropriator of any other surplus water, the inception of which right, like that of any other appropriator, dates from the first steps taken to provide for its use.

ADVERSE USE—EVIDENCE.

64. Under a plea of title by adverse user, a showing of a continuous application of the water for a beneficial use by an upper proprietor for more than 10 years makes a *prima facie* showing under such claim, to defeat which it is incumbent upon the person questioning such right by competent evidence to overcome the showing thus made.

ADVERSE USER—EVIDENCE.

65. Where a *prima facie* claim by adverse user is established by continuous use and application for the required time prior to suit, the onus thus thrown upon the party thus contesting such claim is fully met by proof that within the statutory period the shortage in the water supply below the adverse claimant was not sufficient to substantially prejudice the interests of other appropriators from the source of water supply from which the appropriation is made.

PLEADING—INCONSISTENT DEFENSES.

66. Adverse possession and prior appropriation are not inconsistent defenses, and both may be asserted in the same pleading.

ADVERSE POSSESSION—APPROPRIATION.

67. Where the pleader relies on adverse possession only, and in his proof fails to sustain such defense, and the evidence offered is sufficient to establish an appropriation, it may be considered, and his rights under the doctrine of prior appropriation may be established in accordance with the showing thus made.

APPROPRIATION—NONUSER.

68. The right to the use of water cannot be deemed forfeited on account of nonuser alone, short of the period prescribed by the statute of limitations for real actions.

WATER RIGHTS—"ABANDONMENT."

69. To constitute an "abandonment" of a water right, there must be a concurrence of the intention to abandon and an actual failure in its use.

WATER RIGHTS—FORFEITURE.

70. Involuntary abandonment of real property cannot work a forfeiture of any water rights previously initiated in connection therewith.

LOSS OF LANDS—CHANGING WATER USE.

71. Water rights initiated in the reclamation of lands lost to another, who had inaugurated a right to water for irrigation, cannot change the use thereof to other lands; but he will be treated as having abandoned such right, where not to do so would work to the prejudice of other appropriators.

TRIAL—DISMISSAL—GROUNDS.

72. When one of the parties to the suit has not offered proof as to his rights, and it does not appear that he is claiming a right to the use as against others whose interests are involved, the court may, in its discretion, dismiss without prejudice to him.

DISMISSAL AND NONSUIT—DISCRETION OF COURT.

73. Where the trial court properly orders all claiming and interest in matters before it to be made parties, and they appear, it may, in the exercise of its sound discretion, refuse to grant a motion for nonsuit, in which event their failure to further proceed may result in a decree against them on the merits; but the court may, if it deems proper, grant such motion, and, if granted, their rights will not be determined.

APPEAL IN EQUITY—DECREE.

74. While it is the general rule that, as to the interests of the parties to a suit in equity who do not appeal, a decree more favorable than entered in the trial court will not be entered, such general rule may not always be invoked, where their appearance is not voluntary in the first instance, but made in response to an order of the court requiring all interested in the subject-matter of the suit to be made parties.

WATER RIGHTS.

75. As between the parties whose rights are adjudicated, at all times that the water in controvery is not required by one or more, it must, when needed by others, remain uninterrupted and subject to their use.

WATER RIGHTS—APPLICATION.

76. All water rights are limited in their application to the number of acres and to the land for which acquired, except when the increase in the acreage or change in place of use will not work to the material prejudice of others interested in the stream diverted.

WATER RIGHTS—JUDGMENT.

77. Water suits are *sui generis*, concerning which all questions of practice are not provided for either by statute or precedent, for which reason courts of equity are not necessarily bound in all cases by the rules of practice usually invoked; and where parties are served with summons and by order of the court required to interplead with reference to each other, and any of them directly or indirectly act in disregard of the spirit of the order, the court, in the exercise of its sound discretion, may either enter a decree affecting their interests, or not, as it may deem just and equitable.

PLEADING—ADMISSIONS - EFFECT.

78. If, in violation of the spirit of the court's order requiring all interested to be made parties, for the purpose of avoiding the effect of such order, any parties neglect to frame issues, or in framing them between themselves make admissions in their pleadings which. to recognize and to follow, makes a decree impracticable of enforcement, the pleadings may be deemed amended to conform to the proof, thereby being within the general purview of the order of the court, and all admissions not in harmony with the proof and inimical to the enforcement of a decree may be disregarded.

APPEAL IN EQUITY—TRIAL DE NOVO.

79. Since, under the Code, suits in equity are tried *de novo* on appeal, the court, except where limited by the statute, has the same discretionary power in reference thereto as the trial court.

SUPPLEMENTAL DECREES.

80. Owing to the difficulties usually encountered in the enforcement of decrees, where there are many conflicting interests, in water suits, the trial court has the power when deemed advisable, to enter such supplemental decree, not inconsistent with the decree of the appellate court as may be necessary to make the decree of the appellate court effective.

COSTS—DISCRETION OF COURT.

81. Where it is clear from the evidence that a suit was made necessary by knowingly wrongful acts of one of the parties, costs should be taxed against

him in favor of the parties directly injured thereby; but where it appears
that parties to the proceeding are benefited by the general result arising from
an adjustment of all conflicting claims on the stream, the court may, in the
exercise of its discretionary powers under the Code in such matters, adjudge
that each pay his own cost.

From Lake: HENRY L. BENSON, Judge.

Statement by MR. COMMISSIONER KING.

This suit was instituted on April 14, 1900, by Marion
Conley and Annie C. Hough against Stephen A. D. Por-
ter, to restrain him from interfering with the flow of
the waters of Silver Creek, in Lake County, Oregon, to
plaintiffs' premises. On the 8th day of October of the
same year, by permission of the court, an amended com-
plaint was filed, in which Annie C. Hough appears as the
sole plaintiff, with Stephen A. D. Porter as the only de-
fendant, averring, in effect, that plaintiff and her grant-
ors, for more than 15 years prior thereto, were the own-
ers of certain arid land there described, riparian to the
stream named, which for more than 20 years has re-
quired the use of 500 inches of the waters of Silver Creek
for the proper irrigation thereof, without which plain-
tiff's land would become worthless, etc.; that in the year
1895, Porter wrongfully constructed, and has ever since
maintained, and threatens to continue, a dam and head
gate in the channel of Silver Creek above her premises
in such a manner as to interfere with the flow thereof
to her farm, thereby depriving her of the use of the
water necessary for the irrigation thereof, as to which
plaintiff avers that she has 280 acres of land adapted
chiefly to the growing of grass and requiring the amount
of water specified for the proper irrigation thereof,
without which the lands would become worthless. These
averments were followed by the usual prayer for equit-
able relief. Defendant answered, specifically denying
such allegations as were inconsistent with the affirma-
tive matter in the answer, which affirmative averments
are, in effect, as follows: That the cause of suit did not
accrue within 10 years before its commencement; that

Porter is the owner in fee of certain lands described, followed by the usual allegations as to the irrigation season—the lands being arid, requiring irrigation, as well as riparian on the stream—claiming his diversion as prior appropriator from March 3, 1883, and application of the water to a beneficial use to the extent of 100 inches under a six-inch pressure; and that in April, 1895, this point of diversion was changed to a more convenient point about 200 yards below his former dam, from which his diversion was thereafter continued, giving the dimensions of the ditch, etc., and its carrying capacity fixed at 100 inches, all of which it is maintained has been constantly used since March, 1883, in the proper irrigation of his lands, and without which his lands would become worthless, etc. This is followed by a prayer to the effect that: (1) Plaintiff's suit be dismissed, and defendant go hence unharmed; (2) that the preliminary injunction issued be dissolved; and (3) for such other and general relief as may seem meet and equitable.

An amended reply having placed the cause at issue, it was referred to the official reporter as referee to take and report the testimony, who did so and certified it to the court; and the court then took the cause under advisement. After due consideration, the court, on October 23, 1901, after hearing the evidence and argument of counsel upon the testimony taken, and after being duly advised, and finding it impracticable to settle and make a complete determination of the matters in controversy between the plaintiff and defendant, involving the waters of Silver Creek and tributaries, without the presence of other parties before the court, and it appearing that the rights of numerous other parties were involved in the litigation, ordered that all the persons so interested, naming them, be brought in by the plaintiff and made parties to the suit; that they appear and plead on or before March 1, 1902; and that the clerk furnish the sheriff with a duly certified copy of the order for

service, to be served by him, as such officer, within 30 days upon the persons designated. The order directed the parties appearing pursuant thereto to plead either as plaintiffs, or defendants, as their respective interests might appear, and that all appearing as defendants should answer to the complaint and interplead as to their codefendants, or any of them.

Pursuant to the court's order, Annie C. Hough thereupon asked permission to amend her amended complaint, which was granted, and on May 20th, following, filed an amended complaint, to which was added, as coplaintiffs, the names of Mary J. Kittredge, Marion Conley, W. H. Hayes, J. M. Hayes, John Hayes, A. C. Geyer, and W. H. McCall; and as defendants, S. A. D. Porter, C. D. Porter, administrator, Daisy Porter, widow, and W. F. Porter, E. A. Porter and Carl D. Porter, minor heirs of S. A. D. Porter by Daisy Porter, guardian; P. G. Chrisman, John C. Porter, and James C. Porter, his guardian; F. M. Chrisman, B. F. Lane, Jennie Lane, C. C. Jackson, Occidental Land & Improvement Co., a corporation, and Chewaucan Land & Cattle Co., a corporation, its grantee; P. W. Jones, C. E. McKune, Mary C. Brown, and E. D. Lutz. On May 20, 1902, the plaintiffs caused each of the defendants named to be served with a summons, etc., in practically the same form and manner as in the filing of an original suit. The amended complaint last named, omitting formal parts, is as follows:

"That plaintiff, Annie C. Hough, and her grantors have been for more than 17 years last past, and she is now, the owner in fee simple of the S. $\frac{1}{2}$ of the S. $\frac{1}{2}$ of section 2, the N. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$, and the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 11, and the S. W. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$ of section 1, in township 28 S., range 14 E., in Lake County, Or., containing 320 acres. That there is, and ever since the memory of man there has been, a natural stream of water, known as Silver Creek, with well-defined bed and banks, flowing a perpetual stream of water. That said Silver Creek flows from and over lands of de-

fendant S. A. D. Porter, through and over said lands of plaintiff Hough, and that all her said land is riparian to said stream. That in the year 1876 plaintiff Hough's grantors diverted and appropriated, and ever since and until the year 1895 have used of the waters of said Silver Creek in irrigating those portions of said described lands not naturally irrigated by said stream, 280 inches of water, measured under a six-inch pressure, by means of dams and ·ditches, and by such use of said water raised large and valuable crops of grasses, which were cut and cured for hay. That at the time of said appropriation all the lands on said Silver Creek were public lands, belonging to the government of the United States. That plaintiff Mary J. Kittredge is the owner of section 36, in township 27 S., range 14 E., containing 640 acres, in Lake County, Or., and in possession thereof by purchase from the State of Oregon as school lands, having paid one third of the purchase price and having received a certificate of purchase from said State therefor, which is now in full force and effect; and that Silver Creek, after flowing over lands of defendant S. A. D. Porter, flows over all the said lands of plaintiff Kittredge, and all her said land is riparian to said stream. That plaintiff W. H. Hayes is the owner and in possession of the N. E. ¼ of the N. W. ¼, and lot 1 of section 30, and the S. E. ¼ of the S. W. ¼, and lots 3 and 4, section 19, in township 27 S., range 15 E., in Lake County, Or., containing 151.95 acres. That plaintiff John Hayes is the owner and in possession of the S. E. ¼ of the N. W. ¼, the S. W. ¼ of the N. E. ¼, and the N. ½ of the S. E. ¼, section 30, township 27 S., range 15 E., in Lake County, Or., containing 160 acres. That said Silver Creek, after flowing over lands of the defendant S. A. D. Porter, flows over all of said land of said several plaintiffs Hayes, and all their said lands is riparian to said stream. That plaintiff A. G. Geyer is the owner in fee simple of the E. ½ of the S. W. ¼ and lot 4, section 31, township 27 S., range 15 E., in Lake County, Or., containing 105.66 acres, and that said Silver Creek, after flowing over lands of defendant S. A. D. Porter, flows over all said land of plaintiff Geyer, and all said land is riparian to said stream. That plaintiff W. H. McCall is the owner in fee simple of the E. ½ of the E. ½ of section 3, township 28 S., range 14 E., in Lake County, Or.,

containing 160.04 acres, and that said Silver Creek, after
flowing over land of defendant S. A. D. Porter, flows
over all of said lands of plaintiff McCall, and all his said
land is riparian to said stream.   That plaintiff Marion
Conley and his predecessors in interest, in the year
187—, settled upon and since then by patent from the
United States government acquired title to, and he now
is the owner in fee simple of, the W. ½ of section 12,
township 28 S., range 14 E., in Lake County, Or., con-
taining 320 acres, and during all said times has been
in possession of said land.   That in the year 1876 plain-
tiff Conley diverted and appropriated from land of the
United States, and ever since and until the year 1895
has used of the waters of said Silver Creek, in irrigating
his said land, 320 inches of water, measured under six-
inch pressure, diverted and applied by means of dams
and ditches, and by such use of said water raised large
and valuable crops of grass and grain.   That at the time
of said appropriation all lands on said Silver Creek were
public lands belonging to the government of the United
States.   That since the year 1895, by reason of the acts
of the defendant S. A. D. Porter hereinafter complained
of, the supply of water in said Silver Creek has been
diminished, but that plaintiffs Hough and Conley have
each year used the waters of said stream in the irriga-
tion of their said land, to the extent of the supply of
water reaching their land.   That all of the lands of the
parties plaintiff are arid lands and require irrigation to
produce crops of value, and with irrigation produce and
will produce large and valuable agricultural crops, that
all said land can be irrigated from said Silver Creek, and
that one inch of water, measured under six-inch pres-
sure, is necessary per acre of said land to irrigate said
land and cause the same to produce agricultural crops,
during each of the months of May, June and July of
each year.   That in the year 1895 the defendant S. A. D.
Porter wrongfully constructed, and ever since has wrong-
fully maintained and still maintains, and threatens to
continue, a dam and head gate in the channel of said
Silver Creek, above the lands of plaintiffs, at or near the
S. E. corner of the S. W. ¼ of the S. W. ¼ of section 11,
township 28 S., range 14 E., in Lake County, Or.   That
said dam and head gate during the growing season for
agricultural crops diverts all the water of Silver Creek

from its natural channel, and the same is carried off
from said point of diversion in an easterly direction and
entirely prevented from running down onto the lands of
the parties plaintiff, and the plaintiffs are thereby de-
prived of the use of said water for irrigating purposes,
and plaintiffs' said lands are rendered worthless by rea-
son of the wrongful diversion of said water by defend-
ant S. A. D. Porter, as aforesaid, and that it is now the
proper season of the year to have the water of said creek
flow upon plaintiffs' lands, to grow grasses for hay, and
other crops, and unless the said diversion is prevented
by a temporary restraining order of this court, plaintiffs
will sustain great and irreparable loss in a total
failure of crops.    That the defendant Occidental Land &
Improvement Co. is a foreign private corporation, duly
organized and existing.    That defendants Isa M. Corum
and Jewell D. Corum are minors, aged 13 and 10 years,
respectively, and that no guardian has ever been ap-
pointed or is acting for them.    That all the defendants
have, or claim to have, some rights or interests in the
waters of Silver Creek, but that the exact nature or ex-
tent of said rights or claims of the defendants are to
plaintiffs unknown, and the interests, if any, of the de-
fendants, and each of them, are inferior to the rights of
plaintiffs in the waters of said stream.    Wherefore plain-
tiffs pray for a temporary order of injunction against
the defendant S. A. D. Porter, enjoining and restraining
him from obstructing the natural channel of said Silver
Creek, and from maintaining the dam or head gate here-
inbefore mentioned, and from in any manner diverting
the waters of said Silver Creek from its natural channel,
and thereby or otherwise preventing the waters from
running down said Silver Creek in its ancient way and
volume, and plaintiffs be decreed to have a prior right
and interest in the waters of said Silver Creek as against
the defendants, and each of them, and are entitled to
the flow of the waters of said creek to their said lands
and use of said waters, to the extent as follows, meas-
ured under six-inch pressure, that is to say: Annie C.
Hough, 280 inches; Mary J. Kittredge, 640 inches; Ma-
rion Conley, 320 inches; W. H. Hayes, 152 inches; John
Hayes, 160 inches; J. M. Hayes, 160 inches; A. G. Geyer,
160 inches; and W. H. McCall, 160 inches—of the waters
of Silver Creek.    That a guardian *ad litem* be appointed

for Isa Corum and Jewell D. Corum, to represent said minors in this suit; and that each of the defendants be required to set forth and show any rights or interests they may have in the waters of Silver Creek, and that upon the final determination of this suit said injunction be made perpetual. That plaintiffs have and recover their costs and disbursements herein, and have such other and further relief as to the court may appear equitable."

Answers were then filed by nearly all the defendants, substantially as follows:

S. A. D. Porter, after specifically denying the principal averments of the complaint, as an affirmative defense, in substance, avers: That the cause of suit did not accrue, as to any of the defendants, within ten (10) years from the commencement thereof. That at all times since May 7, 1889, he has been and is the owner in fee simple of the S. E. ¼ of section 11, township 28 S., range 14 E., W. M., containing 160 acres; also the S. ½ of the S. W. ¼ of section 11, in said township and range aforesaid, containing 80 acres; also the S. ½ of the N. E. ¼ of section 11, said township and range aforesaid, containing 80 acres, in Lake County, Oregon. That all these lands were valuable for agricultural purposes, and since the month of June, 1880, have been possessed, cultivated, occupied, used, and improved by defendant, from which he has annually harvested large and valuable crops, etc. That the lands through which Silver Creek, a natural stream, flows in well-defined banks and channels, are arid, and will not produce crops without irrigation. That in the month of March, 1881, defendant Porter entered upon the stream at a point about the center, on the south line of the south side of the S. W. ¼ of the S. W. ¼ of section 11, township 28 S., range 14 E., W. M., where the creek crosses the section line between sections 11 and 14, and built and placed a dam therein and constructed a ditch leading therefrom, upon the south side of the S. ½ of the S. W. ¼ of section 11, and on to the S. E. ¼ of the S. ½ of the N. E. ¼

of said section, in said township and range, by means of
which he diverted and appropriated, as prior appro-
priator, 100 inches of water, conducting the same to and
upon the lands described for irrigation and domestic and
stock purposes. That at all times since March, 1881,
until the service of the injunction herein, defendant con-
tinuously and uninterruptedly, and exclusively and with
knowledge to all, and adverse to the whole world, dur-
ing the irrigation season of each year, diverted and ap-
propriated and used upon his lands, through and by
means of the said ditch and dam, 100 inches of the
waters of Silver Creek. That for a more convenient and
proper irrigation of his land, in the month of April,
1895, he changed the point of diversion to a point about
200 yards below the dam and head gate, and constructed
a ditch leading thence on to the center of the S. ½ of the
S. W. ¼ of section 11, and thence on to the west side of
the S. E. ¼ of said section 11, connecting it with the
former ditch, from which he thereafter irrigated his
premises. That at the time of the diversions alluded to,
all the lands bordering upon the stream below defend-
ant's premises were public lands, and so continued up
to the time of the construction of his ditches named.
That ever since the year 1870, it has been and is the
general custom of the people in and upon and about Sil-
ver Creek and territory in the vicinity thereof to appro-
priate, divert and use, by means of dams and head gates
and ditches, all the waters of Silver Creek, and such cus-
tom is general and well recognized, used and followed
by the people in the locality and territory thereof, and
Silver Creek was and is an open public stream therefor.
"That he and his predecessors in interest herein during
the period of over 22 years and more next last past, and
openly, notoriously, peaceably, adversely, uninterrupt-
edly, exclusively, continuously, under a claim of right
thereto, with notice and knowledge to all, and everybody,
and adversely to the whole world, diverted and appro-

priated and used, as aforesaid, 100 inches, measured under a six-inch pressure, of the waters of Silver Creek, for the irrigation of his said lands and for a beneficial and useful purpose, and that such diversion and appropriation and use aforesaid of said quantity of water of said stream is and was necessary and proper therefor during all of said time." That each of the plaintiffs, specifically and separately naming them, has no interest or right in common with each other in the waters of Silver Creek. "That the plaintiff Annie C. Hough's husband, Wm. Hough, with said plaintiff's knowledge, approval, and acquiescence and connivance, together with plaintiff W. H. McCall, and defendant Geo. H. Small, during the year 1889, and in the year 1900, up to April 15, 1900, in concert, did connive, conspire and combine to cheat and defraud the defendant S. A. D. Porter out of his rights in and to the waters of Silver Creek, and that since the 15th day of April, 1900, and up to the present time, the said parties, conspirators, have and still are contriving unlawfully and conniving, conspiring, and combining unlawfully, deceitfully and wickedly, to deprive this defendant of the waters of Silver Creek to which he is lawfully and legally entitled, and his just and lawful right thereto and therein. That the said conspiracy, among other things, consisted in and as a part of said conspiracy, that the plaintiff Hough was to commence this suit, which was the direct result of such conspiracy aforesaid, and the said defendant Geo. H. Small, under and by virtue of said conspiracy and as a part thereof, was to and did turn the water off above, and they, the conspirators and others, would all testify and claim that S. A. D. Porter did and caused it, the diversion of the waters alleged; and said McCall was to help, and if they, the said conspirators, could by such unlawful means deprive the said defendant S. A. D. Porter of the water of Silver Creek, said Small was then to turn the waters down the creek so Hough would get water which

they were not entitled to, and then Hough and Small were to let McCall have water to which the said McCall was not entitled to, and thereby dry up this defendant's lands and drive this defendant out of the country, which the said conspirators have repeatedly threatened so to do. That if the party conspirators above named are allowed their dire way, it will ruin the defendant's lands and his home and this defendant. Wherefore, defendant demands judgment and decree: (1) That plaintiffs' said suit be dismissed, and that defendant go hence unharmed; (2) that the preliminary injunction heretofore issued herein upon the filing of this answer be dissolved; (3) for general relief, and for such other and further or other or further relief as may seem meet and equitable and as is usual in such cases; and (4) for general relief and for costs and disbursements of suit."

P. W. Jones answers, in substance, to the same effect as set out in the answer of S. A. D. Porter, except as to the description of lands and date of acquiring title thereto, and character and date of inception of water right. The description of the lands and date of acquiring title thereto is as follows: The E. ½ of the N. W. ¼, and lots 1, 2 and 3 of section 31, township 27 S., range 15 E., W. M., 155.42 acres; also, the S. ½ of the S. E. ¼, the S. E. ¼ of the S. W. ¼, and lots 3 and 4 of section 31, township 27 S., range 15 E., W. M., 169.15 acres. The lands are alleged to be riparian to Silver Creek, to which defendant's rights attached by settlement on the lands described, October 22, 1892, and the prayer is for the dismissal of the suit, and that defendant P. W. Jones be adjudged to have a reasonable use of the waters of Silver Creek, to an extent of five fourteenths of an inch per acre under a six-inch pressure, with costs, etc., and for general relief.

P. G. Chrisman and John C. Porter, by his guardian, Jas. C. Porter, demurred to the amended complaint, on the ground that it did not state facts sufficient to con-

stitute a cause of suit against either of the defendants named, and for the further reason that it is uncertain, in that it cannot be ascertained therefrom where or by what means the plaintiff Hough or plaintiff Conley, or either of them, diverted or appropriated the waters of Silver Creek, or the size or the capacity of the ditch or ditches, or the location thereof. The demurrer was overruled. An answer was filed by them, which, after the usual specific denials, avers: That the cause of suit did not accrue within ten years before the commencement thereof. That John C. Porter, since July 9, 1884, has been and is the owner of the S. ½ of the N. W. ¼ of section 24, and the N. E. ¼ of section 23, township 28 S., range 14 E., W. M., containing 320 acres of land, all of which is agricultural, arable, etc., and which he has cultivated at all times since July, 1884. That P. G. Chrisman now is the owner, and he and his grantors have been at all times the owners since 1884, of the W. ½ of the S. E. ¼ and the S. E. ¼ of the S. W. ¼, and all that part of the N. E. ¼ of the S. W. ¼, except the tract upon which the town of Silver Lake is situated, section 22, township 28 S., range 14 E., W. M., containing about 140 acres of land, all of which is agricultural, requiring irrigation, etc. That all of the lands of the defendants described are arid, and during the months of May, June, July, August, September and October of each year, require irrigation in order to produce crops thereon. That Silver Creek is a natural stream of water flowing through defendants' lands in well-defined banks and channels. That in the year 1885, defendants John C. Porter and P. G. Chrisman, at a point above their lands, and by means of dams and ditches, diverted and appropriated 218 inches of water therefrom to and upon the lands described as belonging to them, for the irrigation thereof and for domestic uses. That their use of the water has been continuous since the date named, and in accordance with a general custom which, ever since the

year 1870, has been and is in force among the people in and around Silver Creek, under which it was usual to appropriate, divert, and use the water, by means of dams, head gates and ditches, etc. That none of the plaintiffs have any interest in common with each other in the waters of Silver Creek. "That they and their predecessors in interest herein during the period of over 17 years and more next last past, and openly, notoriously, peaceably, adversely, uninterruptedly, exclusively, continuously, under a claim of right thereto, with notice and knowledge to all, and everybody, and adversely to the whole world, diverted and appropriated and used, as aforesaid, 218 inches, measured under a six-inch pressure, of the waters of Silver Creek, for the irrigation of their said lands, and for a beneficial and useful purpose, and that such diversion and appropriation and use as aforesaid of said quantity of water of said stream is and was necessary and proper therefor during all of said time. Wherefore defendants demand judgment and decree: (1) That plaintiffs' said suit be dismissed, and that defendants go hence unharmed; (2) that said defendants be adjudged to have a right to divert, appropriate and use 218 inches, measured under a six-inch pressure, of the waters of Silver Creek, through and by means of the dam and ditches described in this answer; (3) for general relief, and for such other and further or other or further relief as may seem meet and equitable and as is usual in such cases; and (4) for general relief, and for costs and disbursements of suit."

George H. Small, in his answer, after the usual specific denials for affirmative defenses alleges: That for more than ten years prior to the commencement of the suit he has been and is the owner and in possession of the E. $\frac{1}{2}$ of section 9, the S. $\frac{1}{2}$ and the N. W. $\frac{1}{4}$ of section 10, the W. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ and the N. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$, and the N. E. $\frac{1}{4}$ of the S. W. $\frac{1}{4}$, and the S. W. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of section 11, all of section 15 except the S. W.

¼ of the N. W. ¼, the N. ½ of the N. E. ¼ of section
16, and the N. E. ¼ and the E. ½ of the N. W. ¼ of
section 22, all in township 28 S., range 14 E., W. M.
That the lands described were arid, requiring irrigation,
and that Silver Creek is a natural stream of water flow-
ing through the same in well-defined banks and chan-
nels. "That more than 10 years prior to the commence-
ment of this suit, and while all of the lands upon said
Silver Creek were owned by the United States or the
State of Oregon, this defendant appropriated from the
said lands of the United States and the State of Oregon
and diverted and carried away from said Silver
Creek 800 inches of the waters of said stream (com-
puted by miner's measurement under a six-inch pres-
sure), by means of dams and ditches, and carried the
same to and upon his said lands, and during all of said
time has used all of said water in irrigating said lands,
and has so used, occupied and possessed said 800 inches
of water in an open, notorious, conspicuous and contin-
uous manner, during all of said time, claiming to own
the same as against all the world, and that all of said
water is and was necessary for the successful irrigation
of said lands so as to cause crops to grow and mature
thereon. That the diversion, use and appropriation of
said water by the defendant, as aforesaid, was made
long prior to any use, diversion or appropriation of any
of the waters of said stream by either or any of the plain-
tiffs or defendants, and long prior to any ownership or
occupation of any of the lands upon said stream by
either or any of the plaintiffs or defendants or their
grantors. Wherefore the defendant prays that it be de-
creed herein that this defendant is the absolute owner
of 800 inches, miner's measurement under a six-inch
pressure, of the waters of said Silver Creek; that this
defendant have judgment for his costs and disburse-
ments herein; and for such other and further relief as
to the court may seem just and equitable."

B. F. Lane and Jennie Lane, after the usual specific
denials, aver: That the cause of suit in favor of each of
the plaintiffs did not accrue within ten years before the
commencement of this suit. That B. F. Lane and Jennie
Lane, husband and wife, and B. F. Lane is the owner,
and has been since March, 1890, of the N. E. ¼ of sec-
tion 18, township 28 S., range 15 E., W. M., containing
160 acres; and, also, the E. ½ and lots 1 and 2 of the
N. W. ¼ of section 18, township 28 S., range 15 E., W.
M., containing 159.96 acres of agricultural land, requir-
ing irrigation to make it productive. That from and
after March, 1890, defendant has possessed, cultivated,
occupied, used and improved all of said lands, and during
all the time since has harvested annually therefrom large
and valuable crops, etc. That the irrigation season in the
vicinity of the land is from April to October, inclusive,
during which time irrigation is necessary to the produc-
tiveness of said premises. That the lands described are
situated upon Bunyard Branch of Silver Creek, upon
which they are riparian owners. That the branch re-
ferred to, having flowed in well-defined channels through
the premises described, from time immemorial, and by
reason of the natural flow, seepage and percolation of
the Bunyard Branch through its lands, they are irri-
gated, moistened, made fertile and valuable, and defend-
ants are entitled to a reasonable use of the waters of
said stream by reason of their riparian ownership of the
lands described, and need the waters thereof for irriga-
tion and "stock water." That four fifteenths of an inch,
measured under a six-inch pressure, is necessary per
acre for such irrigation; the same being a reasonable
and necessary amount thereof. That each of the plain-
tiffs have no interest in common with the other in
the subject-matter of the suit. A decree is demanded:
(1) That the suit be dismissed; (2) that defendants be
adjudged a reasonable use of the waters of Silver Creek
to an extent of four fifteenths of an inch of water per

acre; and (3) for general relief, such as may be deemed equitable, etc.

Lucinda Egli, after the usual denials and averments in reference to the character of the land that requires irrigation, etc., alleges: "That for more than ten years prior to the commencement of this suit defendant and her grantors have been the owners and in possession of the following described real estate: The S. W. ¼ of section 28, and the E. ½ of the S. E. ¼ of section 29, and the S. ½ of the N. W. ¼ and the N. W. ¼ of the S. W. ¼, and the N. W. ¼ of the N. W. ¼ of section 33, all in township 28 S., range 14 E., W. M. That more than ten years prior to the commencement of this suit, while all the lands above defendant and all the lands claimed by the plaintiffs were government lands or belonging to the State of Oregon, the defendant appropriated from the said lands of the United States and the State of Oregon, and diverted and carried away from said stream, about 200 inches, miner's measurement, under a six-inch pressure, of the waters of said stream by means of dams and ditches, and carried the same to and upon defendant's said lands, and there used the same and all thereof for the purposes of irrigation, and has continued to so use all of said water openly, notoriously, continuously during all of said time, claiming the right so to do as against all the world without interruption or protest from any one, and all of the said water was and is necessary for said purposes. That said diversion and use of said water by the defendant was made prior to any diversion or use of the waters of said Silver Creek by any of the plaintiffs or defendants or their grantors or predecessors in interest. Wherefore the defendant prays that it be decreed herein that this defendant is the absolute owner of 200 inches of water of said Silver Creek, miner's measurement, under a six-inch pressure; that this defendant have judgment for her costs; and for such other and further relief as to the court seems just and right."

John C. Porter, by his guardian, Jas. C. Porter, after the overruling of a demurrer to the complaint, answered, in substance, the same as S. A. D. Porter, and for an affirmative defense alleges that on December 6, 1900, in Lake County, Oregon, John C. Porter was adjudged insane, and Jas. C. Porter appointed his guardian; that John C. Porter is the owner, and he and his grantors since April, 1873, have owned the N. ½ of section 14, township 28 S., range 14 E., W. M., containing 320 acres of land; that at all times since April, 1874, he and his grantors have cultivated, occupied and improved the lands described, annually harvesting large crops therefrom by means of irrigation, without which the lands would be worthless; that the lands described are riparian to Silver Creek and Bunyard Branch thereof; that Bunyard Branch, when unobstructed, flows in its natural channel through his land and naturally irrigates the same, and from time immemorial has, in well-defined banks and channels, flowed through his premises and by reason of such natural flow, seepage and percolation, has irrigated the greater portion of the lands described; that defendant uses and needs the waters of said stream for irrigation and stock water, and four fifteenths of an inch of water per acre, measured under a six-inch pressure, is necessary and reasonable for the irrigation of the said lands; that at all times, except when interrupted by dams and head gates and ditches leading therefrom and placed therein by defendant and his grantors for the purpose of irrigation upon the premises, the waters of Silver Creek and branches, in their natural channels, flow upon the premises described, by reason of which seepage and percolation the dams, head gates and ditches leading therefrom irrigate, moisten and make fertile and valuable a large portion of defendant's land, and all of which are necessary for irrigation, to the extent of four-fifteenths of an inch per acre, and that none of the plaintiffs have any interest or right in common with

each other.   A decree is demanded:  (1) That the suit be
dismissed;  (2) that defendant be adjudged to have a rea-
sonable use of the waters of the main branch of Silver
Creek, to the extent of four fifteenths of an inch of water
per acre;  (3) that defendant be adjudged a reasonable
use of the waters of Bunyard Branch in the same amount;
(4) for general relief, such as may be deemed equitable,
etc.;  (5) that it be adjudged and decreed that Silver
Creek divides as alleged, and forms what is known as the
Main Branch and Bunyard Branch, and that Bunyard
Branch has at all times flowed and now flows one third
of the waters of Silver Creek, and that it be permitted to
continue in the same proportion without interruption or
diminution in the proportions averred.

F. M. Chrisman, after the usual denials, as an affirma-
tive defense, avers: That the cause of suit in favor of each
of the plaintiffs did not accrue within ten years before
the commencement thereof; that at all times since Feb-
ruary 21, 1890, defendant has been and is the owner of
the S. E. ¼ of section 12, township 28 S., range 14
E., W. M., containing 160 acres of land, all of which are
agricultural in character and required irrigation to make
them productive, and are situated on the banks of, and
are riparian to, Bunyard Branch of Silver Creek, and dur-
ing the months of from April to October, inclusive, are
necessary for the irrigation of the lands described; that
none of the plaintiffs have any interest or right in com-
mon with each other in or to the waters of Silver Creek,
or its branches.   A decree is demanded that the suit be
dismissed, that defendant be adjudged to have a reason-
able use of the waters of Silver Creek, to an extent of
four fifteenths of an inch per acre, and for general relief.

Mary C. Brown, after the usual denials, complains that
the cause of suit did not accrue within ten years before
the commencement thereof; that at all times since No-
vember 21, 1892, defendant has been and is the owner of
the S. E. ¼ of section 31, township 27 S., range 15

E., W. M., containing 160 acres of land, all of which is valuable agricultural land, arid in character, and requiring irrigation from April to October of each year to make the lands productive, which lands are situated upon, and riparian to, Silver Creek; and that none of the plaintiffs have any interest or right in common with each other to the waters of said stream; and prays for a decree, to the effect that the suit be dismissed, that defendant be awarded, as a reasonable use of the waters of the stream, five fourteenths of an inch of water per acre, and for general relief.

C. C. Jackson, after the usual denials, says: That the cause of suit did not accrue within ten years before its commencement; that he at all times since the year 1886 was, has been and is the owner of the N. E. ¼ of section 12, township 28 S., range 14 E., W. M., containing 160 acres of land, all of which is valuable agricultural land, requiring irrigation during the months of April to October of each year to make them productive; that it is situated upon, and riparian to, Conley Branch of Silver Creek, the seepage and percolation from which serves to irrigate, moisten and make fertile and valuable the greater portion of the lands named, and by reason of which defendant is entitled to a reasonable use of the waters of the stream for irrigation and domestic purposes, to the extent of four fifteenths of an inch per acre; and that none of the plaintiffs have any interest or right in common with each other to the waters of Silver Creek or its branches. A decree is asked for dismissal of the suit, and that defendant be awarded four fifteenths of an inch of water per acre, and for general relief.

C. E. McKune, for answer, after the usual denials, alleges: That the cause of suit did not accrue within ten years before its commencement; that at all times since February 28, 1900, defendant has been and is the owner of the N. E. ¼ of section 31, township 27 S., range 14 E., W. M., containing 160 acres, all of which are agri-

cultural lands, arid in character, and requiring irrigation to make them productive, and are situated upon, and riparian to, Silver Creek, which stream naturally irrigates portions of the lands named, and by reason of such natural flow, seepage and percolation, the greater portion thereof are irrigated and made fertile and valuable, for which defendant is entitled to a reasonable use of the waters of the stream by reason of his riparian ownership, to the extent of five fourteenths of an inch of water per acre; that none of the plaintiffs have any interest or right in common with respect to each other in respect to the subject-matter of the suit; and asks for a decree to the effect that the suit be dismissed, and defendant be awarded five fourteenths of an inch of water per acre, and for general relief.

The Occidental Land & Improvement Co., for answer, after the usual denials, alleges: That the cause of suit in favor of plaintiffs did not accrue within ten years before its commencement. That defendant is a corporation, and at all times since the year 1874 defendant and its grantors have been and are the owners of certain lands in Lake County, Oregon, particularly described as follows: First tract, No. 1, to wit: The S. ½ of the N. ½, S. ½ of section 16; the N. ½, N. ½ of the S. ½, and the S. ½ of the S. W. ¼ of section 21; the W. ½ of the N. W. ¼, section 22, and the S. ½ of the N. E. ¼, the N. W. ¼ of the S. E. ¼, and the N. E. ¼ of the S. W. ¼ of section 20—all in township 28 S., range 14 E., W. M., containing 1,320 acres. And the second tract, No. 2, to wit: The N. ½ and the N. ½ of the S. ½ of section 2, in township 28 S., range 14 E., W. M.; the S. ½ of the S. ½, the N. E. ¼ of the S. E. ¼, and the E. ½ of the N. E. ¼ of section 35; the S. E. ¼ of the S. E. ¼ of section 34; and the S. ½ of the S. E. ¼, section 26—all in township 27 S., range 14 E., W. M., containing 880 acres of land. That all the lands described are agricultural in character, requiring irrigation to make them productive, and since

the year 1874 they have been cultivated, occupied, used and improved, and crops annually harvested therefrom, and require irrigation from April to October of each year to make them productive. That the lands are situated upon, and riparian to, Silver Creek. That in the year 1875 the defendant corporation's grantors diverted and appropriated, and at all times since have appropriated and used of the waters of Silver Creek in the irrigation of the portion of lands described in tract No. 1, not naturally irrigated by said stream, 586 inches, under a six-inch pressure, by means of dams and ditches, by the use of which valuable crops have been produced thereon, and at the time of the appropriation referred to, all the lands on Silver Creek were public lands belonging to the government of the United States and to the State of Oregon. That none of the plaintiffs have any interest or right in common to the waters of Silver Creek with all or any of the other plaintiffs. A decree is demanded to the effect that the suit be dismissed; that defendant corporation be adjudged a reasonable use of the waters of Silver Creek to the extent of eight fourteenths of an inch of water per acre on all the lands possessed by it; and that the right to the use of the water to the extent named be decreed superior to any right or claim by defendants or either of them, and for such general relief as may be deemed just and equitable, etc.

E. K. Henderson, after the usual denials, alleges: That for more than ten years prior to the commencement of the suit defendant has been and is the owner and in possession of all of section 1, township 28 S., range 14 E., except the S. W. ¼ of the S. W. ¼, all of sections 6 and 7, and the W. ½ of section 8, and lots 1, 2, 3, 8 and 9, in section 17, township 28 S., range 15 E., W. M., all of which lands are meadow and grass lands and arid in character, requiring irrigation to make them productive, and are situated upon, and riparian to, Silver Creek, requiring one inch of water per acre, miner's measurement, for the

proper irrigation thereof, for which a decree is demanded that defendant be decreed and entitled to the use of 2,350 miners' inches of the waters of Silver Creek for the use of the lands described, and for general relief.

Geo. Durand, for answer, after the usual denials, admits the "acts of the defendant S. A. D. Porter as alleged in the complaint, and the effect thereof," and avers that for more than ten years prior to the commencement of this suit defendant and his grantors have been the owners, and in possession, of the S. E. ¼ of the S. W. ¼ of section 18, and the N. ½ of the N. W. ¼, and the S. W. ¼ of the N. W. ¼, and the S. W. ¼ and the S. ½ of the S. E. ¼ of section 19, and the N. E. ¼ and the E. ½ of the N. W. ¼ of section 30, in township 30 S., range 14 E., W. M., all of which lands are agricultural in character, requiring irrigation to make them productive, etc., and are situated upon, and riparian to, Silver Creek; that more than ten years prior to the commencement of this suit, when all the lands bordering upon the stream were the property of the United States and of the State of Oregon, defendant appropriated and diverted from Silver Creek, for the irrigation of the premises, 250 inches of water, and has continued so to use all of that amount openly, notoriously and continuously, without interruption, claiming the right to do so as against all the world; that the use thereof was necessary for irrigation purposes, and was made prior to any diversion or use of any of the waters of the stream by any of the plaintiffs or defendants or their grantors or predecessors in interest. And demands a decree to the effect that he is the absolute owner of 250 inches of the waters of Silver Creek, and for general relief.

E. D. Lutz, for answer, after the usual denials, avers that he is the owner of the E. ½ of the N. E. ¼, and the W. ½ of the N. E. ¼, and the E. ½ of the N. W. ¼ of section 15, township 28 S., range 14 E., W. M., and the N. E. ¼ of section 10, township 28 S., range 14 E., W. M.,

all in Lake County, Oregon, containing 400 acres of land, and has been such owner at all times since 1890; that the lands described are arid in character, requiring irrigation to make them productive, and are situated upon, and riparian to, Silver Creek; that defendant and his grantors, by means of dams and ditches, have diverted, used and appropriated large quantities of water from Silver Creek in the irrigation of the premises described for more than fifteen years next before the commencement of this suit. And demands a decree to the effect that he be adjudged to have the right to take from the stream a sufficient quantity of water for the irrigation of his land, and for general relief.

Walter C. Buick, Corinna Buick, Lulu Corum La Brie, Isa M. Corum, a minor, by L. F. Conn, guardian *ad litem,* Jewell D. Corum, a minor, by L. F. Conn, guardian *ad litem,* and J. M. Small, after the usual denials, in substance aver: That at all times since the —— day of ——, 1884, Walter C. Buick and his grantors have been the owners and in possession of and entitled to the possession of the S. W. ¼ of section 14, township 28 S., range 14 E., W. M., which are naturally dry and arid lands, and, without artificial irrigation, are unproductive. That the remainder of the lands, viz., the N. W. ¼ of the S. W. ¼, and the N. ½ of the N. E. ¼ of the S. W. ¼ of said section 14, are meadow lands, but of such character that a flow of one inch of water per acre is necessary for the proper irrigation thereof, requiring 160 inches to irrigate the entire premises during the months of May, June and July, which amount is a reasonable use for the purposes named. That for more than ten years prior to the commencement of the suit, while all the lands on Silver Creek and its various branches were owned by the United States and the State of Oregon, defendant Buick and his grantors, by means of dams, ditches, etc., diverted and appropriated from Silver Creek 250 inches of the waters of the stream to and upon said lands, and during all of

the time mentioned have so used, occupied and possessed 250 inches thereof in an open, notorious, conspicuous and continuous manner, claiming to own the same against the world, all of which was and is necessary for the successful irrigation of the property described, and all of which diversion, use and appropriation by defendant and his grantors were made prior to any use, diversion or appropriation thereof by either or any of the plaintiffs or defendants, and prior to any ownership or occupancy of any lands on the stream by either or any of the plaintiffs or defendants and their grantors, except the defendants Corinna Buick, Lulu Corum La Brie, Isa M. Corum and Jewell D. Corum, and their grantors, and the defendant J. M. Small and his grantors; they and each of them and their grantors having appropriated and diverted, in conjunction and simultaneously with this defendant and his grantors, certain of the waters of said stream. That such use of all the water by defendant Walter C. Buick and his grantors has been uninterrupted and exclusive and adverse to all the world all of said time. That at all times since 1884 defendant Corinna Buick and her grantors have been the owners, and in possession and entitled to the possession, of the S. E. 1/4 of section 14, township 28 S., range 14 E., W. M., all of which, except the N. 1/2 of the N. 1/2 of the S. E. 1/4 of said section 14, are naturally meadow lands, but of such character as to be unproductive and unprofitable without irrigation, and all the lands mentioned are situated upon, and riparian to, Silver Creek, and require one inch per acre of the waters thereof for their proper irrigation, making necessary, in the aggregate, 160 inches during the months of May, June and July of each year for their proper irrigation. That for more than ten years prior to the commencement of the suit, and while all the lands on Silver Creek and its various branches were public lands of the United States or property of the State of Oregon, defendant Corinna

Buick and her grantors diverted and appropriated from the stream at a point above their premises, by means of dams, ditches, etc., to and upon the property described, and during all of the time mentioned she and her grantors have used all of the waters in the irrigation thereof and have so used, occupied and possessed 250 inches of water in an open, notorious, conspicuous and continuous manner, during all of said period. and claiming to own the same as against the world, and that all is necessary for the successful irrigation of said lands to the growing and maturing of crops thereon. That all of the diversion and appropriation was prior to that of the diversion of any of the waters of Silver Creek by either or any of the plaintiffs or defendants, and long prior to any ownership or occupancy of any other lands upon the stream by either or any of the defendants or their grantors, excepting the defendants Walter C. Buick, Isa M. Corum, Lulu Corum La Brie, Jewell D. Corum and J. M. Small, and their grantors, and they and each of their grantors have appropriated and diverted, in conjunction and simultaneously with this defendant and her grantors, certain of the waters of said stream, and such use of all the waters by defendant Corinna Buick and her grantors has been uninterrupted, exclusive and adverse to all the world during all of said time. That Isa M. Corum, Jewell D. Corum and Lulu Corum La Brie are tenants in common and joint owners of the W. ½, and the N. ½ of the N. E. ¼ of section 13, and the N. ½ of the N. E. ¼ of section 24, township 28 S., range 14 E., W. M., and they and their grantors at all times since the —— day of ——, 1884, have been the owners of said premises. This is followed by similar averments to those contained in the answer of Walter Buick and Corinna Buick, except that they claim in the aggregate 480 inches, miner's measurement, of the waters of the stream for the irrigation of the premises, during the months of May, June and July, and ten years' adverse possession to the use of 250 inches of

the waters of the stream, and that their diversion and use and appropriation is prior to that of any of the plaintiffs or defendants, except Walter Buick, Corinna Buick and J. M. Small, as to whom it is averred the appropriation and diversion was made in conjunction and simultaneously. That J. M. Small and his grantors have been the owners and in possession at all times since the —— day of ——, 1884, of the S. ½ of the N. E. ¼, and the S. E. ¼ of section 13, and the N. ½ of the N. E. ¼, and the S. E. ¼ of the N. E. ¼ of section 24, township 28 S., range 14 E., W. M., and the S. W. ¼ of section 18, and the N. W. ¼ of section 19, township 28 S., range 15 E., W. M., all of which lands are agricultural in character and situated upon the channels of Silver Creek and its branches, as to which they are riparian and require one inch of water per acre under six-inch pressure for the proper irrigation therof, during the months of May, June and July of each year. This is followed by an allegation of ten years' adverse possession to the extent of 250 inches of the waters of said stream; that the use, appropriation and diversion thereof is prior in time and superior in right to the plaintiffs or defendants, and long prior to any ownership or occupancy of any of the lands upon said stream by either or any of the plaintiffs or defendants or their grantors, except Walter C. Buick, Corinna Buick, Isa M. Corum, Lulu Corum La Brie and Jewell D. Corum and their grantors, whose appropriation is alleged to have been made in conjunction and simultaneous with that of J. M. Small. A decree is demanded by each of the defendants to the effect that they be awarded a prior right and interest in the waters of Silver Creek as against plaintiffs and all of the other defendants and each of them to the flow of the waters of Silver Creek to their lands, as follows: To Corinna Buick, 250 inches; Isa M. Corum, Lulu Corum La Brie, Jewell D. Corum, as tenants in common and as prior appropriators, 250 inches; J. M. Small, as prior appropriator, 250 inches;

Walter C. Buick, as riparian proprietor, 160 inches; defendant Corinna Buick, as riparian proprietor, 160 inches; defendants Isa M. Corum, Lulu Corum La Brie and Jewell D. Corum, as tenants in common and as riparian proprietors, 480 inches; defendant J. M. Small, as riparian proprietor, 680 inches, of the waters of Silver Creek and its branches.

To each of the answers of the several parties named, plaintiffs filed a reply, and as between themselves defendants proceeded as follows:

Geo. H. Small, for answer to the affirmative matter contained in the answer of S. A. D. Porter, admits that in the year 1895 S. A. D. Porter constructed a dam in the channel of Silver Creek at the point claimed, by which he conducted water from the stream upon the S. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of section 11, but denies that it was constructed for a more convenient or any use of the water which had been theretofore appropriated by him, or that it constituted a change in the point of diversion which had been previously made, and denies that he at all times since the year 1881, or at any time except since 1895, diverted or appropriated or used, adversely or otherwise, upon his lands or otherwise through said or any ditches, 100, or any other number of, inches of the waters of the stream, and denies specifically the other affirmative allegations of the answer, and demands the same affirmative relief as in his "first' original answer."

E. K. Henderson and Lucinda Egli, for answer to the affirmative averments in the answers of S. A. D. Porter to the amended complaint, plead, in effect, and ask the same relief as in the answer thereto of Geo. H. Small.

Geo. H. Small, Geo. Durand, Lucinda Egli and E. K. Henderson, for answer to the affirmative averments of the answer to P. G. Chrisman and Jno. C. Porter, deny the affirmative averments therein.

S. A. D. Porter, for response to the affirmative matter in the answer of Geo. H. Small, denies all the allegations,

except to admit that at the time of the commencement of the original suit in May, 1900, Small had diverted from the main channels of Silver Creek all the waters thereof, and was then diverting and conveying the same from defendant's lands, and at the time of the commencement of the suit, and for more than one month prior thereto, Small had been entirely depriving defendant of all the waters of the stream, and that during a period of five years immediately prior thereto, Geo. H. Small had at various times diverted large quantities of water from the stream by means of dams and ditches, but denies that any such diversion has been continuous, uninterrupted, or that at the time of any diversion or appropriation of the waters of Silver Creek by him all the lands bordering upon the stream were public lands or the property of the State of Oregon, or that any appropriation or diversion by defendant was prior to the occupation or possession of the lands occupied by defendant along Silver Creek, and prays that Geo. H. Small take nothing by reason of the separate allegations of his answer.

P. W. Jones, P. G. Chrisman, John C. Porter, by his guardian Jas. C. Porter, B. F. Lane and Jennie Lane, F. M. Chrisman, Mary C. Brown, C. C. Jackson, C. E. McKune, Occidental Land & Improvement Co. and E. D. Lutz, for response to the affirmative averments in the answer of Geo. H. Small, on information and belief, specifically denied them.

Geo. H. Small, Lucinda Egli, E. K. Henderson and Geo. Durand answer the affirmative averments in the answer of B. F. Lane and Jennie Lane, and, after denial thereof, allege "that the stream or channel designated as 'Bunyard Branch' is an artificial channel and was first constructed about nine years ago, when it was a very small ditch conveying a small amount of water, and since said date, by artificial means and by the flow of water through the said channel, it has become greatly enlarged so that the said 'Bunyard Branch' now carries about five times as much

51 OR.— 12

water as it did when it was first built," and pray that it be decreed that B. F. Lane and Jennie Lane have no interest in the waters of said stream, and pray for the relief demanded in their first answer.

B. F. Lane and Jennie Lane move to strike out the separate and several answers of defendants Geo. H. Small and Lucinda Egli to their answer to the amended complaint, as unauthorized by law or the rules of practice in equity, and as sham, frivolous and irrelevant, and filed their separate and several demurrers to the same answer, on the grounds: "(1) That such 'does not state facts sufficient to constitute any cause of suit against the defendants B. F. Lane and Jennie Lane'; (2) that it 'does not state facts sufficient to constitute a defense to the affirmative matter set out in the answer of said B. F. Lane and Jennie Lane'; (3) that it 'does not state facts sufficient to constitute any cause of counterclaim or owner's complaint against the defendants B. F. Lane and Jennie Lane'; and (4) that 'it now appears upon the face of the complaint, and upon the answer of the defendants B. F. Lane and Jennie Lane, and the answer of the defendant * * and the further and separate answer of B. F. Lane and Jennie Lane, that there is a misjoinder of parties defendant, as well as a misjoinder of parties plaintiff, and that the defendant * * cannot obtain relief against these defendants in this suit.' "  The motions and demurrers were overruled.

S. A. D. Porter, F. M. Chrisman, C. C. Jackson, B. F. Lane and Jennie Lane, Jno. C. Porter, by his guardian Jas. C. Porter, Mary C. Brown, C. E. McKune, E. D. Lutz, P. W. Jones, Occidental Land & Improvement Co., a corporation, and P. G. Chrisman, responding to the affirmative averments in the answer of Lucinda Egli, specifically denied the material portions thereof.

Geo. H. Small, Geo. Durand, Lucinda Egli and E. K. Henderson, for response to John C. Porter's answer, specifically denied the material averments.

Geo. H. Small, Lucinda Egli, E. K. Henderson and Geo. Durand specifically denied the affirmative averments in the answer of F. M. Chrisman, which answer Chrisman moved to strike out as sham, frivolous and irrelevant, also demurring on the grounds that they did not state sufficient facts to constitute a cause of suit or counterclaim against him, and as showing a misjoinder of parties defendant, which the court overruled.

Geo. H. Small, Lucinda Egli, E. K. Henderson and Geo. Durand responded to the affirmative averments in the answer of Mary C. Brown, specifically denying the material portions thereof, as to which motion a demurrer was filed, the same as by F. M. Chrisman, and overruled by the court, and separate answers were filed by the same parties to the affirmative averments in the answer of C. C. Jackson, specifically denying the material portions of his answer, to which Jackson demurred, and the demurrer was overruled. The same parties answered and denied specifically the averments in the answer of C. E. McKune, which was unsuccessfully attacked by a motion and demurrer.

Walter C. Buick, Corinna Buick, Lulu Corum La Brie, Isa M. Corum by her guardian *ad litem* L. F. Conn, Jewell D. Corum by her guardian *ad litem* L. F. Conn, and J. M. Small filed their separate and several answers, and the defendants Geo. H. Small, Geo. Durand, Lucinda Egli, E. K. Henderson, S. A. D. Porter, B. F. Lane and Jennie Lane, P. G. Chrisman, Jno. C. Porter by his guardian Jas. C. Porter, F. M. Chrisman, P. W. Jones, Mary C. Brown, C. E. McKune, C. C. Jackson, Occidental Land & Improvement Co., a corporation, and E. D. Lutz jointly answered, specifically denying each of the averments, and putting in issue all of the new matter set up in each of the answers of defendants Geo. H. Small, Lucinda Egli, E. K. Henderson and Geo. Durand, to the answer of the Occidental Land & Improvement Co., specifically denying each of its material averments.

S. A. D. Porter, F. M. Chrisman, C. C. Jackson, John C. Porter by his guardian Jas. C. Porter, Mary C. Brown, C. E. McKune, E. D. Lutz, P. W. Jones, Occidental Land & Improvement Co., a corporation, Jno. C. Porter and P. G. Chrisman specifically denied the affirmative matter in the answer of defendant Geo. Durand.

Defendants Geo. H. Small, Lucinda Egli, E. K. Henderson and Geo. Durand also specifically denied the affirmative averments of the answer of E. D. Lutz.

On October 20, 1902, defendants Geo. Durand, Geo. H. Small, Lucinda Egli, E. K. Henderson, F. M. Chrisman, C. C. Jackson, B. F. Lane and Jennie Lane filed a written stipulation as to the intention and effect of certain pleadings, as follows: "Be it remembered that it is hereby stipulated and agreed by and between counsel, A. S. Hammond, appearing for defendants George Durand, George H. Small, Lucinda Egli and E. K. Henderson; and counsel W. J. Moore and Spencer & Raker, appearing as counsel for defendants F. M. Chrisman, C. C. Jackson, B. F. Lane and Jennie Lane: That each and all of the statements and paragraphs set out in each one and all of the answers filed or presented by said attorney A. S. Hammond for each or either of said defendants, stating or alleging to the effect that the stream or channel described as the 'Bunyard Branch' is an artificial channel, and was constructed about nine years ago, and to the effect that the so-called 'Conley Branch' is not a natural stream of water, but was caused by cutting a ditch, shall be taken, considered and treated only as denials, and not as allegations of new matter calling for a denial or reply."

On October 24, 1904, judgment by default for want of answer or other appearance was taken as to L. Heusmand, Morris Ranner, John Partin, Jr., L. P. Klippel, Emil Egli, Henry Egli, Martie Ward, Angeline West, Mary Small, Jas. M. Martin, J. M. Sherer, Maude Small, J. Hall, C. D. Buick, R. E. Smith, J. A. Smith, J. C. Harrow and F. F. McCarty. A voluntary nonsuit was taken

as to A. C. Geyer, John Hayes and J. M. Hayes. The
testimony was taken on the foregoing issues upon which,
with the testimony first taken, the cause was submitted to
the court, and a decree rendered, which, omitting formal
parts, is as follows:

"It is hereby ordered, adjudged, and decreed:

That the defendant S. A. D. Porter be and he is hereby
perpetually enjoined from in any manner diverting or
interfering with the flow in said Silver Creek of the
amount of water which this decree grants to the plaintiff
Annie C. Hough.

That the said plaintiff Annie C. Hough is the owner
in fee simple of the following described lands, to wit:
The S. ½ of the S. ½ of section 2, the N. ½ of the
N. E. ¼ and the N. E. ¼ of the N. W. ¼ of section 11,
the S. W. ¼ of the S. W. ¼ of section 1, township 28 S.,
range 14 E., W. M., in Lake County, Or., containing 320
acres of land, in Lake County, Or. That Silver Creek, in
Lake County, Or., flows to and upon said lands; that
said lands are riparian thereto; that the predecessor in
interest of plaintiff Annie C. Hough, in the year 1878,
appropriated, and said Annie C. Hough and her prede-
cessors in interest in said land have ever since used, 240
inches of the water of Silver Creek, measured under six-
inch pressure, and the same was and is a reasonable and
necessary use of said water, for the irrigation of said
land, and her right to the use of said water is superior
and prior to the rights of all others in said stream, save
the rights as herein decreed to George H. Small and
Lucinda Egli.

That the plaintiff Mary J. Kittredge is the owner in fee
simple of the following described lands, to wit: All of sec-
tion 36, township 27 S., range 14 E., containing 640 acres
of land, in Lake County, Or. That Silver Creek, in Lake
County, Or., flows to and upon said lands; that said
lands are riparian thereto; that the said Mary J. Kit-
tredge, as such riparian owner, is entitled to the use of
480 inches of the waters of said Silver Creek, measured
as aforesaid, as a reasonably necessary use of the water
for the irrigation of her said lands; said plaintiff's right
to the use thereof being subsequent and inferior to the
right of the defendants S. A. D. Porter, George H. Small,
and plaintiffs Annie C. Hough and Marion Conley, to the

use to the extent granted in this decree of the said waters of said Silver Creek, measured in like manner.

That the plaintiff Marion Conley is the owner in fee simple of the following described lands, to wit: The W. ½ of section 12, township 28 S., range 14 E., W. M., containing 320 acres of land, in Lake County, Or. That in the year 1880, said plaintiff appropriated and has ever since used 250 inches of the waters of said Silver Creek, measured as aforesaid; that said Marion Conley, as such appropriator, is entitled to the use of 250 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said lands, aforesaid; but that said plaintiff's right to the use is subsequent and inferior to the uses, to the extent granted by this decree, of plaintiff Annie C. Hough, defendants George H. Small, Lucinda Egli, John C. Porter, and the Occidental Land & Improvement Co.; that said water has been and should be diverted through what is known as the 'Conley Ditch.'

That the plaintiff W. H. McCall is the owner in fee simple of the following described lands, to wit: The E. ½ of the E. ½ of section 3, township 28 S., range 14 E., W. M., containing 160.04 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon said lands; that 120 acres of said lands are riparian thereto; that the said W. H. McCall, as such riparian owner, is entitled to the use of 60 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said waters for the irrigation of his said lands; that said use is subsequent and inferior to all of the appropriations herein set out, to the extent granted by this decree.

That the defendant S. A. D. Porter is the owner in fee simple of the following described lands, to wit: The S. E. ¼, the S. ½ of the S. W. ¼, the S. ½ of the N. E. ¼ of section 11, township 28 S., range 14 E., W. M., containing 320 acres of land, in Lake County, Or. That the said defendant, in the year 1883, appropriated, and has ever since used, 100 inches of the waters of Silver Creek, measured as aforesaid; that the said S. A. D. Porter, as such appropriator, is entitled to the use of 100 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said lands aforesaid; but that

said defendant's right and use is subsequent and inferior to the rights of plaintiffs Annie C. Hough and Marion Conley and defendants Lucinda Egli, George H. Small, Occidental Land & Improvement Company and J. C. Porter, to the extent granted by this decree.

That the defendant Lucinda Egli is the owner in fee simple of the following described lands, to wit: The S. W. ¼ of section 28 and the E. ½ of the S. E. ¼ of section 29, and the S. ½ of the N. W. ¼, and the N. W. ¼ of the S. W. ¼, and the N. W. ¼ of the N. W. ¼ of section 33, in township 28 S., range 14 E., W. M., containing 400 acres of land, in Lake County, Or. That in the year 1878, said defendant appropriated and diverted 200 inches of the waters of said Silver Creek, measured as aforesaid, and has ever since used the same; that the said Lucinda Egli, as such appropriator, is entitled to the use of 200 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of her said lands aforesaid; but that said defendant's right and use is subsequent and inferior to the rights, to the extent granted in this decree, of defendants George H. Small, Occidental Land & Improvement Company, and John C. Porter.

That the defendant George H. Small is the owner in fee simple of the following described lands, to wit: The E. ½ of section 9; the S. ½ and the N. W. ¼ of section 10; the W. ½ of the N. W. ¼, and the W. ½ of the S. W. ¼ of section 11; the N. E. ¼ of the S. W. ¼, the S. W. ¼ of the N. W. ¼ of section 11; all of section 15, excepting the S. W. ¼ of the N. W. ¼; the N. ½ of the N. E. ¼ of section 16; the N. E. ¼ and the E. ½ of the N. W. ¼ of section 22—all in township 28 S., range 14 E., W. M., containing 1,960 acres of land, in Lake County, Or. That the said defendant, in the year 1878, appropriated and has ever since used 650 inches of the waters of said Silver Creek, measured as aforesaid; that said George H. Small, as such appropriator, is entitled to the use of 650 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said lands aforesaid; that said appropriation was and is prior to the rights of all of the other parties herein.

That the defendant John C. Porter is the owner in fee simple of the following described lands, to wit: The N. ½

of section 14, township 28 S., range 14 E., W. M., containing 320 acres of land in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon the said lands; that said lands are riparian thereto; that said John C. Porter, as such riparian owner, is entitled to the use of 100 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said land; 75 inches of the said waters, measured as aforesaid, to be diverted from the said Bunyard Branch of said Silver Creek, and the remaining 25 inches from the main channel of said Silver Creek; that said use is subsequent and inferior to the appropriation of Marion Conley and George H. Small and Annie C. Hough, to the extent granted in this decree.

That the defendant E. K. Henderson is the owner in fee simple of the following described lands, to wit: All of section 1, township 28 S., range 14 E., excepting the S. W. ¼ of the S. W. ¼; all of sections 6 and 7, and the W. ½ of section 8, lots 1, 2, 3, 8 and 9, section 17—all in township 28 S., range 14 E., W. M., containing —— acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon the said lands; that 640 acres of said land is riparian to said Silver Creek; that the said E. K. Henderson, as such riparian owner, is entitled to the use of 170 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said lands; that said use is subsequent and inferior to all of the rights acquired by appropriation, to the extent granted in this decree.

That the defendant P. W. Jones is the owner in fee simple of the following described lands, to wit: The E. ½ of the N. W. ¼ and lots 1, 2 and 3 of section 31, in township 27 S., range 15 E., W. M., containing 155.42 acres; also the S. ½ of the S. E. ¼, the S. E. ¼ of the S. W. ¼, and lots 3 and 4 of section 31, in township 27 S., range 15 E., W. M.—containing 169.15 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon the said lands; that said lands are riparian thereto; that the said P. W. Jones, as such riparian owner, is entitled to the use of 110 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irri-

gation of his said lands; but said use is subsequent and inferior to all of the rights acquired by appropriation, to the extent granted in this decree.

That the defendant Mary C. Brown is the owner in fee simple of the following described lands, to wit: The S. E. 1/4 of section 31, township 27 S., range 15 E., W. M., containing 160 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon said lands; that said land is riparian thereto; that the said Mary C. Brown, as such riparian owner, is entitled to the use of 50 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of her said lands; that said use is subsequent and inferior to all of the rights acquired by appropriation, to the extent granted by this decree.

That the defendant C. E. McKune is the owner in fee simple of the following described lands, to wit: The N. E. 1/4 of section 31, township 27 S., range 14 E., W. M., containing 160 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon said land; that said land is riparian thereto; that the said C. E. McCune, as such riparian owner, is entitled to the use of 50 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of her said lands; that said use is subsequent and inferior to all of the rights acquired by appropriation, to the extent granted in this decree.

That the defendant E. D. Lutz is the owner in fee simple of the following described lands, to wit: The N. E. 1/4 of section 10, and the E. 1/2 of the N. E. 1/4, and the W. 1/2 of the N. E. 1/4, and the E. 1/2 of the N. W. 1/4 of section 15, township 28 S., range 14 E., W. M., containing 400 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon the said land; that said land is riparian thereto; that the said E. D. Lutz, as such riparian owner, is entitled to the use of 107 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said lands; that said use is subsequent and inferior to each of the rights acquired by appropriation, to the extent granted by this decree.

That the defendant George Durand is the owner in fee simple of the following described lands, to wit: The S. E.

¼ of the S. W. ¼ of section 18; the N. ½ of the N. W. ¼, and the S. W. ¼ of the N. W. ¼, the S. W. ¼ and the S. ½ of the S. E. ¼ of section 19; the N. E. ¼ and the E. ½ of the N. W. ¼ of section 30, township 30 S., range 14 E., W. M., containing 640 acres of land, in Lake County, Or. That the said defendant Durand is the owner by prescription of the right to the use of 160 inches of the waters of said Silver Creek for the reasonably necessary irrigation of his said lands.

That the defendant C. C. Jackson is the owner in fee simple of the following described lands, to wit: The N. E. ¼ of section 12, township 28 S., range 14 E., W. M., containing 160 acres of land, in Lake County, Or. That the said defendant C. C. Jackson is the owner of a right to the use of the surplus waters from the Conley ditch flowing past the lands of the said plaintiff Marion Conley; that the same is not riparian to Silver Creek.

That the defendant the Occidental Land & Improvement Co., a corporation, · is the owner in fee simple of the following described lands, to wit: Tract No. 1: The S. ½ of the N. ½ and the S. ½ of section 16; the N. ½ and the N. ½ of the S. ½ and the S. ½ of the S. W. ¼ of section 21; the W. ½ of the N. W. ¼ of section 22; the S. ½ of the N. E. ¼ of the N. W. ¼ of the S. E. ¼, and the N. E. ¼ of the S. W. ¼ of section 20—in township 28 S., range 14 E., W. M., containing 1,320 acres of land, in Lake County, Or. Tract No. 2: The N. ½ and the N. ½ of the S. ½ of section 2, township 28 S., of range 14 E., and the S. ½ of the S. ½ and the N. E. ¼ of the S. E. ¼, and the E. ½ of the N. E. ¼ of section 35; the S. E. ¼ of the S. E. ¼ of section 34; the S. ½ of the S. E. ¼ of section 26, township 27 S., range 14 E., W. M., containing 880 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon the said lands; that said lands are riparian thereto; that the Occidental Land & Improvement Co., as such riparian owner, is entitled to the use of 355 inches of the waters of said Silver Creek, measured as aforesaid, as a reasonably necessary use for the irrigation of the tract of land hereinbefore designated as tract No. 1; that the Occidental Land & Improvement Co., as such riparian owner, is entitled to the use of 235 inches of the waters of said stream, measured as aforesaid, as a reasonably necessary use for

the irrigation of the tract of land hereinbefore designated as tract No. 2; but said use by said defendant, the Occidental Land & Improvement Co., upon the above-named tracts of land, is subsequent and inferior to the appropriation, to the extent granted by this decree, to the defendant George H. Small.

That in the S. E. ¼ of the S. W. ¼ of section 15, township 27 S., range 14 E., W. M., in Lake County, Or., a branch of said Silver Creek, known as the 'Bunyard Branch,' diverges and flows in a southeasterly direction. That said Bunyard Branch is an ancient and well-defined channel of the said Silver Creek; that there has been accustomed to flow through the said Bunyard Branch at that point of diversion one quarter of the waters of said Silver Creek.

That the defendant Walter C. Buick is the owner in fee simple of the following described lands, to wit: The S. W. ¼ of section 14, township 28 S., range 14 E., W. M., containing 160 acres of land, in Lake County, Or. That the defendant Corinna Buick is the owner in fee simple of the following described lands, to wit: The S. E. ¼ of section 14, township 28 S., range 14 E., W. M., containing 160 acres of land, in Lake County, Or. That the defendants Isa M. Corum, Jewell D. Corum and Lulu Corum La Brie are the joint owners and tenants in common of the following described lands, to wit: The W. ½, the N. ½ of the N. E. ¼ of section 13, the N. ½ of the N. W. ¼ of section 24, township 28 S., range 14 E., W. M., containing 480 acres of land, in Lake County, Or. That the defendant J. M. Small is the owner in fee simple of the following described lands, to wit: The S. ½ of the N. E. ¼, and the S. E. ¼ of section 13, and the N. ½ of the N. W. ¼, and the S. E. ¼ of the N. E. ¼ of section 24, in township 28 S., range 14 E., W. M., the S. W. ¼ of section 18, the N. W. ¼ of section 19, in township 28 S., range 15 E., W. M., containing in all 680 acres of land, in Lake County, Or. That in the year 1885, the defendants Walter C. Buick, Corinna Buick, Lulu Corum La Brie, Isa M. Corum, Jewell D. Corum and J. M. Small, and their grantors, appropriated from the United States and the State of Oregon, and diverted and carried away from said Silver Creek at a point near the S. W. corner of the S. E. ¼ of the N. W. ¼ of section 22, township 28 S., range 14 E., W. M., in Lake

County, Or., by means of dams, head gates and ditches, 600 inches of the waters of said Silver Creek, and ever since said date the said defendants and their grantors have used all of the said water for the necessary irrigation of their tracts of land as hereinbefore set out. That the said defendants Walter C. Buick and Corinna Buick, as such appropriators, are entitled to the joint use of 200 inches of the waters of said Silver Creek, measured as aforesaid, to be deducted from the flow of the said Bunyard Branch of said Silver Creek, as a reasonably necessary use of said waters for the irrigation of their said lands; said right to be subsequent and inferior to the rights of plaintiffs Marion Conley and Annie C. Hough, and the defendants John C. Porter, George H. Small, Lucinda Egli, Occidental Land & Improvement Co. and S. A. D. Porter, to the extent granted by this decree. That the defendants Lulu Corum La Brie, Isa M. Corum and Jewell D. Corum, as such appropriators, are entitled to the joint use of 100 inches of the waters of said Silver Creek, measured as aforesaid, and deducted from the flow of the Bunyard Branch aforesaid, as the reasonably necessary use of said waters for the irrigation of their said lands; said right to be subsequent and inferior to the rights of the plaintiffs Marion Conley and Annie C. Hough and the defendants John C. Porter, George H. Small, Lucinda Egli, Occidental Land & Improvement Co. and S. A. D. Porter, to the extent granted by this decree. That the defendant J. M. Small, as such appropriator, is entitled to the use of 200 inches of the waters of said Silver Creek, measured as aforesaid, to be deducted from the flow of the Bunyard Branch of said Silver Creek, as a reasonably necessary use of said waters for the irrigation of his said lands; said right to be subsequent and inferior to the rights of the plaintiffs Marion Conley and Annie C. Hough and the defendants John C. Porter, George H. Small, Lucinda Egli, Occidental Land & Improvement Co. and S. A. D. Porter, to the extent granted by this decree.

That the defendants B. F. Lane and Jennie Lane, his wife, are the owners in fee simple of the following described lands, to wit: The N. E. ¼ of section 18, township 28 S., range 15 E., W. M., containing 160 acres of land, in Lake County, Or.; also the E. ½ and lots 1 and 2, and the N. W. ¼ of section 18, in township 28 S., range 15

E., W. M., containing 159.96 acres of land, in Lake County, Or. That Silver Creek, in Lake County, Or., flows to and upon said land from the said Bunyard Branch of said Silver Creek; that said land is riparian thereto; that the said B. F. Lane and Jennie Lane, his wife, as such riparian owners, are entitled to the use of 90 inches of the waters of said Bunyard Branch of said Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of their said lands; but said use is subsequent and inferior to all of the rights acquired by appropriation hereinbefore set out, to the extent granted by this decree.

That the defendant F. M. Chrisman is the owner in fee simple of the following described lands, to wit: The S. E. ¼ of section 12, township 28 S., range 14 E., W. M., containing 160 acres of land, in Lake County, Or. That the Bunyard Branch of Silver Creek flows to and upon said land; that said land is riparian thereto; that the said F. M. Chrisman, as such riparian owner, is entitled to the use of 40 inches of the waters of said Bunyard Branch of Silver Creek, measured as aforesaid, as a reasonably necessary use of the said water for the irrigation of his said land; that said use is subsequent and inferior to all of the rights acquired by appropriation, to the extent granted in this decree.

That the defendants L. Huesmand, Morris Ranner, John Partin, Jr., L. P. Klippel, Emil Egli, Henry Egli, Martie Ward, Angeline West, Mary Small, James M. Martin, J. M. Sherer, Maude Small, J. Hall, C. D. Buick, R. E. Smith, J. A. Smith, J. C. Harrow and F. F. McCarty have been duly served with summons and complaint herein, as more particularly appears from the records and files in this court, and a default has long since been ordered entered against them for the want of appearance or answer. It is adjudged and decreed that said defaulting defendants have no right, title or interest in the waters of Silver Creek, or any of its tributaries or branches, or the use of such water. It is further adjudged and decreed that P. G. Chrisman has no right, title or interest in the waters of Silver Creek, or the use thereof. It is decreed that none of the parties to this suit are entitled to recover either costs or disbursements herein. That there is to be allowed to flow from Silver Creek into its Bunyard Branch not to exceed one fourth

of the flow of Silver Creek at the head of Bunyard Branch, less 600 inches of water, measured under six-inch pressure, being the diversion in and through the Buick ditch."

The defendants L. Huesmand, Morris Ranner, John Partin, Jr., L. P. Klippel, Emil Egli, Henry Egli, Martie Ward, Angeline West, J. A. Smith, Mary Small, James M. Martin, J. M. Sherer, Maude Small, J. Hall, C. D. Buick, R. E. Smith, J. C. Harrow and F. F. McCarty each defaulted, and do not appeal.

Those appearing but not appealing are: George Durand, L. Huesmand, Morris Ranner, Lucinda Egli, John Partin, Jr., George H. Small, L. P. Klippel, Emil Egli, Lulu Corum La Brie, Isa M. Corum, Jewell D. Corum, Walter C. Buick, Corinna Buick, E. K. Henderson and J. M. Small.

The appellants are: S. A. D. Porter, C. D. Porter, administrator, Daisy Porter, widow, and W. F. Porter, E. A. Porter and Carl D. Porter, minor heirs of S. A. D. Porter by Daisy Porter, guardian; P. G. Chrisman, John C. Porter and James C. Porter, his guardian; F. M. Chrisman, B. F. Lane, Jennie Lane, C. C. Jackson, Occidental Land & Improvement Co., a corporation, and Chewaucan Land & Cattle Co., its grantee; P. W. Jones, C. E. McKune, Mary C. Brown and E. D. Lutz.

AFFIRMED IN PART: CONTINUED.

For plaintiffs and respondents there was a brief and oral argument by *Mr. J. C. Rutenic.*

For appellants there was a brief over the names of *Mr. W. J. Moore* and *Mr. E. B. Watson,* with an oral argument by *Mr. Watson.*

For defendants and respondents Walter C. Buick, Lulu Corum La Brie, Isa M. Corum, Jewell D. Corum and J. M. Small there was a brief and oral argument by *Mr. Lionel R. Webster.*

For defendant and respondent Geo. H. Small, there was a brief over the names of *Coovert & Stapleton.*

There was a brief and oral argument by *Mr. Roscoe R. Johnson, amicus curiae.*

Opinion by MR. COMMISSIONER KING.

1. We have given above a synopsis of the pleadings filed, including the orders and decree of the circuit court, extracted from the 300 pages of printed abstract of record, with a view to the proper understanding of the issues upon which the main contentions of the numerous parties to the suit are based and argued on this appeal. The first point to which our attention is directed is in respect to the order of the court directing that all parties having, or claiming, an interest in the subject-matter of the controversy, be brought into the suit, which order, it is maintained, is not authorized by law, by reason of which it is argued the rights of only the parties to the suit as first filed can be adjudicated, requiring a dismissal thereof as to all others. The statute under which the order was made is as follows:

"The court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy cannot be had without the presence of other parties, the court shall cause them to be brought in": B. & C. Comp. §§ 41, 394.

The facts presented by the testimony taken in the suit as first instituted, and upon which the order was made, developed a serious controversy as to who was the real party causing the alleged injury. It appears that Silver Creek is a perennial stream with well-defined banks and channels, carrying from 11½ second feet during the low-water season to 100 second feet when at its highest water mark, and that the lands of all parties to the suit are dependent upon this stream for irrigation. Hough's farm is a short distance below that of Porter on the creek, and it is disclosed by the first testimony taken, as well as that taken later, that below Porter's point of

diversion George H. Small and others had for a long time diverted a large quantity of water from this stream. Hough claimed 100 inches as the quantity necessary for the proper irrigation of her farm, to which quantity she asserted her right was superior to that of Porter, who, she maintained, was wrongfully interfering with her right to the use thereof. In response thereto, Porter claimed a right as prior appropriator to 100 inches of the waters of Silver Creek and its branches for the irrigation of his lands above the Hough farm, and insisted that, whether his rights were superior to Hough's rights or not, he at all times permitted not less than 100 inches of water to flow below his point of diversion, which would have reached Hough's farm but for the wrongful interference of Geo. H. Small, who was not a party to the suit. Others, not parties, but situated upon and in the immediate vicinity of the stream, also appear to have claimed water rights therein, and to have been diverting water in various quantities for irrigation purposes, and that during the months of June, July, August, September and October of each year there was not a sufficient quantity of water to supply the demands of all; the amount during the latter part of the irrigation season consisting of but 11½ second feet.

It is manifest that plaintiff, in the first instance, could have made as defendants all persons along the stream and on its tributaries and branches, against whom she might have claimed adversely: B. & C. Comp. § 394. Although some may not have been necessary, all would have been proper parties to the suit: *Williams* v. *Altnow,* 51 Or. 275 (95 Pac. 200, 208). But as to the interruptions by Small and those using water through the Small ditches and in connection therewith, it is apparent from the character of the testimony adduced, that in order to properly determine the rights of Hough and Porter, they were necessary and were properly made defendants, for if true, as claimed by Porter, that he let suffi-

cient water pass his premises to supply Hough's needs and demands, the court could not have determined who was entitled to the use thereof, as between Small and Hough, or between Small and Porter or Porter and Hough, as the case might have been, unless they were parties to the suit. To illustrate: Assume the court had determined the respective rights of Hough and Porter in the first suit under the first amended complaint, and had found there were 460 inches in the stream during the low-water season; that Hough was entitled to the first 100 inches, and, as between them, Porter was awarded the second 100 inches, and had entered a decree to that effect; and that after the entry thereof Porter had diverted water for irrigation purposes, by reason of which he was cited to appear and show cause why he should not be held for contempt of court, but at the hearing should have proved that he used 100 inches only, leaving 360 inches to pass his head gate. Would he then have been in contempt because the water passing his point of diversion did not reach plaintiff? In other words, could he be held for the interference by Small, or others not parties to the suit? This illustration serves to demonstrate the ineffectiveness of a decree entered under such circumstances. Numerous instances occur where the rights between two persons can be, and have been, determined without bringing in others; for example, assume that A. and B. are at the head of a stream, and B., who is below A., has the first right to 100 inches of water. A suit to enjoin A. from a wrongful interference could easily be maintained, where there was no one diverting water from the stream between their respective points of diversion, for a decree in that case favorable to B., it can readily be seen, would be effective, as it would be such that its violation could be punished. Such a decree, it is true, would not bind others not parties to the proceeding, but it would be efficient as between the parties to it, and constitute an

adjudication of their respective rights, of which either could avail himself in the event both should subsequently be joined with others in litigation over the same stream. Many of the suits where water rights have been adjudicated have been of this class, and the decrees have accordingly been effectual, while a large number, no doubt, have passed through the courts and to final decree as between a few on the stream, when, to have afforded a complete remedy, and to have avoided a multiplicity of suits, others should have been made parties, as was done in the case under consideration; but the failure to do so in such cases has been due to the point not having been raised, nor the court's attention called to the status of litigants in this respect. It is manifest that in the suit under consideration the rights of any of the three parties named could not have been determined with respect to each other without all being in court, and the same could be said of others along the stream.

We are of the opinion therefore that much discretion must be allowed the trial court in such cases, and that it comes within the reason and spirit of the statute to hold that all who may have an interest, directly or indirectly, in the subject-matter of the suit, may, by order of the court, be made parties thereto, especially where, as in the case before us, the determination of the rights of the litigants before the court could not otherwise have been had with reasonable accuracy, nor the decree, when entered, effectively enforced. The discretion of the court below in this respect was exercised by requiring all persons owning lands adjoining or claiming an interest in the waters of Silver Creek, its tributaries or branches, to be brought in and made parties, either plaintiff or defendant, as their interests appeared, with directions to interplead as to each other, and we think the evidence adduced at the trial confirms the wisdom of the course pursued. It is consonant with public policy, and public interests require, that when in the determination of con-

flicting claims to the right to the use of public streams, for irrigation, manufacturing or other useful purposes, it appears that many suits must eventually be brought to determine the various rights of persons whose property is to be affected by such use, it should be within the sound discretion of the trial court to require all, or any of the persons interested, to be made parties, as was done here, in order that the rights of each may be adjudicated and finally determined in one proceeding. This course should be permitted, and is obviously contemplated by the statute, not only with the view to economy in litigation, but that the respective interests of all affected may be justly, peaceably and permanently ascertained and settled during the lifetime of those cognizant of the facts upon which the adjudications must be had. It is obvious that it is not only impracticable to determine such rights in many instances without adopting such course, but that if left to separate suits to be brought from year to year as disputes may arise, not only will much valuable evidence pass beyond the reach of all, but such course, if pursued, must necessarily result in years of litigation and turmoil, and, in many instances, in a complete denial of justice. We are of the opinion therefore that no error was committed by the court in requiring the appearance of all the defendants.

2. The next point to which our attention is directed is that there is a misjoinder of parties plaintiff and of parties defendant. Some of the defendants having demurred on this ground, and otherwise raised the question, a determination thereof becomes necessary. These points, however, are necessarily disposed of adversely to appellants' contention under the first question considered. Since this court holds that the persons named as plaintiffs and defendants were necessary to a proper determination of the respective rights of Hough and Porter, they were, accordingly, properly made parties to the suit, and as to who should have been joined as plaintiffs,

and who should have been made defendants, accordingly depends upon the facts alleged or proved. Since it appears that the diversion or use of the water of Silver Creek, or of its branches or tributaries, by any of the defendants, affects each of the plaintiffs' alleged rights thereto, then all are interested in the relief demanded, by reason of which they were entitled to join as plaintiffs to secure the required protection: B. & C. Comp. § 394; *Stingel* v. *Nevel,* 9 Or. 62, 65; *Williams* v. *Altnow,* 51 Or. 275 (95 Pac. 200-208). This also disposes of the question in reference to the alleged misjoinder of the defendants, for the same authorities and reasoning are applicable to their relative positions as to the plaintiffs.

3. Another and more serious point urged is that the complaint, as amended, after the order bringing in the additional parties, does not state sufficient facts to constitute a cause of suit against any of the defendants, except S. A. D. Porter, on which grounds the defendant P. G. Chrisman and others demurred. It is, in effect, conceded that the complaint is sufficient as to Porter, since it alleges sufficient interference by him in the use of the stream to constitute a substantial injury. After averring the facts constituting the injury by Porter, and upon which an injunction against him is sought, the complaint avers: "That all the defendants have, or claim to have, some rights or interest in the waters of Silver Creek, but that the exact nature or extent of said rights or claims of the defendants are to plaintiffs unknown, and the interests, if any, of defendants and each of them are inferior to the rights of plaintiffs in the waters of said stream." It is to this allegation that the demurrers of various defendants appear to be directed. In the arid states, where the sufficiency of this manner of pleading has been questioned, it has been sustained: *Cache L. P. R. Co.* v. *Water S. & S. Co.* 27 Colo. 532 (62 Pac. 420) ; *Harris* v. *Harrison,* 93 Cal. 676 (29 Pac. 325) ; *Wiggins* v. *Muscupiabe L. & W. Co.* 113 Cal. 182 (45 Pac. 160:

32 L. R. A. 667: 54 Am. St. Rep. 337) ; *Farm Inv. Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258: 87 Am. St. Rep. 918: 50 L. R. A. 747). Averments to that effect would seem to come within the language and spirit of B. & C. Comp. § 394, which, *inter alia,* provides: "Any person may be made a defendant who has or claims an interest in the controversy adverse to plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein."

4. In *Umatilla Irri. Co.* v. *Umatilla Imp. Co.* 22 Or. 386 (30 Pac. 30), the rights attempted to be maintained, and for the determination of which a decree was sought, were asserted under a special statute governing corporations, wherein a specific manner was provided for acquiring title to water by appropriation; and, when the court there observed that the statute required a strict construction, it evidently had reference to that act. In the consideration of that case, attention is called to the fact that the plaintiff had not perfected a claim to the water rights there asserted, in reference to which the court at page 389 of 22 Or. (page 37 of 30 Pac.), say: "The plaintiff has failed to bring itself within any principle of equity jurisdiction which would enable a court of equity to consider or pass upon the supposed rights alleged in its complaint." And at page 387 of 22 Or. (page 37 of 30 Pac.) : That the clear logic of the position seemed to be to ask the court "to certify that the plaintiff owns the water which it claims, for the purpose of enabling it to make a sale of its bonds." The rule there announced can have no application to cases where the defendants, or some of them, may be necessary to a proper determination of the rights between any of the plaintiffs, who may allege facts disclosing an established right, and defendants in a suit based upon acts, real or threatened, sufficient to constitute reasonable grounds for the apprehension of some substantial injury to vested property rights. Section 394, B. & C. Comp., would appear ex-

pressly to give the right, under such circumstances, to make any person a party who has, or claims to have, an interest in the controversy adverse to plaintiffs. But, independent of that section of the statute, the right existed at common law, as a part of the general equity jurisdiction. As observed in *Ballou* v. *Inhabitants. of Hopkinton*, 4 Gray (Mass.) 324, 328: "In regulating the rights of mill owners and all others in the use of a stream, wherein numbers of persons are interested, equity is able, by one decree, to regulate their respective rights, to fix the time and manner in which water may be drawn, and within what limits it shall or shall not be drawn by all parties, respectively; and thus it is peculiarly adapted to the relief sought against such alleged nuisance and disturbance, and affords a more complete and adequate remedy than can be afforded by one or many suits at law: *Bemis* v. *Upham*, 13 Pick. (Mass.) 169; *Bardwell* v. *Ames*, 22 Pick. (Mass.) 333." Again, since Sections 41 and 394, B. & C. Comp., when construed together, give to the court discretionary power to require all persons interested in the subject-matter of the suit to be made parties, these provisions of the statute, by implication, include all such powers essential to the proper carrying of the order into effect.

5. In this connection it is manifest that, as to those persons not actually interfering with plaintiffs' alleged rights along the stream, no averment, except of similar import to that set out in the complaint, could well have been made. It is obvious therefore that the allegation that all of the defendants have, or claim to have, an interest in the distribution of the waters of Silver Creek, the nature of which is unknown to complainants, etc., should be sufficient for the purpose of requiring all to interplead and assert their respective rights, whatever they may be, in the subject-matter of the suit; and this was the course of procedure adopted in respect to all, except as to S. A. D. Porter. While some did not see

proper to affirmatively assert their rights, the neglect
on their part to do so cannot affect the interest of the
other parties to the suit, and, at most, could only result
in a decree being entered precluding those in default
from hereafter asserting any rights against the parties
whose interests under the issues as made may here be
adjudicated.   We are therefore impelled to hold that,
whether brought in question by demurrer, or otherwise,
the averments of the complaint and procedure adopted
are sufficient.

6. The next question for determination relates to the
right of defendants to have their interests and claims
adjudicated between themselves.   It appears that prac-
tically all of the defendants who are not in default have
filed pleadings in response to the answers of their co-
defendants, specifically denying the affirmative aver-
ments or counterclaims in the answers of the several
defendants.   In this respect the case is unlike that of
*Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 83 (45 Pac. 472:
60 Am. St. Rep. 777), in which it is held that while each
of the defendants therein denied the averments of the
complaint and affirmatively set up their rights, and in
some instances had alleged their claims to be prior and
superior to the rights of all the other defendants, and
of those of plaintiff, the procedure there adopted was
insufficient to permit the court to adjudicate the quan-
tity and priority of any of the appropriations, except as
between the plaintiff therein and the several defendants.
Since our statute does not indicate the course to be pur-
sued, the proper procedure in such cases would seem to
be that the general methods of chancery, as modified by
the spirit of the Code, must be adopted: Pomeroy, Rem.
(3 ed.), § 808; Bliss, Co. Pl. (3 ed.), § 390; *Eve* v. *Louis,*
91 Ind. 457, 470; *Diamond F. G. Co.* v. *Boyd,* 30 Ind. App.
485, 488 (66 N. E. 479) ; *Tucker* v. *St. Louis Life Ins.
Co.* 63 Mo. 588, 594.

In the chancery courts, when a defendant sought relief against a codefendant, as to matters not apparent upon the face of the original bill, he filed his cross-bill, alleging therein the matters upon which he relied for relief, making defendants thereto of such codefendants and others as was proper, and process was necessary to bring them in. B. & C. Comp. § 391, abolishes cross-bills, but provides that in actions at law, where a defendant is entitled to relief, arising out of facts requiring the interposition of a court of equity, and material to his defense, he may, upon filing his answer therein, also as plaintiff file a complaint in equity, in the nature of a cross-bill, upon which the issues may thereafter be tried out as in a suit in equity. This provision implies that, when a suit in equity is brought, the same right would follow, except that the necessity of filing a separate and distinct pleading is obviated, leaving the defendant affirmatively to set up his defense, commonly termed a counterclaim, alleging the facts necessary to relief against all or any of the parties to the suit.

7. This method is applicable, however, only where the cause of suit set up against the codefendants is one arising out of, or having reference to, the subject-matter of the original suit; and such appears to be the status of the defendants in the suit under consideration, as each appears to claim an interest in the main stream involved, and to claim and assert some right in respect thereto as against the other. "No court," says Mr. Bliss (Section 390), "would deny one's right, or invent an original mode of proceeding for protecting it, because of an omission in the Code, so long as the common-law or equity practice furnished a remedy." Here the Code abolishes the form, but leaves the substance, and this court appears to recognize this remedy, as available under it: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 83 (45 Pac. 472: 60 Am. St. Rep. 777).

8. It is necessary, however, in such cases, that sufficient notice be given the codefendant against whom the relief is sought. In *Tucker* v. *St. Louis Life Ins. Co.* 63 Mo. 588, 595, it is remarked that in that state "it has not been the practice to issue process in such cases; but it has always been customary to afford ample time to a codefendant to answer as to the relief sought—a time which is generally fixed by the court's order to that effect. And if, in the absence of any statutory rule, we are to be governed by parity of reasoning deduced from cases where relief is sought by petition, at least the same time and opportunity to plead should be granted where relief is sought by an answer in the nature of a cross-bill, as when prayed for by petition." But from Pomeroy, Rem. § 808, cited with approval in *Nevada Ditch Co.* v. *Bennett,* at page 83 of 30 Or. (page 472 of 45 Pac: 60 Am. St. Rep. 777), it would appear that service of a notice of some substantial nature would be essential to jurisdiction in such cases. As the notice required in such cases is not pointed out by the Code, it would seem that since there exists the right to affirmatively set up in the answer the matter constituting the cross-complaint, or counterclaim, in place of by an original bill, as in the chancery practice, the defendant in so doing, to all intents and purposes, places himself in the position of a plaintiff in respect to his codefendants, with the result that the issue and service of a summons accompanied by a copy of the answer in a similar manner to that provided for a plaintiff in an original proceeding would be sufficient. In the case at bar, however, the order of the court, a copy of which was directed to, and served upon each, required that all should appear within a time there specified, and plead and interplead with respect to each other as their several interests might appear, which was in effect the same, and served the same purpose, as a summons, and was sufficient to require the appearance and interpleas demanded. In that respect the order hav-

ing directed the interpleas between each, only such proceedings were required after service thereof, in reference to serving copies of answers, etc., as were required by the rules of the district in which the suit was brought.

Without, at this time, determining whether the affirmative defenses constituting the counterclaims, are sufficiently pleaded, or state sufficient facts, etc., we hold that the method of procedure adopted by the court and parties responding thereto was ample, and, if the pleadings state sufficient facts for the purpose, is sufficient to give the court the jurisdiction necessary to determine the rights of each and all who may appear to have been duly and regularly served with the court's order in reference thereto.

9. Thus far we have disposed of the principal points discussed in the briefs and oral arguments of counsel for the respective parties, the determination of which, it was argued with much force, must result in a dismissal of the suit so far as affects all, except the parties to the original suit. The conclusion reached, however, leaves all in court, making necessary an adjudication of their respective rights so far as practicable under the issues and evidence, which brings us to the merits of the controversy.

As will appear from the issues stated, some of the parties to the proceeding claim as riparian proprietors, while others invoke the doctrine of prior appropriation. Throughout the discussion, oral and otherwise, it has been and is taken for granted that all the lands on the streams involved are riparian thereto for irrigation purposes. If this assumption, as a matter of law, is correct, then, so far as such riparian owners are concerned, the water to which each thereof may be entitled must be distributed on that basis; their rights thereto being subject only to the rights of those who may have appropriated the water prior to the time of the inception of such riparian interests. What, then, must be the basis of the

distribution between the riparian owners, if any? During the low-water season, and when most needed, the water flowing in Silver Creek is approximately 460 inches, with about 4,000 acres of riparian lands demanding water rights as such. These lands cover a large territory, and to divide the water proportionately between them—to say nothing of about 7,000 acres of lands of parties hereto claiming as prior appropriators—would result in such scarcity of water that it would seem that none could be very materially benefited under such circumstances. A large portion of this acreage has never been irrigated, yet the owners thereof demand water for this acreage on an equality with lands long since brought into cultivation by irrigation. If the riparian doctrine must prevail, their rights, under the law, appear entitled to the same consideration as those who have diligently applied the water to a beneficial use. It was, in effect, announced, in *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068: 54 L. R. A. 630: 87 Am. St. Rep. 634), and in *Williams* v. *Altnow* (decided April 28, 1908), 51 Or. 275 (95 Pac. 200), that there is no such thing as prior riparian ownership, so far as distribution of water for irrigation purposes between riparian owners is concerned. In *Williams* v. *Altnow,* Mr. Chief Justice BEAN says:

"A riparian proprietor has no title to the water flowing over his land, but only the right to use it while it is passing his place, and this right is subordinate to a corresponding right in all the other proprietors. One proprietor cannot unreasonably detain or give the water another direction or use it in any way to the injury of the others. It necessarily follows, therefore, that the nature and extent of the right of a riparian proprietor to the water of a stream, for irrigation, cannot be measured by any definite or fixed rule, nor can the amount of water to which he is entitled to use for that purpose ordinarily be definitely ascertained or determined, although this may, perhaps, be done in exceptional cases. It is necessarily a varying quantity, depending upon the

use by other proprietors and whether it is an injury to them."

10. If, then, the distribution of the water, or of any material portion of it, in the case at bar, is to be made under the so-called modified riparian doctrine, we are confronted with a serious problem as to how it shall, in this case, be accomplished. While the cause has been tried largely on the theory that riparian rights have attached to the lands, the evidence seems to be inadequate for the purpose of making an equitable distribution under that rule. Before the distribution can be made, we must first know the quantity of water in the stream from time to time during the irrigation season, the acreage of each farm in crops, character thereof, the amount required for the proper irrigation of each crop and kind of crop, time for irrigation of each, etc., and all of the lands should be properly surveyed and platted, showing its status in this and various other respects in detail. But the record, although voluminous, discloses but little evidence of a definite nature upon these and other points required. When there is a scarcity of water, and the acreage is large, much and more explicit evidence is required in order to adjust the rights between riparian proprietors than under ordinary conditions. It has been held in California that the distribution among riparian owners, in some instances, may be made under the rotation method, or by periods of time, rather than by a division of its quantity: *Wiggins* v. *M. L. & W. Co.* 113 Cal. 182, 190 (45 Pac. 160: 32 L. R. A. 667: 54 Am. St. Rep. 337). In fact, as stated in *Jones* v. *Conn*, 39 Or. 30 (64 Pac. 855, 65 Pac. 1068: 54 L. R. A. 630: 87 Am. St. Rep. 634), each case must depend upon the particular facts in it, and no definite rule can be adopted for that purpose. It is clear, therefore, that greater particularity is required in the proof in such cases than where the question of riparian ownership does not arise. But this case appears to have been tried upon the theory that the

converse is true, and if the riparian doctrine is applicable to the lands owned by the several parties, or by a great number of them, it may become necessary to remand the cause for further light on the points suggested.

The record, however, discloses that none of the lands were settled upon by those subsequently acquiring title thereto, until beginning with about the year 1878, which is subsequent to the passage of the Desert Land Act, and as indicated in *Williams* v. *Altnow,* 51 Or. 275 (95 Pac. 200), it is a serious question whether this act does not abolish the common-law rule relative to the doctrine of riparian rights, so far as its interpretation has been applied to irrigation of lands to which title has been acquired since that act became a law: Act March 3, 1877, c. 107, § 1, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), 6 Fed. St. Ann. 393; *United States* v. *Rio Grande Irri. Co.* 174 U. S. 690 (19 Sup. Ct. 770: 43 L. Ed. 1136); *Farm Inv. Co.* v. *Carpenter,* 9 Wyo. 110, 138 (61 Pac. 258, 265: 50 L. R. A. 747: 87 Am. St. Rep. 918, 935). While this question was neither raised in the court below nor here, it so materially affects rights of the parties to the suit, some of whom are not represented by counsel, that it cannot be passed unnoticed. Nor do we feel disposed to pass upon a question of such vast importance, not only to the litigants here, but, perhaps, to numerous others throughout the State, without first giving those concerned an opportunity to be heard.

It is therefore deemed proper to continue the cause for further argument, by such as may wish to be heard, upon the points indicated, leaving open for discussion any other points involved and not here determined, among which may be the sufficiency of the pleadings to determine the rights of the several defendants, as well as the respective priorities between the parties claiming as prior appropriators, together with the right to a full discussion of any other points that may arise, with the privilege of

filing such other and additional briefs bearing on the points to be considered as may be desired.

AFFIRMED IN PART:    CONTINUED FOR FURTHER ARGU-
MENT.

---

Decided January 5, 1909.

## SUPPLEMENTAL OPINION.

[98 Pac. 1083.]

Opinion by MR. COMMISSIONER KING.

The principal contention of appellants as first urged was that the court acted without jurisdiction in directing that all persons interested in the lands bordering on Silver Creek, its tributaries and channels, be made parties to the suit, and that such action on the part of the court constituted reversible error. These questions of practice with matters incidental thereto, were determined adversely to counsel's contention (51 Or. 367: 95 Pac. 732), and the cause was set down for further argument on the main points involved, principal among which is that of riparian rights, as affected by Act. Cong. March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), known as the "Desert Land Act": 95 Pac. 732. This question and the points formerly determined were fully discussed at the re-argument. After a reconsideration of the questions of practice presented we find no reason to depart from the conclusions announced in our former opinion.

11. We come, then, to a consideration of the Desert Land Act, as to its effect upon the parties hereto owning lands upon the streams involved, the rights of each of whom have attached since the passage of the act. This confronts us with the legal problem as to whether any are riparian owners, and, if so, to what extent and what bearing their claims as such have upon the water rights in question.

· It has become a matter of history that prior to any laws upon the subject the use of water was exercised under a custom permitting any person to go upon a stream, or other source of water supply upon the public domain, and divert water therefrom wherever and whenever needed, provided the use thereof did not interfere with the prior rights of others. In other words, priority in the diversion and use determined the rights of all conflicting claimants. This procedure was encouraged and acquiesced in by the government for many years throughout the Pacific Coast states, until in recognition thereof Act Cong. July 26, 1866, c. 262, § 9, 14 Stat. 253, 7 Fed. St. Ann. 1090 (U. S. Comp. St. 1901, p. 1437), was adopted, which provided: "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the · purposes herein specified is acknowledged and confirmed. * *." This act constituted a recognition of pre-existing rights rather than a creation of any new one, and accordingly recognized and assented to appropriation of water in contravention to the common-law rule as to continuous flow: *Broder* v. *Water Co.* 101 U. S. 274 (25 L. Ed. 790); *United States* v. *Rio Grande Irr. Co.* 174 U. S. 690 (19 Sup. Ct. 770: 43 L. Ed. 1136); *Gutierres* v. *Albuquerque Land Co.* 188 U. S. 545 (23 Sup. Ct. 338: 47 L. Ed. 588); *Davis* v. *Chamberlain*, 51 Or. 304 (98 Pac. 154).

12. Supplemental to the above act, provision was made by congress July 9, 1870, for incorporating a reservation in favor of such rights in all patents when issued, as follows: "All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued

water rights or rights to ditches and reservoirs used in connection with such water rights. * *": Rev. St. § 2340 (U. S. Comp. St. 1901, p. 1437). This was followed on March 3, 1877, by what is known as the "Desert Land Act," parts of which, in so far as material to this discussion, are:

"That it shall be lawful for any citizen of the United States, or any person of requisite age 'who may be entitled to become a citizen, and who has filed his declaration to become such' and upon payment of twenty-five cents per acre, to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one section, by conducting water upon the same, within the period of three years thereafter: Provided, however, that the right to the use of water by the person so conducting the same, on or to any tract of desert land of six hundred and forty acres shall depend upon *bona fide* prior appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands, and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights * *": 19 Stat. U. S. 377, 6 Fed. St. Ann. 392 (U. S. Comp. St. 1901, p. 1548).

The title of the foregoing act reads: "An act to provide for the sale of desert lands in certain states and territories." Being an act of congress, it is well known that it is not required that the title of the act embrace all its provisions; and, while a different rule prevails in some of the states, it is probably an exception rather than the rule that acts of congress are limited to matters contained in their title. This being the rule which prevailed in congress, we have only to look to the body of the act to ascertain its intention.

13. After providing for the reclamation of arid lands and for the procuring of title thereunder, it will be observed that, in this act, as essential to the reclamation of lands, the water right, when located by the person taking the land, shall depend upon *bona fide* prior appropriation. The reason for this is apparent. The object and purpose of the act was by this method to reclaim, develop, and make productive arid lands or those of a desert character, which as a rule were nonriparian. For many years it was an open question whether lands through which streams flowed in their natural channels were subject to reclamation under this act: *Sims* v. *Phalen,* 11 Land Dec. Dep. Int. 206. But it was finally determined that such lands could be reclaimed where clearly shown to be of a desert character: *Houck* v. *Betlelyoun,* 7 Land Dec. Dep. Int. 425; *Nilson* v. *Anderson,* 23 Land Dec. Dep. Int. 139. Considering this feature with the then long-existing conditions in reference to the public lands throughout the West, the reasons for providing that the water right should be acquired under the doctrine of prior appropriation are obvious.

This first act (1866) refers to priority of possession and local customs, rules, regulations, etc., to which rules of construction were soon applied; the outcome depending largely upon whether the decisions were by courts in localities of a strictly arid nature or in the humid states. If in a strictly arid section, the doctrine of prior appropriation prevailed; while, if humid, a middle ground, or what is called the "modified doctrine of riparian rights," appears to have been the one adhered to and deemed the most conducive to the public welfare. Near the time of the passage of this act conflicts had arisen from the application of the law, as applied to riparian rights, in the arid and semi-arid West. In California the effect thereof on riparian rights was involved in much doubt and not fully determined, while in Nevada

the noted case of *Vansickle* v. *Haines,* 7 Nev. 249, had
been decided, adhering to the common-law rule on the
subject. This latter case, however, was subsequently
overruled, since which time the doctrine of prior appro-
priation has there prevailed: *Jones* v. *Adams,* 19 Nev. 78
(6 Pac. 442: 3 Am. St. Rep. 788) ; *Reno S. Works* v.
*Stevenson,* 20 Nev. 269 (21 Pac. 317: 4 L. R. A. 60: 19
Am. St. Rep. 364) ; *Walsh* v. *Wallace,* 26 Nev. 299 (67
Pac. 914: 99 Am. St. Rep. 692). The act of 1866 had
left somewhat in doubt, not only the question of its effect
upon riparian rights, but an uncertainty whether it
thereby intended to establish a permanent rule upon the
subject; and the act of 1870, requiring reservations in
all patents issued, by inserting a statement therein to the
effect that the patents were executed subject to vested
and accrued water rights, etc., was evidently intended
as a precautionary measure to remove doubts then ex-
tant as to the legal effect of any patents subsequently
issued, so far as applicable to any rights acquired before
the date thereof.

In order, therefore, to remove such doubts and to es-
tablish a uniform rule throughout the states mentioned
in the act, whereby all appropriations made from streams
flowing through public lands over which congress had
power to legislate, after the provisions specifying the
manner in which lands taken under the act could be re-
claimed, there was added the clause: "And all surplus
water over and above such actual appropriation and use,
together with the water of all lakes, rivers, and other
sources of water supply upon the public lands, and not
navigable, shall remain and be held free for the appro-
priation and use of the public for irrigation, mining and
manufacturing purposes subject to existing rights": 19
Stat. 377 (U. S. Comp. St. 1901, p. 1549). This reser-
vation of water rights for the benefit of the public was
clearly not essential to any of the other provisions of the
act. The previous statement contained sufficient to de-

fine and protect the rights of those selecting lands under the desert land act; but the added proviso, or something of similar import, was essential to the establishment of a clear and uniform rule upon the subject as regards all appropriations thereafter to be made from streams or other bodies of water upon the public lands and to which such might be riparian. The words "shall remain and be held free for the appropriation and use of the public for irrigation," etc., are clearly words of reservation and dedication, and obviously so intended. It is insisted, however, that the language quoted is insufficient for either a grant, trust, or dedication; that a grant presupposes a grantee capable of receiving it; that it is not a trust, because all three essentials necessary to constitute a trust—i. e., trustee, *trust res,* and *cestui que trust* —are wanting; that it cannot be held to be a dedication, in that the right there alluded to is not an easement, but is usufructuary only, partaking of the nature of real estate, an incorporeal hereditament, analogous to a "profit" in land, in that it depletes the riparian right. It is further observed that a dedication is not a grant and cannot arise by grant, since it exists in favor of the entire public, in respect to which it was asserted, as above stated, that it cannot become a grantee.

14. A dedication is defined as being in the nature of a gift, inuring to the benefit of the public as a grant, but differing from a grant in that no grantee *in esse* is necessary to its validity: 9 Am. & Eng. Ency. Law, 21; 13 Cyc. 439. It consists of devotion or giving of property for some proper object and in such a manner as to conclude the owner: *State ex rel. Sims* v. *Otoe County,* 6 Neb. 129, 133; *Patrick* v. *Y. M. C. A.* 120 Mich. 185, 193 (79 N. W. 208).

15. A "reservation," as here used, is something taken from the whole thing covered by the general terms making the grant, and cuts down and lessens it (or act, under which title to the *res* from which the reservation may be

made) from what it would be except for such reservation: Words & Phrases, p. 6140; *Weynand* v. *Lutz* (Tex. Civ. App.), 29 S. W. 1097.

16. The latter term applied here: The national government by its various laws relating to public lands granted to its citizens the privilege of acquiring title thereto. Construing all together as one act, the Desert Land Act by the language used appears to reserve therefrom to the entire public the right of any citizen, after March 3, 1877, to divert, use, and acquire a right in and to the unappropriated waters flowing through, or adjacent to, any lands thereafter patented, such right to be determined by priority. Reservations of this class may be found in *Calhoun Gold Min. Co.* v. *Ajax Gold Min. Co.* 27 Colo. 1 (59 Pac. 607, 615: 50 L. R. A. 209: 83 Am. St. Rep. 17); *Wilcox* v. *McConnell*, 13 Pet. (U. S.) 498 (10 L. Ed. 264); *Wilson* v. *Higbee* (C. C.), 62 Fed. 723.

17. It would not be seriously questioned that such a reservation might be expressly and effectively made in a deed or other evidence of title: Then, when we take into consideration that to determine the extent of the title received through a conveyance of any kind from the government, whether by grant, patent, or otherwise, we must look into all acts in force in reference to the lands intended thus to be conveyed, to ascertain what interests remain subject to transfer, it becomes manifest that there is no difference in principle between a reservation resulting from an act in force at the time and an express reservation in the instrument itself through which title may be asserted.

18. It would seem, however, that as to what may be the proper term by which any interests thus reserved may be designated, we need not inquire. Nor is it material whether any term has been recognized or established by the courts to cover the privileges and rights reserved or surrendered by the government to the public, or individuals of which the public is composed. Our form of

government, constitution, and powers reserved to the government, has necessarily given rise to privileges and rights not fully covered by the common law or by the terms in common use under it. The right of the government to dispose of its public lands, and to deal with all rights incident thereto, in such a manner as it may deem best, has long been fully established and recognized by all decisions upon the subject. True, it cannot by legislation determine for any state, after its admission, what the local laws relative to riparian rights shall be (*United States* v. *Rio Grande Irr. Co.* 174 U. S. 690, 703 : 19 Sup. Ct. 770 : 43 L. Ed. 1136) ; but the general government, in dealing with its public lands, may provide for their transfer as might any other landed proprietor, and make such reservations therefrom by grant, dedication, or otherwise as it may see fit.

19. Riparian rights may become the subject of a grant or dedication, and may be severed from the soil: *Coquille Mill & M. Co.* v. *Johnson* (Or.), 98 Pac. 132. This principle is clearly and concisely stated in an opinion by KNOWLES, District Judge, in *Howell* v. *Johnson* (C. C.), 89 Fed. 556, 558, as follows: "Being the owner of these (public) lands, it has the power to sell or dispose of any estate therein or any part thereof. The water (in question) in an unnavigable stream flowing over the public domain is a part thereof, and the national government can sell or grant the same, or the use thereof, separate from the rest of the estate, under such conditions as may seem to it proper." Decisions to the above effect are too numerous and too well understood to need extensive citation.

By the homestead and other land acts congress granted to the citizens of various states and territories the right, at any time thereafter, to enter upon the public domain and to select a quantity of land, in the manner there specified, and of thereby securing a home, notwithstanding no certain individual was designated to accept and

receive such title. The effect of these acts was that the grantor of the public lands, the national government, was to hold these lands in trust for the public, to be acquired by any qualified citizen thereof on compliance with the rules prescribed. Numerous grants *in praesenti* were also made, to be held in trust by states designated in such grants for any company, person, or persons who might construct any wagon or other roads there indicated. For example, a grant was made to the State of Oregon of alternate sections of public lands, designated by odd numbers, three sections per mile, to be selected within six miles of what was, at the time of the passage of the act, an imaginary road between two given points within the State, upon the doing of certain acts thereafter to be performed, thus reserving to the builders, if any there might be, the right to select the odd sections desired: Act July 5, 1866, c. 174, 14 Stat. 89; *Cahn* v. *Barnes* (C. C.), 5 Fed. 326; *United States* v. *Dalles Military R. Co.* (and seven others), 140 U. S. 599, 11 Sup. Ct. 988, 35 L. Ed. 560; *United States* v. *Willamette V. & C. M. Wagon Road Co.* (D. C.), 42 Fed. 351; *United States* v. *Willamette V. & C. M. Wagon Road Co.* (C. C.), 55 Fed. 711. Such a road in time became a certainty, and more than 30 years after the passage of the act lands were selected, in reference to which it has been held that upon selection thereof the right thereto relates back to the date of filing the map of definite location of the road, shutting out all intervening claims and settlements, regardless of patents issued to settlers thereon during the meantime; and this, too, notwithstanding such policy was instrumental in holding in abeyance and withdrawing from settlement large tracts of the public domain for more than a quarter of a century: *Eastern Oregon Land Co.* v. *Brosnan* (C. C.), 147 Fed. 807. Any settlers on such lands are held to have entered thereon with full knowledge of the law, and to have taken them subject to the "contingent interests" in the land, of such

possible road, of such company as might become the ben-
eficiary of the grant: *Altschul* v. *Gittings* (C. C.), 102
Fed. 36, 38.

Another and more apt illustration is that of the policy
of the national government respecting its mineral lands,
in regard to which any one, acquiring title to any part
of the public domain under the homestead or under any
other act, takes such land subject to the exception that
he does not acquire title to the minerals known to be
therein at the time of entry or patent, whether located
for minerals at the time of the inception of the rights of
its grantee or not: 5 Fed. St. Ann. §§ 2318, 2319 (U. S.
Comp. St. 1901, pp. 1423, 1424) ; *Calhoun Gold Min. Co.*
v. *Ajax Gold Min. Co.* 27 Colo. 1 (59 Pac. 607: 50 L. R. A.
209: 83 Am. St. Rep. 17).

20. It was in the exercise of a similar prerogative on
the part of the government that there was by the act of
1877 given to the public, or to any individual thereof, the
right to appropriate and apply to a beneficial use the
waters flowing through its public domain.   No limit as
to the time in which this right may be exercised is made,
except in effect that he who first diverts the water and
with due diligence applies it to the uses there enumerated
is given the better right thereto.   It can make no differ-
ence, therefore, whether it be termed a grant, reserva-
tion, dedication, trust, or other privilege.

21. This unquestioned power of the owner over the
public domain was exercised, and any one entering upon,
and acquiring title to, any part of the public domain after
the passage of this act, accepted such land and title
thereto with full knowledge of the law under which the
patent was issued; the import thereof being that this
right incident to the soil was reserved by the govern-
ment, to be held in trust for the public, and that he who
first applies the water to a beneficial use shall become
the owner of the right thereto, and that the recipient
of such title takes it subject to that right, which he, in

common with others of the public, is privileged to exercise. It is elementary that the grantor can convey no greater title than he has. This rule, as applied to cases of this nature, is clearly and concisely stated in *Hume* v. *Rogue River Packing Co.* 51 Or. 237 (92 Pac. 1065, 1067). There the plaintiff was owner of a grant from the State, either directly to himself or by mesne conveyances to others, of all the tide lands bordering upon the river, as well as of all the uplands adjacent to the river above tide water, the title to which was acquired from the United States, and the description of which ran to the meander lines. In discussing this feature, this court, by SLATER, C., says:

"He has no title by express grant from the State to any part of the bed and stream as such; but he does claim title to the entire bed of the stream at the mouth of the river, where, by reason of the shifting of the channel of the river from north to south, and *vice versa,* and by successive purchases from the State as tide land of the uncovered sands on both sides of the river, his deeds overlap, and apparently, at least, he is, at that point of the river, the owner of the bed of the stream. But this fact, we apprehend, will be of no avail in support of his claim of ownership of the water when flowing over such land, for in any event he could acquire no greater rights thereby than would be given the ordinary and legal effect of such deed by virtue of the statute authorizing its execution and delivery."

22. It is true that the act of 1870 made it necessary to insert in the patents a reservation of all vested and accrued water rights, rights of way, etc., as well as to make similar reservations in patents respecting minerals; but, as stated, so far as a legal effect of the reservation is concerned, such would have been unnecessary, in that the government could grant no greater right than it had. Acts of this nature, like those requiring patents to be issued for lands acquired under railroad and other grants, under which title passes by virtue of the acts granting the lands, are but supplemental legislation. In

this manner the evidence of title may more conveniently be placed of record, and thereby add to the convenience, in many respects, of the holder of the title, but otherwise adds nothing thereto: *Cahn* v. *Barnes* (C. C.), 5 Fed. 326, 331; *Pengra* v. *Munz* (C. C.), 29 Fed. 830, 835; *Langdeau* v. *Hanes*, 21 Wall. 521 (22 L. Ed. 606) ; *United States* v. *Dalles Military R. Co.* 140 U. S. 599 (11 Sup. Ct. 988: 35 L. Ed. 560) ; also cases cited in 8 Rose's Notes (U. S.), 466.

A good illustration of the power of the government or other landed proprietor, at all times and whenever desired by it, to grant, reserve, or dedicate a right to any one at any time to acquire title to all or to any part of its public domain in such manner as it might designate —either to the land itself, or to the incorporeal rights appurtenant thereto, whether an easement over it, the removal of the minerals, of the timber, or of the right to the use of all or any of the waters flowing through or adjacent to such land—may be found in the recent case of the *United States* v. *Winans,* 198 U. S. 371 (25 Sup. Ct. 662: 49 L. Ed. 1089). In that case a suit was brought to enjoin the owners of certain lands on the Columbia River from interfering with the exercise by the Indians on the Yakima Indian reservation, in the State of Washington, of fishing rights and privileges over, on and adjacent to lands along the Columbia River, patented to the defendants therein, which rights were claimed under the provisions of a treaty made in 1859 between the Indians and the United States. This treaty reserved to them the exclusive right to fish in all streams running on and within certain lands within prescribed limits, and to fish in common with the citizens of the territory at all accustomed places in the vicinity, and further secured to such Indians the right of way over all lands necessary for carrying such reserved rights into effect, together with the privilege of erecting on any of the then public lands temporary buildings for the curing of fish. Subsequently

the lands between the Columbia River and the special tract set aside and known as their "reservation" were entered by citizens of that state, and patents, without reservations therein of any kind, were issued to them. Grants from the State of Washington to the shore land fronting the patented lands were also procured by the patentees, together with licenses from the state to maintain devices for taking fish, called "fish wheels." By virtue of these patents, grants and rights thus acquired by the landowners it was maintained that they could preclude the Indians from fishing along the shores and from crossing the patented lands for that purpose, in respect to which it was argued that the Indians, under the rights reserved to them and recognized by the government in the treaty, acquired "merely an executory license or privilege, applying to no certain and defined places, and revocable at will of the United States, to fish, hunt, and build temporary houses upon public lands, in common with white citizens, upon whom the law has conferred no title by occupancy whatever." These contentions were sustained by the United States Circuit Court in that state (*United States* v. *Winans* (C. C.), 73 Fed. 72, 74) ; Judge HANFORD, *inter alia,* observing: "The theory that lands conveyed by government patents, after being so conveyed and appropriated by individual citizens, still remain subservient to use and occupation by the Indians, for travel over the same, otherwise than by lawfully established public highways, and for camping grounds, finds no support in the provisions of the treaty, nor in the rules for the construction and interpretation of statutes, which must be applied in the interpretation of the treaty and of the public land laws of the United States." But on appeal to the United States Supreme Court this decision was reversed (198 U. S. 381: 25 Sup. Ct. 662: 49 L. Ed. 1089) ; the court holding, in substance, that, notwithstanding patents were issued to the lands by the government, the patentees took the same subject

to the rights reserved to the Indians thereafter to fish along the shores of the Columbia River, including a right to erect temporary structures for that purpose, and to retain such easements as would enable the privileges thus reserved to be exercised. In discussing the effect of the patents the court say: "The reservations were in large areas of territory, and the negotiations were with the tribe. They reserved rights, however, to every individual Indian, as though named therein. They imposed a servitude upon every piece of land, as though described therein. There was an exclusive right of fishing reserved within certain boundaries. There was a right outside of those boundaries reserved 'in common with citizens of the territory.' The land department could grant no exceptions from its provisions. It makes no difference, therefore, that the patents issued by the department are absolute in form. They are subject to the treaty as to the other laws of the land."

23. It is clear from the foregoing decision (1) that whether the landed proprietor be the government, a tribe of Indians, or other owner, such proprietor may reserve or grant a right or interest in, over, and appurtenant to, or in any manner connected with, its lands, not necessarily to an individual alone, but to a class of individuals in general, as well as in particular, without limit as to time, application, and use, of the rights or privileges thus reserved, dedicated, or granted; (2) and such right or interest in its public lands becomes effective in favor of those for whom it may be reserved, or to whom it may be dedicated, and against those subsequently acquiring title thereto, even though such rights may not be exercised until after the lands shall have been patented to others; (3) and that, in so far as the binding effect thereof is concerned upon such subsequent purchaser, it is immaterial that such reservations, or exceptions, are not specified in the patents or other instruments of conveyance.

24. Reservations of this class are fully and ably discussed by the Supreme Court of Kentucky in *Rowan's Ex'rs* v. *Town of Portland,* 8 B. Mon. 232. The Supreme Court of New Hampshire, in the case of *State* v. *Franklin Falls Co.* 49 N. H. 240, 256 (6 Am. Rep. 513), declines either to agree with the reasoning of that court or to follow the rule there enunciated; but the United States Supreme Court, in *Morgan* v. *Railway Co.* 96 U. S. (6 Otto 716) (24 L. Ed. 743), clearly adopts the reasoning applied by the Kentucky court, and observes that the consideration there given those questions is a full, able, and correct exposition of the law on the subject, with which conclusion we concur. In *Rowan's Ex'rs* v. *Town of Portland,* 8 B. Mon. 232, the dedication related to certain streets adjacent to a stream, and included the right of wharfage or right to land boats and other vessels along that part of the street bordering upon the river. The court, in discussing the legal effect thereof, concludes that the grantor, holding title subject to the use to which it was dedicated, held the title thereto in himself as trustee for the public, which his grantee took subject to such trust, and further observes: "Whether the public at large was or could be the immediate grantee or recipient of this right we should consider it fruitless to inquire. The potential right of use in and by the public was created by the sale and conveyance of the lots, and whether it passed at once to the public, or remained in abeyance, or is the mere result of an estoppel, or vested in the purchasers of lots as a part of the estate conveyed to them, it was in either case alike perfect and beyond the future control of the original proprietor or his alienees of the title on which this right of use was ingrafted." Again, as stated in *Pearsall* v. *Post,* 20 Wend. (N. Y.) 111, 119: "It seems to be well settled by the Supreme Court of the United States, by several courts in the neighboring states, to which we may, perhaps, add the court of chancery in this state, that dedications of land for religious and charitable

purposes, as well as for public ways, and squares, commons, parks, and other easements in nature of ways, are to be upheld, although there be no person *in esse* capable of taking as a grantee at the time. It was remarked by Mr. Justice THOMPSON, in *Cincinnati* v. *White's Lessee,* 6 Pet. 431 436 (8 L. Ed. 452), that 'the principle, if well founded in law, must have a general application to all appropriations and dedications for public use, where there is no grantee *in esse* to take the fee.' He adds: 'This forms an exception to the rule applicable to private grants, and grows out of the necessity of the case.' These remarks comprehend every conceivable case where a man has furnished evidence of a clear intent to give up his real estate for the purposes of any legitimate public use."

Privileges of this class were not unusual, and were recognized as being subject to dedication in the early history of the law on the subject, as disclosed by further remarks therein of the same court, namely: "I pass over the more usual instances of easements, such as ways, commons, and water privileges, etc., enjoyed either by individuals, towns, or other corporations. * * We may also pass over those which are less common, and one put by Mr. Justice THOMPSON, in 6 Pet. 437 (8 L. Ed. 452), from *McConnell* v. *Lexington,* 12 Wheat. 582 (6 L. Ed. 735), the reservation of a spring of water for public use. It was made to a corporation, which might turn the spring to its own or public purposes. Thus the user was invoked to establish an individual right. A like case is mentioned in Co. Litt. 56*a*, a customary watering place in the Inhabitants of Southwarke, for violating which an action was held to lie." In the spring case alluded to it appears that the Commonwealth of Virginia in 1773, by an act known as the "Land Law," reserved 640 acres of land, upon which the spring was situated, for the benefit of those who had settled in a village or city, afterwards to be laid out into lots and divided among such settlers. The spring was in common use by the inhabitants of a village

located on this tract, and afterwards claimed by one of the purported grantees of the lot upon which it was situated. The court, however, in an opinion by Mr. Chief Justice MARSHALL, held that the use of the spring by the public and the recognition thereof for a long period of time constituted such a dedication, and that, even though the claimant thereof be considered the grantee of the land upon which the spring was situated, its use for the purposes mentioned, although no reservation was made in the deed, must be deemed to have been reserved. It may be said that in that case the entire public exercised the right to the use of the spring thus dedicated, but it must be remembered that the exercise of this right was merely by the individuals constituting the public.

25. In the case at bar the public exercises the right in a somewhat similar manner, except on a larger and more extensive scale, in that an appropriation by any individual or corporation gives it a right in and to the flow and use of the water appropriated for the purposes for which it is diverted, which right may afterwards be subject to sale and transfer. But it is clear that, if a dedication can be made to the public of a spring or a stream in the manner indicated in the last case quoted, the owner of any source of water supply may make a like dedication in that or in any other manner determined upon. The manner of making the dedication, as well as its legal effect, must be determined from the act or instrument by which it is made. In the case under consideration it will be observed that the language used is that the surplus waters of the streams and of other sources of water supply designated shall remain and be held free for the appropriation and use of the public for (1) irrigation, (2) mining, and (3) manufacturing purposes.

The manner of appropriating and using the water for irrigation, manufacturing, and mining purposes was at that time and has been at all times since well understood; hence the use by the public and manner thereof is specified, meaning, when interpreted in the light of the

then existing facts, the usual manner of applying it for power purposes and of diverting it by means of ditches and other systems in use for irrigation, including also the usual methods in use by miners.

26. It follows that the rights reserved to the public and dedication of the surplus waters therefor were intended for use in that manner. Construed, then, with the act of 1866 and other provisions of the act of 1877, we are of the opinion that all lands settled upon after the date of the latter act were accepted with the implied understanding that (except as hereinafter stated) the first to appropriate and use the water for the purposes specified in the act should have the superior right thereto.* So far as we are able to determine, the question, as here presented, has not heretofore been squarely before any of the courts. But, while not deemed essential to an adjudication therein, we find the act of 1877 considered to some extent in the following cases: *Williams* v. *Altnow,* 51 Or. 275 (95 Pac. 200) ; *Farm Investment Co.* v. *Carpenter,* 9 Wyo. 110 (61 Pac. 258: 50 L. R. A. 747: 87 Am. St. Rep. 918) ; *United States* v. *Conrad Inv. Co.* (C. C.) 156 Fed. 123, 128; *United States* v. *Rio Grande Irr. Co.* 174 U. S. 690 (19 Sup. Ct. 770: 43 L. Ed. 1136) ; *Gutierres* v. *Albuquerque Land Co.* 188 U. S. 545 (23 Sup. Ct. 338: 47 L. Ed. 588) ; *Kansas* v. *Colorado,* 206 U. S. 46 (27 Sup. Ct. 655: 51 L. Ed. 956) ; *State ex rel. Liberty Lake Ice Co.* v. *Superior Court, Spokane County,* 47 Wash. 310 (91 Pac. 968).

In the first case mentioned, Altnow, who was the proprietor of the land upon which Warm Springs Creek had its source, claimed both as a prior appropriator and as a riparian owner. To his riparian claim it was maintained as a defense that his lands were settled upon after the date of the desert land act, for which reason he was not a riparian proprietor in the sense that as such alleged riparian owner he could assert a right in the stream for

*See: *Boquillas Land & Cattle Co.* v. *Curtis,* 212 U. S.—29 U. S. Sup. Ct. Rep. 494, citing this cast on above point.        REPORTER.

irrigation; and this contention was in that case expressly upheld by the trial court. On this point Mr. Chief Justice BEAN observes that Altnow's claim as riparian proprietor (all other parties therein being in the same position in this respect) could not be upheld for two reasons: (1) That he relied upon his claim as prior appropriator and was bound by it; (2) that the lands having been entered since the year 1877, "it is a serious question whether the desert land act does not abolish the so-called modified doctrine of riparian rights, which gives to riparian proprietors the right to use water for irrigation as to all lands through which nonnavigable streams flow, the title to which has been acquired from the government of the United States since the passage of that act." And after quoting from the act, he further remarks: "The government of the United States, as the primary owner of the soil, undoubtedly has the right to make such provisions concerning the waters of nonnavigable streams thereon as it deemed proper, and it is at least a debatable question whether, by the language quoted, congress did not intend to recognize and assent to the appropriation of such waters in contravention to the common-law doctrine of riparian rights as to persons subsequently acquiring title from the United States: *United States* v. *Rio Grande Irr. Co.* 174 U. S. 690 (19 Sup. Ct. 770: 43 L. Ed. 1136)."

In Wyoming the doctrine of priority of appropriation for beneficial use in contravention to the common-law rule on the subject prevails. By legislative enactment in 1886 the water of every natural stream in that state was declared to be the property of, and dedicated to the use of, the public. The manner of appropriation and acquirement of such rights are specified, included among which, priority of an appropriation for a beneficial use was declared to give the better right. It is thus evident that without the provisions of the desert land act the court there held and was bound to adhere to that doctrine.

But in *Farm Investment Co.* v. *Carpenter*, 9 Wyo. 110
(61 Pac. 258: 50 L. R. A. 747: 87 Am. St. Rep. 918), Mr.
Chief Justice POTTER, in discussing the question as to
whether an express constitutional or statutory declara-
tion was necessary in the first instance to render the
streams and other natural bodies of water the property
of the public, and subject to the control of the laws of the
state, without reference to riparian rights, says: "If
any consent of the general government was primarily
requisite to the inception of the rule of prior appropria-
tion, that consent is to be found in several enactments
by congress, beginning with the act of July 26, 1866, and
including the desert land act of March 3, 1877. Those
acts have been too often quoted and are too well under-
stood to require a restatement at this time at the expense
of unduly extending this opinion."

In New Mexico Territory, where the doctrine of prior
appropriation also prevails, a similar question to that in
the Wyoming case came before the court in *Gutierres* v.
*Albuquerque Land Co.* 188 U. S. 545 (23 Sup. Ct. 338:
47 L. Ed. 588). The question there involved the validity
of a territorial act permitting the construction of canals
and condemning rights of way, etc., in reference to which
it was urged that the territorial act was invalid, because
it not only assumed to dispose of the property of the
United States without its consent, but was in conflict with
the legislation of congress and, therefore, void. It was
there argued that the waters affected by the statute were
public and exclusively the property of the United States;
but the statute alluded to permitted private parties and
corporations to acquire the unappropriated waters in vio-
lation of the right of the government to control and dis-
pose of its property wherever situated. In considering
this feature, Mr. Justice WHITE, speaking for the court
(188 U. S. 552: 23 Sup. Ct. 341, 47 L. Ed. 588), in his
opinion observes: "Assuming that the appellants are
entitled to urge the objection referred to, we think, in

view of the legislation of congress on the subject of the
appropriation of water on the public domain, particularly
referred to in the opinion of this court in *United States*
v. *Rio Grande Irrigation Co.* 174 U. S. 690, 704-706:
19 Sup. Ct. 770 (43 L. Ed. 1136), the objection is devoid
of merit. * * By act March 3, 1877, c. 107, 19 Stat. 377,
the right to appropriate such an amount of water as might
be necessarily used for the purpose of irrigation and
reclamation of desert land, part of the public domain,
was granted, and it was further provided that 'all surplus
water over and above such actual appropriation and use,
together with the water of all lakes, rivers, and other
sources of water supply upon the public lands and not
navigable, shall remain and be held free for the appropria-
tion and use of the public for irrigation, mining, and man-
ufacturing purposes subject to existing rights.' "

27. In *United States* v. *Rio Grande Irr. Co.* the inquiry
was into the navigability of the Rio Grande River and as
to the effect a proposed dam therein would have on navi-
gation.  While it was there unquestioned that the com-
mon-law rule was that every riparian owner was entitled
to the continual flow of the stream, and that states and
territories had the power to change this rule and to permit
the appropriation of the flowing waters for such purposes
as they deemed wise, the court states that this power "is
limited by the superior power of the general government
to secure the uninterrupted navigation of all streams
within the limits of the United States." It was urged in
this connection that the desert land act of 1877 also in-
cluded therein the right to appropriate the waters of any
stream, even though the depletion caused thereby should
impede navigation.  In the opinion the desert land act,
together with that of the acts of 1866 and 1891, are re-
ferred to, concerning which the court, by Mr. Justice
BREWER, at page 706, of 174 U. S., and page 776 of 19
Sup. Ct. (43 L. Ed. 1136), comments as follows: "Ob-
viously by these acts, so far as they extended, congress

recognized and assented to the appropriation of water in contravention of the common-law rule as to continuous flow. To infer therefrom that congress intended to release its control over the navigable streams of the country and to grant in aid of mining industries and the reclamation of arid lands the right to appropriate the waters on the sources of navigable streams to such an extent as to destroy their navigability, is to carry those statutes beyond what their fair import permits. This legislation must be interpreted in the light of existing facts—that all through this mining region in the west were streams, not navigable, whose waters could safely be appropriated for mining and agricultural industries, without serious interference with the navigability of the rivers into which those waters flow. And in reference to all these cases of purely local interest the obvious purpose of congress was to give its assent, so far as the public lands were concerned, to any system, although in contravention to the common-law rule, which permitted the appropriation of those waters for legitimate industries."

These appear to be the only cases in which the attention of the court has been called to this act, the plain inference from which is that, in the opinion of the eminent jurists quoted, the act of March 3, 1877, was such a reservation by the national government to and for the public and such dedication thereto of all its rights in and to all the waters flowing through its public lands for irrigation, manufacturing and mining purposes, as to abrogate the modified common-law rules upon the subject, in so far as applicable to all lands entered after that date. But the effect of the language of the act that "there shall remain and be held free for the appropriation and use of the public for irrigation," etc., we think, while constituting words of reservation and dedication, limits the rights thereunder to the deprivation of the riparian lands of the water only in so far as it may be claimed by the riparians for the purposes there enumerated. One of the rights insepara-

ble from the land has always been that the owner of such land was entitled to an adequate supply of water flowing over it for domestic use, together with sufficient for the domestic animals necessary for the proper subsistence and maintenance of the landed proprietor and his family. This necessary use, no doubt, gave rise to the doctrine of riparian rights in the earliest development of the law upon the subject, followed by requirements for navigation, next extended to include the right to its use for power purposes, and later to the production of such garden and grains as was essential to the subsistence of the family of such riparian owner. At first the right of all riparians was evidently restricted to the demands upon the stream for the first purposes named. Lastly, as civilization progressed and extended over the semi-arid sections throughout the different nations, the riparian demands accordingly became more extensive and enlarged to include irrigation, but limited at first, no doubt, to the watering of such garden and other produce reasonably necessary for the riparians' domestic consumption, and as the strictly arid localities became populated, by reason of the correspondingly increased commercial, agricultural, and mining development, this right was finally extended to include the irrigation, not only for the limited purposes mentioned, but to the watering of large areas in the production of grains and other agricultural products, together with its expansion thereof to include all its present uses.

28. The language used in this act was clearly intended to change the rule respecting the right of riparians to the use of water for irrigation, mining, and power purposes; but as in the last case cited, it has its limits. It does not go so far as to affect the rights originally giving rise to the doctrine of riparian rights; that is, for domestic use, including the watering of domestic animals and such stock as may be essential to the sustenance of the owners of lands adjacent to the streams or other bodies of water.

And as held in the last case cited, although abrogating the common-law rule on the subject, the act was not intended to permit appropriators to deplete the flow to such an extent as materially to impair the navigation of the rivers to which such streams directly or indirectly may be tributaries. The reason for this is plain: To permit an interference with navigation would be to deprive the entire public of a valuable right, which at all times has been recognized as paramount to that of the individual desiring such interference; while to permit an appropriation of water depriving the owner of the land through which it may fiow of its use for irrigation, affects such person only. So far as the government may be concerned by the depletion of a particular tract of land of such benefit, if any, it is recouped by the reclamation of a like tract for which the diversion causing the injury may be made.

29. However, it cannot be presumed that it was the intention of congress to render the soil absolutely worthless by drying the lands by diversion of the waters flowing through them to nonriparian lands as to leave the soil without the water essential to the owner's domestic needs. Presumably the best possible results for all concerned were intended, which it is clear could best be obtained by permitting the settler to retain the quantity of water essential to the sustenance of his family and to other natural wants incident thereto, but, if he does not see proper to apply it to any of the uses specified in the act, then to permit the first home builder on other lands to make such use of it as will bring into cultivation the lands not adjacent to the streams, thereby protecting the settlers upon both classes of lands, and at the same time not only encourage home building, but enable the government to dispose of more of its lands, and to enhance its revenues proportionately.

30. It often happens that an owner of lands in arid districts does not want to farm them, but merely wants a home where he may raise stock or engage in other pur-

suits, requiring only sufficient water supply to meet the natural wants incident thereto, and for which no artificial diversion or application of the stream may become necessary. It will not, therefore, necessarily be presumed that such settler intends to irrigate his lands, or that he will ever demand the water for such purposes, for which reason congress evidently intended by the language used in the act of 1877 that, if desired for such purposes, some manifestation thereof by diversion or other sufficient notice should be given, and, if not desired for the reclamation of his lands, that the owner should not be permitted to complain if another shall so apply it. But, as regards the requirements for domestic use, the settlement, or other steps taken looking towards the procurement of title thereto, gives ample notice that the water for all necessary domestic uses is, and will continue to be, demanded as appurtenant to the land entered, as much so as would a diversion of the water for such purposes; while, if intended to be appropriated for irrigation, mining, or power purposes, some affirmative action in that direction is essential, and it is but reasonable to require a clear manifestation of an intent or notice thereof. This requirement is vital to the initiation of such a right, for the same reason that some notice is exacted for the entry of the land itself. Congress could reasonably presume that, if an appropriation were desired for the purposes mentioned in the act, some steps would be taken manifesting such intent, and that, if the owner is not the first to move in that direction, the person making an application thereof to a beneficial use within a reasonable time ought to be rewarded for his diligence, and he is entitled to have his rights in that respect recognized and protected. For this reason the settler who has acquired title to the land through which any stream may flow, took it subject to the rights of the person who has or who may subsequently make the first use of such stream for the purposes enumerated in the act, excepting only as to the natural wants and needs of such settler.

31. Our attention is called to references in our statute to riparian rights (B. & C. Comp. §§ 4994, 5000), which, it is argued, recognize the doctrine of riparian rights as being in force in this state, regardless of the act of congress under consideration. It could with equal strength be maintained that Section 5002, B. & C. Comp., which provides that "all controversies respecting rights to water under this act shall be determined by the dates of the appropriations as respectively made by the parties," constitutes a declaration to the effect that the doctrine of prior appropriation shall prevail. The statute does not attempt to define riparian rights, nor to determine the extent or effect of the doctrine as applied to irrigation. It has reference only to such rights as such riparian owner, as the proprietor, may have, whatever they may be; and the question as to what such rights are, and since 1877 have been, is the one under consideration here. Owners of land adjacent to bodies of water have riparian rights other than those presented in this controversy: See *Morton* v. *O. S. L. Ry. Co.* 48 Or. 444 (87 Pac. 151, 1046: 7 L. R. A., (N. S.), 344: 120 Am. St. Rep. 827) ; *Coquille Mill & M. Co.* v. *Johnson* (Or.), 98 Pac. 132. As hereinbefore held, the act of 1877 only affects riparian rights to lands the title to which has been acquired since that date, and then only in so far as a claim to the use of water may be asserted as riparian owner for the purposes in the act enumerated. And in this connection it will be observed that Section 5000, B. & C. Comp., protects the owner contiguous to the stream, as against those claiming under the act of which that section is a part, in his right to the flow of the stream to the extent required for household, domestic, and other uses incident thereto, with sufficient quantity for irrigation purposes to the extent then actually needed and in use. An exception to that extent is accordingly made in favor of the land owner, as against, and only to the extent of, such rights as may be asserted under the act.

Our attention is called to *Sturr* v. *Beck,* 133 U. S. 541 (10 Sup. Ct. 350: 33 L. Ed. 761). That was a controversy between a riparian owner and a subsequent, but prior, appropriator, and was submitted on an agreed statement of facts. Based upon these stipulations, the trial court made findings, among which was that the defendant's first settlement upon his land through which the stream flowed was in March, 1877, and that he made a homestead filing thereon on the 25th of the same month. These findings were conclusive upon the appellate court. The date alluded to does not disclose whether the settlement was prior or subsequent to March 3, 1877, the date of the desert land act. Owing, therefore, to the uncertainty as to the date of settlement, this decision cannot be held in point. And the further fact that no reference appears as to the exact date clearly indicates that either the settlement was made before that date, or that the question did not occur to the litigants and was accordingly not urged before the court, nor considered by it. But, whatever view may be taken in this respect, its bearing on the question at hand is practically disregarded, if not overruled, by that court in its declaration on the subject through Mr. Justice BREWER in *United States* v. *Rio Grande Irr. Co.,* above quoted, as well as in the general reference to this act by the same court in an opinion by Mr. Justice WHITE in *Gutierres* v. *Albuquerque Land Co.* 188 U. S. 545 (23 Sup. Ct. 338: 47 L. Ed. 588). To the extent, therefore, that *Sturr* v. *Beck* may be deemed a precedent as regards riparian rights, its weight is materially lessened, if, indeed, the rule as there and previously enunciated on the subject is not overruled by that court in the recent case of *Kansas* v. *Colorado,* 206 U. S. 46 (27 Sup. Ct. 655: 51 L. Ed. 956). In *Sturr* v. *Beck* it was, in effect, held that the plaintiff could make no appropriation as against Beck, who was a riparian proprietor and who was entitled to the undiminished flow of the stream. This claim as to the law was asserted and

the same application thereof insisted upon in *Kansas* v. *Colorado,* in which the citizens of Kansas insisted that large quantities of water were being diverted from the Arkansas River by the inhabitants of Colorado, a large number of whom were claiming as prior appropriators and diverting the water to nonriparian lands, as against Kansas, a riparian proprietor. In Kansas the modified doctrine of riparian rights prevailed, while in Colorado prior appropriation was and is recognized as the governing doctrine. The court refused injunctive relief and dismissed the bill, stating in substance that if the riparian doctrine should prevail in Kansas as against Colorado and against the nonriparian users whose rights were involved therein, Oklahoma and its citizens lower on the Arkansas River might invoke the same rule in opposition to both the citizens of Kansas and Colorado, to their great injury, which doctrine, it is observed, would be ruinous in its effect. The court, in dismissing the bill, indicated that no injunction would lie until a more substantial injury could be shown, and at the same time found that the interference by a large number of the appropriators above in the State of Colorado materially depleted the flow to the riparian lands of the plaintiff. This opinion was written by Mr. Justice BREWER, who was not a member of the court when the case of *Sturr* v. *Beck* was argued and submitted, for which reason, although a member of the court when the opinion in the latter case was filed, he took no part in the decision. The opinion in the Kansas-Colorado case not only brushes aside the rule claimed to have been announced in *Sturr* v. *Beck,* regarding riparian rights, but discloses what, in the opinion of the writer, is a strong and commendable tendency on the part of that great court to recognize that the rigid rules of common law, as interpreted and sought to be applied by those insisting upon the "undiminished flow" theory, are inapplicable to the many new and intricate questions necessarily arising under our form of government and through-

out the arid and semi-arid sections. For a specific statement of the facts in this case, disclosing many of the defendants to be using the water on nonriparian lands, see the first opinion, which was on demurrer: *Kansas* v. *Colorado,* 185 U. S. 125 (22 Sup. Ct. 552: 46 L. Ed. 838).

32. We come, now, to the adjudications in this state. While it is urged that the decisions of this court have recognized a doctrine inconsistent with that here enunciated, our attention is not directed to any where the question, as here presented, has been before the court or in any manner urged or submitted. Nor have we been able to find such a case. Numerous suits have arisen where the riparian questions have been urged, considered, and discussed, and in some respects determined; but in none does it appear that the lands were entered after the date of the act under consideration. If, in fact, the titles to lands involved in some of the cases were obtained since the date of the act, the court's attention was not directed thereto, and it is well settled that no case can be deemed a precedent binding upon the court unless the point in question was there presented or considered.

The first case in this state wherein the doctrine of riparian rights appears to have been considered is that of *Taylor* v. *Welch,* 6 Or. 198, which, *inter alia,* holds in effect that every proprietor of land through which a stream of water may run is entitled to its undiminished flow without obstruction. This opinion was filed in 1876, and no questions of irrigation were involved. The rule there announced was not only unnecessary to a decision, but impliedly modified in a subsequent opinion by Mr. Justice BOISE, in *Coffman* v. *Robbins,* 8 Or. 278, which holds that the flow may be diminished by the upper riparian proprietor to the extent of the amount needed to supply his domestic wants and a reasonable quantity for irrigation. Since then numerous other opinions have been filed in this court, where directly and indirectly riparian rights as affected by irrigation have been dis-

cussed, and points in reference thereto determined, among which are *Shively* v. *Hume,* 10 Or. 76; *Shaw* v. *Oswego Iron Co.* 10 Or. 371 (45 Am. Rep. 146) ; *Shook* v. *Colohan,* 12 Or. 239 (6 Pac. 503) ; *Weiss* v. *Oregon Iron Co.* 13 Or. 496 (11 Pac. 255) ; *Kaler* v. *Campbell,* 13 Or. 596 (11 Pac. 301) ; *Faull* v. *Cooke,* 19 Or. 455 (26 Pac. 662: 20 Am. St. Rep. 836) ; *Low* v. *Schaffer,* 24 Or. 239 (33 Pac. 678) ; *North Powder Milling Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223) ; *Jones* v. *Conn,* 39 Or. 30 (64 Pac. 855, 65 Pac. 1068: 54 L. R. A. 630: 87 Am. St. Rep. 634) ; *Brown* v. *Baker,* 39 Or. 66 (65 Pac. 799, 66 Pac. 193) ; *Mace* v. *Mace,* 40 Or. 586 (67 Pac. 660, 68 Pac. 737) ; *Oregon Const. Co.* v. *Allen Ditch Co.* 41 Or. 209 (69 Pac. 455: 93 Am. St. Rep. 701) ; *Salem Mills* v. *Lord,* 42 Or. 82 (69 Pac. 1033, 70 Pac. 832) ; *Cottel* v. *Berry,* 42 Or. 593 (72 Pac. 584) ; *Harrington* v. *Demaris,* 46 Or. 111 (77 Pac. 603, 82 Pac. 14: 1 L. R. A., (N. S.), 756) ; *Morgan* v. *Shaw,* 47 Or. 333 (83 Pac. 534) ; *Seaweard* v. *Duncan,* 47 Or. 640 (84 Pac. 1043) ; *Parkersville Drainage Dist.* v. *Wattier,* 48 Or. 332 (86 Pac. 775) ; *Williams* v. *Altnow,* 51 Or.275 (95 Pac.200) ; *Davis* v. *Chamberlain,* 51 Or.304 (98 Pac. 154). In some of the foregoing cases it appears that the title passed before the year 1877, while in all of the others the date of the initiation of the title to the lands there alluded to as riparian is not disclosed, and no issue appears to have been made upon that point.  In *Jones* v. *Conn* the participants claimed as riparian owners only, and the cause was tried out on that issue; the dates of the inception of their rights presumably having no bearing thereon.

In *Seaweard* v. *Duncan* the initiation of the contestants' rights to the land irrigated occurred after the year 1877; but the only issues presented were as to the relative priorities of their appropriations of the water in dispute. Crooked Creek, there involved, flows through the lands of Seaweard, who used but 120 inches of water for irrigation. Duncan was a nonriparian owner, and insisted

upon having all the water in excess of that amount divided between himself and Seaweard, although his ditch carried but 80 inches, being his full appropriation and sufficient for the irrigation of his nonriparian lands. In this case the court might have passed upon the question here considered, had Seaweard relied upon his claim as riparian proprietor. Likewise in *Seaweard* v. *Pacific L. Co.* 49 Or. 157 (88 Pac. 963), the same question might have been determined, had the company there relied upon that claim. But the issues there, like those in the other case, being as to the relative priorities of their diversions and use of each, only these questions were adjudicated. It is manifest that these Seaweard cases cannot properly be cited in support of the argument that the doctrine of riparian rights was not affected by the desert land act, since the issues were not so framed, nor proof offered thereon, as to entitle the point to be considered, although it were possible to frame issues to that end. But it would be as logical to cite these cases as precedents on the point under consideration as to insist that the other Oregon cases cited should be conclusive. Other illustrations in this state might be given, where the titles to the lands affected by the waters involved were obtained since 1877, and where no reference was made thereto in any opinion filed thereon; but, like the above, and for the reasons given, they are not in point.

33. Considering, then, the effect of the desert land act upon the lands of the parties whose interests are here involved, the question arises as to what lands are riparian and what is the extent thereof. To determine what are riparian channels, a brief examination of the main stream, tributaries, and branches becomes necessary. Silver Creek rises in township 31 S., range 14 E., on the slope immediately north of Cycan marsh, in Lake County, and flows northerly for a distance of about 25 miles into what was formerly Pauline marsh, entering the marsh at a point near the center of section 2 in the township and

range mentioned, where, until recent years, it spread and
its current terminated.  Until its bed was reclaimed the
marsh covered about ten square miles, through which
Silver Creek emptied into Silver Lake, about three miles
below.  The stream is fed mainly by waters from the
slopes south and southwest of Hager Mountain.  During
the early spring, beginning about March 1st, it usually
carries about 100 second feet (sometimes reaching twice
that quantity when at its highest stage), to from 40 to 50
second feet during the first week in May, after which
it rapidly recedes to about 11 or 12 second feet, thus re-
maining during the rest of the year.  The west branch
of Silver Creek rises in township 30 south, range 14 east,
and flows into the main channel near the northwest cor-
ner of township 29 of the same range, and the two streams
together furnish the supply of water mentioned.

Bridge Creek, a tributary of Silver Creek, rises in the
Yamsay Mountains, near the dividing line between Lake
and Klamath counties, and runs northeasterly, emptying
into Island Branch near the center of section 15, town-
ship 28 S., range 14 E., and thence into Silver Creek,
and from February 1st until about June 15th furnishes
an average flow of about three second feet, after which it
diminishes to one second foot, and thus remains through-
out the season.  The quantity supplied by this stream is
not included in the above estimate of the flow of Silver
Creek.  Beginning near the center of the S. ½ of the
N. E. ¼ of section 21, same township and range, a high-
water channel, through which water seldom flows after
the 1st of May of any year, leads from the east side of
Silver Creek and returns to the stream about one mile
below at a point near the southeast corner of the S. W.
¼ of section 15.  At this point two channels diverge, one
from each side of the creek, which, until artificially
opened, were known as "high-water channels," and
through which no water ran at any time after the first
week in May.  The easterly divergence is known as "Bun-

yard Branch," which, at a point near the center of the N. W. ¼ of the S. W. ¼ of section 14, again divides, from which point both branches, continuing to a point near the center of the W. ½ of section 13, township 28 S., range 14 E., practically disappear, emptying into what, at the time the channel was opened, was a marsh. The divergence from the west bank is known as "Island Branch," and flows northerly through section 15, returning to the main stream near the southwest corner of section 11. At a point near the southeast corner of the N. W· ¼ of the S. W. ¼ of section 11, there divaricates what is known as the "Conley Branch," being a channel similar to the other branches named, which extends through the S. A. D. Porter onto the Conley lands, and ends near the west line of the C. C. Jackson farm. In the S. E. ¼ of the N. W. ¼ of section 11, Silver Creek divides into two channels, each of which continues through the lands of Hough and the Occidental Land & Improvement Co., in section 2, into what was once Pauline marsh. With the exception of the main channels of Silver Creek and its tributaries named, all were high-water channels merely, through which no water flowed after May 10th until improved or enlarged as indicated.

Between the years 1878 and 1882 the heads of Island, Bunyard, and Conley Branches were artificially opened, since which time, when the stream was not depleted by diversion for irrigation purposes, about one-fourth of the water has run through Bunyard Branch, one-half of that remaining through the main channel, and the remainder through Island Branch, all returning above the head of Conley Branch, through which latter channel, when not interfered with, about one-fourth flowed to Conley's premises; the rest continuing through the main channel. At this time the only residents on the streams were those occupying what are now the premises of Hough, Conley, S. A. D. Porter, J. C. Porter, and lands now claimed by Geo. H. Small and E. D. Lutz, as well as

those of Lucinda Egli and Geo. Durand, several miles above. The opening of these channels was acquiesced in by all on the stream, and since the year 1882 the water has naturally run through them in about the proportion indicated. Having flowed in this manner for more than the period prescribed by the statute of limitations, they have become fixed: *Cottel* v. *Berry*, 42 Or. 593 (72 Pac. 584) ; *Harrington* v. *Demaris*, 46 Or. 111 (77 Pac. 603, 82 Pac. 14: 1 L. R. A., (N. S.), 756.) Therefore since about the year 1880 each of these branches has been well defined and recognized as a part of Silver Creek, and so far as riparian rights can be applied to the main channel they attach with equal force to the branches named.

34. As nearly as can be determined from the evidence, and especially from the general maps and data to be gathered from the history and records of geological surveys of the country, commonly in use throughout the state at that time, and until reclaimed, all of section 2, except the south one-half thereof, and all of section 1, township 28 south, range 14 east, and sections 35 and 36, in township 27 S., range 14 E., and all of section 31, township 27 S., range 15 E., were swamp and overflowed lands constituting a part of Pauline marsh, into which Silver Creek and its channels emptied; and, while the water finally worked its way through the swamp and marsh into Silver Lake below, there was no practical channel over the lands constituting the swamp or marsh until after the settlement of the farms above on Silver Creek, its tributaries, and channels, after which the depletion of the flow caused by the use of the water above for irrigation, together with the artificial channels constructed for drainage, reclaimed the land, since which it may be said channels have been formed, but when they were formed the record does not disclose. When the water spreads with no well-defined current it cannot be deemed a water course, such as will bring it within any rule permitting a claim thereto as riparian owner on the stream. It is not always necessary, however, that the stream flow through

well-defined banks; but the current and course thereof must be clearly perceptible. On this point, Mr. Farnham, in his work on Waters (Section 458), says: "In order to constitute a water course the water must have a current. It cannot be stagnant, nor spread out so as to destroy the current. If the water spreads out so that the current becomes imperceptible or is lost, the water becomes a lake or pond, and is no longer a water course." See, also, Wiel, Water Rights (2 ed.), p. 161; *West* v. *Taylor*, 16 Or. 165 (13 Pac. 665).

35. None of the lands claimed in section 2 by the Occidental Land & Improvement Co., or by Kittredge in section 36, or by defendants, McKune, Brown, Jones, Henderson, Jackson, J. M. Small, and B. F. Lane, or those owned by J. C. Porter in sections 23 and 26, township 28 S., range 14 E., are riparian to any of the streams or channels mentioned. McCall's land was at one time riparian to one of the lower channels of Silver Creek; but for more than ten years after his settlement thereon and prior to the commencement of the suit this channel has been closed, from which the water has been diverted into other water courses during the dry season. He has, accordingly, lost such rights as he may have acquired, if any, as riparian owner: *Oregon Const. Co.* v. *Allen Ditch Co.* 41 Or. 209 (69 Pac. 455: 93 Am. St. Rep. 701) ; *Harrington* v. *Demaris,* 46 Or. 111 (77 Pac. 603, 82 Pac. 14: 1 L. R. A., (N. S.,) 756).

36. The respective owners of all lands situated on Silver Creek, its tributaries, or branches, are entitled at all times to a sufficient flow of the waters of Silver Creek to supply their domestic needs, including a sufficient quantity for a reasonable number of stock; but no definite quantity for this purpose can, under the evidence before us, be fixed here, further than to hold that it must be such a reasonable quantity as to furnish an ample supply to all and in such a manner that the stream shall not become stagnant nor in any manner injurious to the health of the inhabitants or their stock depending on the supply.

37. The evidence before us being inadequate therefor, the flow necessary for this purpose in each of the channels must therefore be left for determination under this decree to the court below, in the event any question hereafter arises concerning such quantity, with permission to enter a supplemental. decree in reference thereto, upon sufficient showing for that purpose by any of the affected parties: See *Morton* v. *O. S. L. Ry. Co.* 48 Or. 444, 452 (87 Pac. 151, 1046: 7 L. R. A., (N. S.), 344: 120 Am. St. Rep. 827).

38. The surplus remaining after such wants and necessities are supplied during any season of the year are subject to appropriation, and rights thereto attached and became vested in the order of time in which the water has been diverted and appropriated.

39. Before considering in detail the rights of each, we shall notice some of the facts and law of general application to the respective rights involved. The quantity required for the proper irrigation of the lands varies from one-fourth of an inch to one inch per acre. The term "inch," wherever referred to, is estimated on the basis of 40 inches to one "second foot." See Wiel, Water Rights (2 ed.), 278; *Gardner* v. *Wright,* 49 Or. 609, 636 (91 Pac. 286).

40. In determining the "duty of water," or quantity essential to the irrigation of any given tract of land, we must take into consideration the character, the climatic conditions, the location and altitude of the lands to be irrigated, the kind of crops, period of time irrigated, and necessary manner of irrigation, as well as many other contingencies not arising here.

41. The "head" of water, or quantity entering the intake of any canal or ditch, must also be considered. A large body of water, used at one time and upon the same tract, will reclaim a larger quantity of land proportionately than will a small supply; for example, one miner's inch might prove inadequate in many instances for the

proper irrigation of more than a small fraction of an acre, while 100 inches, or 2½ second feet, if under the control òf and used by one person and at one time, might properly irrigate 300 acres of the same kind of land.

42. Applying these principles in the case at hand, where there are no small bodies or tracts involved, we think the water users, by the adoption and use of the more modern and economical methods now more generally applied and in use, will find that a constant flow of from one-third to two-thirds of an inch per acre will prove adequate for the proper irrigation of the lands. The allowance of from one-third to two-thirds of an inch per acre furnishes sufficient quantity, if permitted to flow continuously for 90 days, to cover the soil 1.5 feet in depth (if the lesser amount), making 1½ "acre feet," or approximately 3 feet in depth (if the larger amount), or 3 acre feet, which is more than allowed by the government reclamation service for the irrigation of lands in Klamath County, where they have about the same altitude, climate, and soil, with similar crops, and where the latest and improved methods of irrigation, as required by the government, are in use. The "duty of water" there allowed by the government under its irrigation project to each of the water users for the entire season is 1½ acre feet, being the minimum here awarded: 6 Ann. Rep. of Reclamation Serv. p. 195. In some instances a larger amount than the quantity here permitted was originally diverted; but merely because in the earlier history of the vicinity large quantities were diverted and applied, notwithstanding the ditches first constructed were of sufficient capacity to carry such supply, does not necessarily indicate that such was needed. Again, it has been so often demonstrated as to become a matter of common knowledge that lands after years of irrigation do not require the amount which, when first applied, was essential to the successful growing of crops thereon. This law of nature, added to the improved methods, greatly reduces

the quantity now required. See *United States* v. *Conrad Invest. Co.* (C. C.) 156 Fed. 123, 130.

43. It is also argued that since, under the old methods in use before the substantial depletion of the flow by subsequent appropriators, Hough and some others, by reason of the excessive water supply, with the aid of a few dams in the channels and sloughs, could irrigate with but little trouble or expense, the recognition by this court of the appropriations made by subsequent locators will thrust upon Hough and others, in order to avail themselves of the quantity awarded them, the necessity of changing their methods of application and use of the water by the construction of ditches, etc., at great expense, all of which would be avoided, were it not for the interference of such subsequent claimants. For this reason it is maintained that the rights of the later settlers and appropriators were acquired subject to the methods in use at the time of the inception of their interests. This feature, however, is similar in principle to that of the farmer who at first may have needed but 100 inches of water and yet constructed ditches carrying three times that quantity, using it in a wasteful manner, and which right he still insists upon by reason of the ditch, when first constructed, being of sufficient capacity to carry the excessive supply. It is well settled that such a claim cannot be successfully maintained: *Seaweard* v. *Pacific L. Co.* 49 Or. 157, 161 (88 Pac. 963). It is true, however, that no certain method is necessary to constitute a valid appropriation, so long as the water has been applied to·a beneficial use; and this may be done either by ditches or by other methods of diversion and application, such as the placing of dams in the streams and sloughs, and thereby overflowing the land, or subirrigating it, as the case may be: *McCall* v. *Porter*, 42 Or. 49 (70 Pac. 820, 71 Pac. 976).

44. But will it do to say, that because in some cases irrigation was had by damming the sloughs, with but little

expense and work, causing the large excess of water supply to spread over the premises, the old methods, which had their origin when there was but little demand for water and its supply correspondingly abundant, may be continued? In this arid country such manner of use must necessarily be adopted as will insure the greatest duty possible for the quantity available: *Van Camp* v. *Emery*, 13 Idaho, 202 (89 Pac. 752); *Anderson* v. *Bassman* (C. C.), 140 Fed. 14, 27. The wasteful methods so common with early settlers can, under the light most favorable to their system of use, be deemed only a privilege permitted merely because it could be exercised without substantial injury to any one; and no right to such methods of use was acquired thereby.

45. Owing to the little demand and large proportionate supply in use by those along Silver Creek and its branches in the early '80s, together with the lack of general knowledge and experience on the subject throughout the state, wasteful methods at that time were, no doubt, common; but of recent years improved means throughout the West have come into use, and a scarcity of the supply has made a more economic use necessary. The result is that the law has become well settled that beneficial use and needs of the appropriator, and not the capacity of the ditches or quantity first applied, is the measure and limit of the right of such appropriators: Kinney, Irr. 30; Long, Irr. §§ 54, 55; Wiel, Water Rights, p. 263; *Seaweard* v. *Pacific L. Co.* 49 Or. 157 (88 Pac. 963); *Gardner* v. *Wright,* 49 Or. 609 (91 Pac. 286); *Union Mill M. Co.* v. *Dangberg,* (C. C.), 81 Fed. 73, 119; *Anderson* v. *Bassman* (C. C.), 140 Fed. 26. During the spring freshets, and prior to May 10th of each year, the quantity flowing in the channels of the stream below the junction of the Main and West forks of Silver Creek is sufficient, when properly distributed and economically used, to irrigate all the lands heretofore farmed in the vicinity; and there appears to be no controversy respecting the use of water earlier

than about that date. The irrigation season in the vicinity of Silver Creek, as a rule, begins April 1st and usually ends in July. The crops produced consist largely of natural hay, such as blue joint, red top, and other native grasses.

46. A number of the appropriations were made by the parties hereto, or by their predecessors long before the lands were filed upon or title thereto acquired. In this connection it is argued that a right to the use of water necessarily has its inception only from the date the filing is placed on the land. The right of a person claiming an appropriation of water cannot be tacked to that of a mere squatter, who, while he may have irrigated the land, has abandoned it: *Low* v. *Schaffer,* 24 Or. 239 (33 Pac. 678).

47. But a squatter upon public lands may, even by parol, transfer his claim and interest, whatever it may be in this respect, to another, and the rights of the subsequent purchaser and of his successors in interest, if asserted under the doctrine of prior appropriation, relate back to the date of the first appropriation by the person with whom there may be a privity of estate. It is well settled that the entryman need not necessarily have a complete title to the land in order to acquire a water right therefor.

48. A mere claim of right to the land, supplemented by a diversion and appropriation of the water, is sufficient to entitle him to convey to another such interests as he may have, whether such appropriator be a mere squatter or lessee, or other person in possession: *Rowland* v. *Williams,* 23 Or. 515 (32 Pac. 402) ; *Seaweard* v. *Pacific L. Co.* 49 Or. 157 (88 Pac. 963).

49. Another question developed by the facts to follow is that some of the rights acquired were in the irrigation of lands reclaimed as swamp lands, in respect to which it is maintained that the use of water thereon was not essential to their reclamation or irrigation. The legal

effect of such use depends upon the facts of each particular case. Merely because the land may have been reclaimed as swamp land does not necessarily deprive it of the need of irrigation.

50. The circumstance that it has been reclaimed may raise a presumption that at a particular time it required no water for irrigation; and testimony to that effect may be admitted in evidence for the purpose of ascertaining the quantity of water essential to its productiveness. But when it appears that the land has in fact been reclaimed sufficiently to entitle its possessor to a deed from the state, if in an arid section, it implies that the land has been deprived of its excessive moisture, and thereby restored to the same condition as other agricultural lands in the vicinity, and subject to the same rights in respect to the stream flowing through it, or in an appropriation from any source of water supply for its irrigation.

51. This brings us to a consideration of the relative priorities of the parties. By stipulation each of the parties is deemed to be the owner of the respective tracts of land alleged to belong to them; but the dates as to when and how the titles were acquired, with the exception of that of the property of the Porters and one or two others, are not disclosed, the testimony being directed only to the dates of the first settlement and to when the water was first diverted. The appropriations, considered in the order of the dates made (the numbers indicating their relative priorities), together with the acreage upon which they applied and number of inches to which each is entitled, are as follows:

(1) Anna C. Hough's title to the lands described as belonging to her had its inception in May, 1878, and the appropriation for irrigation thereof was initiated June 1, 1878, by means of dams placed in the various channels flowing over the premises, diverting water therefrom for irrigation of the land, since which date its use has been continuous, except when interrupted by adverse claim-

ants.   Settlement on the lands and use by this method of
the water for irrigation date from 1873; but the privity
of estate between the various occupants is not established
as to any settlement antedating May, 1878.   There were
irrigated on the Hough farm not more than 200 acres of
land, which were brought under irrigation within a rea-
sonable time after the first use of water thereon as in-
dicated.   The lands require not to exceed 100 inches of
water, or 2½ second feet, for the proper irrigation there-
of, as a first right as against all on the stream, except that
of John C. Porter, with whom such right is coincident
in time.

(1a)  John C. Porter's title to the N. ½ of section 14,
township 28 S., range 14 E., relates back to June, 1877,
and the first appropriation of water thereon to about
June 1, 1878. There was applied to a beneficial use within
a reasonable time in the irrigation of 240 acres, 100 inches
of water, the right to which dates from June 1, 1878,
and is coincident with that of Anna C. Hough.   It may
be diverted to his premises by either Bunyard Branch or
Silver Creek, or by ditches therefrom.

(2)  Lucinda Egli's lands  are  situated  above all of
those of the other parties named, except Geo. Durand,
and consist of about 400 acres, the title to which relates
back to 1879, and the water right for which was located
in April, 1882; her rights attaching as of that date, and
used in the irrigation of 240 acres, requiring 120 inches.

(3)  Marion Conley's title to his land relates back to
the year 1880, of which he irrigates 240 acres.   It devel-
ops that he made a cut from the main channel of Silver
Creek into what has since been known as "Conley
Branch," to drain some swamp land· in the year 1877;
and some effort was made at the trial to establish his
appropriation of the water as of that date.   It is not
clear, however, as to where this swamp land is situated.
The evidence strongly tends to show that it was on the
opposite side of Silver Creek, and that by turning the

water from above the lands in another direction he was able to reduce its swampy character and thereby to cut some hay crops thereon. It is not shown that this constituted any part of his present 320-acre tract. But it is clearly and satisfactorily established that about May 1, 1880, he made a cut opening up the Conley Branch of Silver Creek, thereby connecting it with the main channel, and diverted the water through it to his premises for irrigation purposes, since which time he has constantly used water through this channel in the irrigation of his lands to the extent mentioned, for which purpose an aggregate of 100 inches of water at the points of diversion from the Conley Branch near his premises is sufficient. To this quantity he is entitled as of the date last named.

52. (4 and 6) Geo. H. Small's testimony is to the effect that the title to most of his lands relates back to the year 1878, by reason of having settled there at that time, and on account of which he claims a water right from that date. The ownership, however, is averred to have its inception only 10 years prior to the commencement of this suit. He claims to have constructed the first ditch in 1881, which was taken from the stream at a point known as the junction with Silver Creek of Island Branch and Bunyard Branch, and that he constructed the other two ditches in the year 1882. Fifty inches of the water claimed is taken from Bridge Creek. But, after a careful examination of the testimony, we conclude that all except the first diversion was made in the spring of 1884, and made for the purpose of procuring title to about 600 acres under the desert land act. He has 1,800 acres of land, of which we find 600 consist of what was once his desert claim, filed on in 1884. It does not appear from the record where he finally procured his title to his lands; but one of the exhibits in evidence discloses that all his land in section 15—600 acres of which he claimed for a long time to be the owner, but the title to 240 acres

of which was finally acquired by Lutz (*Small* v. *Lutz*, 41 Or. 570: 67 Pac. 421, 69 Pac. 825)—was sold by the State in 1885 to different parties as swamp land, one part of which, the N. W. ¼ of the N. W. ¼ and the S. E. ¼ of the S. E. ¼, was deeded by the State to Small under the swamp land act. It is strongly disputed that Small irrigated any lands, or made any attempt to do so, prior to 1884. The fact that 600 acres thereof were claimed and attempted to be procured under the swamp land act affords strong evidence that no irrigation thereof was made prior to that date. Moreover, it appears that 240 acres of the land which he claims to have irrigated at that time did not belong to him; that he was a trespasser thereon, this land being subsequently procured by the defendant Lutz from the government; and that the irrigation and claim therefor by Small was finally abandoned. The attempt to procure title to the desert land tract, as admitted by Small, discloses that no claim to water could well have been made for the irrigation of that tract prior to 1884, as it was necessary in filing thereon, which is conceded, to make affidavit to the effect that the land had not in any manner been reclaimed prior to that date: *Houck* v. *Bettelyoun*, 7 Land Dec. Dep. Int. 425.

53. Coupled with this circumstance is the testimony of S. A. D. Porter, with other evidence, to the effect that no appropriation was made by Small prior to 1884. However, there in some strong evidence tending to show a diversion and use by him of the water in 1881 or 1882. But we think a clear preponderance of the testimony establishes that, outside of the lands then deemed too swampy for use, and after deducting the 240 acres of Lutz's land, not more than 300 acres were intended to be irrigated by Small, not including the island property, at the time of completion of his ditch in 1884; nor did he intend to increase his irrigation at any time prior to the year 1895. For this delay no cause is assigned, and,

the delay in increasing his appropriation being unreasonable, his use is limited to 190 inches as a total allowance for 360 acres, being the water diverted in and prior to the year 1884, which renders subsequent appropriations and applications of the excess of waters by others valid: *Seaweard* v. *Pacific L. Co.* 49 Or. 157, 161 (88 Pac. 963). At that time 200 or 250 inches of water may have been deemed necessary, and possibly more than that quantity was then diverted through the ditches at which period claimants were few and water in abundance; but, as before stated, the right to the use of water must be limited to the quantity necessary for the proper care of the land, for the reclamation of which the right was acquired. It appears that no more than one-half inch per acre is actually needed for this purpose, and even less may suffice where the water is used in large quantities. We think, therefore, that 150 inches, limited in its use to 300 acres, is about the quantity actually intended in 1884 to be diverted, and is all that is required for the lands then claimed and, prior to 1895, farmed by Small, and for which no intended or attempted diversion was made prior to 1884.

54. In addition to the above amount 100 inches were diverted by Small in June, 1882, and used for irrigation of the island between Island Branch and the main channel, about half of which was used upon the Lutz tract; and since he lost the Lutz tract, 40 inches of this appropriation are ample for the remaining lands, not exceeding 60 acres, belonging to him on the island, to which quantity he is entitled for the irrigation thereof, dating from June 1, 1882. None of the quantity acquired under this (1882) appropriation can be used elsewhere without prejudicing others' rights, for which reason he is limited to its use, when needed, to the lands mentioned. There is no satisfactory evidence of any intended use of more than sufficient to irrigate the lands covered by this diversion prior to 1884, when his second ditch was com-

menced, which, for the reasons given, we are satisfied was begun on the latter date. The second appropriation (1884), consisting of 150 inches, 50 of which were from Bridge Creek, dates from June 1, 1884; and he is entitled as of this date to 50 inches from Bridge Creek and to 100 inches from Silver Creek or its branches, measured at the point of diversion therefrom, and is limited in its use to the irrigation of 300 acres.

(5) S. A. D. Porter's title to his lands, consisting of 320 acres, described in the former opinion, relates back to the year 1880. The first diversion for irrigation purposes, for which use thereafter was continuous, was made in May, 1883, and prosecuted to completion until 240 acres were irrigated, for which he requires not to exceed 100 inches for the proper irrigation thereof, the right to which had its inception May 1, 1883. To this quantity he is entitled as of that date.

55. (7) Walter C. Buick, Corinna Buick, Lulu Corum La Brie, Isa Corum, a minor; Jewell D. Corum, and J. M. Small, through their predecessors in interest, are the owners of the lands described as belonging to them, for which they originally acquired a water right through what is known as the "Buick-Corum-Small ditch," tapping a channel of Silver Creek in the S. E. ¼ of the N. E. ¼ of section 21, township 28 S., range 14 E. This channel diverges from Silver Creek near the center of the S. ½ of the N. E. ¼ of the section named, and returns to the main stream near the northeast corner of the N. W. ¼ of section 22, from which point it again diverges, and below which it is known as the "Bunyard Branch." The construction of this ditch was begun in March, 1885, and completed in the following year within a reasonable time from the commencement thereof. Their rights to the water thus acquired relate back to March, 1885, the date of the commencement of its construction: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59, 86 (45 Pac. 472: 60 Am. St. Rep. 777). The testimony respecting the

carrying capacity of this ditch varies from an estimate of 229 to 600 inches. Mr. Moore, an engineer testifying in the case, states that he surveyed it at a point where he thought was its smallest carrying capacity, which he estimated at 229 inches; the survey being made by him a short time before taking the testimony. The testimony discloses, however, that the ditch has been neglected for the past five or six years, and the capacity thereby reduced about one-third. This is probably due to the fact, as disclosed by some of the testimony, that the owners of the ditch during recent years have been receiving a large part of their supply through the Bunyard Branches. We feel justified, under the evidence, in fixing the capacity of this ditch and right of the appropriation acquired through it at 300 inches at the intake thereof, which, allowing for evaporation and loss by seepage for a distance of three or four miles before it reaches the Small farm, the last on the ditch, should deliver at the points of use somewhere from 270 to 280 inches, which, if properly distributed and economically used, is ample for the irrigation of all the lands under it.

56. There is irrigated by Walter C. Buick and Corinna Buick, his wife, 120 acres from this canal and 20 acres from Bunyard Creek. Isa M. Corum, a minor, Lulu Corum La Brie, and Jewell D. Corum together irrigate 140 acres; and a like acreage has been irrigated for a number of years by J. M. Small. A part of the lands of each of these parties appear to be supplied with water from the different branches of Bunyard Creek, including a new ditch taken out of this branch; the quantity used in this manner and acreage on which it is applied not being clear. J. M. Small states that he uses in irrigation about 60 inches from the ditch and 100 inches in all. It is clear, however, that their right has been acquired through this source, and upon it they must rely to determine the quantity to which each of them may be entitled, as well as to fix the date of the inception of their rights, which,

as stated, began March 1, 1885. They are tenants in common, both as to the ditch and water right: *Moss* v. *Rose,* 27 Or. 595 (41 Pac. 666: 50 Am. St. Rep. 743). There is no controversy or issue between them in this suit, and, as all claim through the same ditch and from the same original appropriation, no decree should be entered as to their relative rights.

57. As against the other parties to the suit, Corum and wife are limited in their use to the quantity required to irrigate 140 acres, not to exceed the use of 90 inches of water, as measured from the point of diversion from the ditch or channel of Bunyard Creek, as the case may be. Jewell D. Corum, Lulu Corum La Brie, and Isa Corum are jointly limited to a like amount and quantity under similar measurement, as is also J. M. Small.

58. It is suggested that the defendants cannot change their use, or any part of it, from the ditch to the channel of the creek, and thereby make use of Silver Creek and Bunyard Creek, and mingle the waters with those of other users on Bunyard Creek, and take water out at some other point; that by so doing they lose their rights to the extent thus attempted to be used and applied. It is settled, however, that any ravine, gulch, or hollow, as well as the natural channel, may be used in transmission of the water to his premises by the appropriator: *Simmons* v. *Winters,* 21 Or. 35, 44 (27 Pac. 7: 28 Am. St. Rep. 727).

59. The appropriator can use either the original canal or ditch as constructed, or any other channel, for the purpose of conveying the water to any point of use.

60. If they or either of them elect to use water from Bunyard Branch in lieu of from the ditch, the difficulty of measuring it arises, to obviate which allowance must be made for evaporation and loss by the different methods of diversions and distribution, together with the added distance which the water may have to flow in order to reach their premises through these channels. In order

to meet these contingencies we think it proper to estimate the difference in the quantity thus used by the acreage upon which it is applied, and, if used through any other source than that of their original canal alluded to, that one inch should be deducted for each acre of land irrigated from the Bunyard or other branches, or ditches leading therefrom, so that in the aggregate the water passing the intake of the channel from which the original ditch was taken and into the head of the Bunyard channel as used by them shall not at any time exceed in the aggregate, so far as their use and appropriation is concerned, 300 inches, when needed by others using the water along the creek or from any of its tributaries or channels.

61. It is urged in respect to their rights that only a part of the lands were entered or in cultivation when the ditch was first dug, and that the rights of each of the parties interested in this ditch are limited to the time when the lands of each were acquired and the irrigation thereof commenced. Whatever may be the rule elsewhere, this question is set at rest in the very clear and able opinion by Mr. Justice WOLVERTON, in *Nevada Ditch Co.* v. *Bennett*, 30 Or. 59 (45 Pac. 472: 60 Am. St. Rep. 777), where this feature was prominent among the many points relied upon. It was there held that a *bona fide* intention to devote the water to a useful purpose, which is required of an appropriator, may comprehend the use to be made by or through other persons and upon lands and possessions other than those of the appropriator.

62. It is also maintained by counsel for appellants that, since the Buick ditch for some distance runs through the property of the Occidental Land & Improvement Co. and was constructed under a written agreement to the effect that the construction of this canal and continuance thereof on those premises is permissive only, therefore no substantial right was acquired by the appropriation and diversion through this source. This is a

question, however, with regard to which none but the Occidental Land & Improvement Company are in a position to complain; and no issue is made by the pleadings, nor is any proof offered thereon between this company and the users and claimants of water through this ditch, for which reason these circumstances can have no bearing on the rights of the parties herein.

(8) P. G. Chrisman's and J. C. Porter's rights to the lands described in the former opinion as belonging to them (not including any owned by Porter in section 14) were acquired and title to their respective titles are as follows: The S. ½ of the N. W. ¼ of section 24, the N. E. ¼ of section 23, and the S. ½ of the N. W. ¼ of section 26, township 28 S., range 14 E., W. M., were entered by Porter under the desert land act in 1884. The W. ½ of the S. E. ¼ and the S. E. ¼ of the S. W. ¼ and all of the N. E. ¼ of the S. W. ¼, except the part thereof on which the town of Silver Lake is situated, of section 22, township 28 S., range 14 E., was entered by Chrisman in 1884. The water used in the irrigation of these lands was obtained through what is known as the "West-Porter-Martin ditch," tapping Silver Creek at a point near the center of section 21, township 28 S., range 14 E., which ditch was first begun September 1, 1885, and completed the following year, during and since which time it has been used in the irrigation of the above lands. The quantity of water used upon these lands and to which a right was acquired sufficiently appears from the capacity of the ditch as it is evident that the ditch was used to its full capacity, all of which was needed and applied in the irrigation of the farms mentioned. The ditch has a carrying capacity at the intake of 200 inches, which should be the limit of quantity allowed under their appropriation for irrigation of the lands described to the extent of 300 acres, not to exceed, in the aggregate, 200 inches, when needed, the right to which dates from the time of the commencement of the ditch in September, 1885.

It is insisted that this ditch and appropriation therein by Porter and Chrisman was made by what is known as the "Silver Creek Irrigation Company," an alleged corporation which is not a party to the suit; and it is so found by the court below. The evidence, however, fails to disclose the perfection of the corporation under the laws of the state, nor does it clearly identify this appropriation as the one intended to be owned by the contemplated corporation. But it is sufficiently established that the ditch was begun in the year 1885 by Chrisman, Porter, and others, its completion and use the following year, and the subsequent acquirement of the rights of all the parties therein by Chrisman and Porter, in respect to which, including the water rights therein, they are tenants in common.

63. (9) C. C. Jackson is the owner of 160 acres of land, which he has irrigated since June, 1886, by means of what is termed "waste and seepage water" from the farms adjoining his premises. While there might be some seepage water flowing to his premises from lands above, there would be no waste water, if those above follow the economical methods required by law. The so-called waste water has evidently been the water diverted by the parties above him in excess of the quantity needed. By the use of this surplus through the Conley Branch and branches over the lands above him, Jackson has, without objection, secured a right to such an amount thereof as, taken together with the seepage mentioned, will properly irrigate the 160 acres named, not to exceed 80 inches of such surplus, the right to which dates from June 1, 1886.

(10) W. H. McCall's title to the 160 acres described as belonging to him took effect in the year 1887, of which 120 acres have been irrigated by taking water from the high-water channel flowing through his premises, which water naturally flows through there until May 10th of each year. To the use of this water he is, in common with all others on the stream, entitled until that date,

and not to exceed 80 inches after May 10th of each year, the right to which dates from April 1, 1887.

(11) B. F. Lane's and Jennie Lane's rights attached to the land described as belonging to them May 1, 1888, and their rights to the water necessary for the proper irrigation of 160 acres thereof in May of the same year. The lands require 90 inches of water for their proper irrigation, which is taken through Bunyard Branch, and to which they are entitled as of the date named at the point diverted from that branch.

64. (12) George Durand's land is situated on Silver Creek and above all of the other parties. He seems to have initiated a title thereto in 1878, but claims a diversion of the water only for more than 10 years prior to the institution of this suit. A diversion more than 10 years prior thereto (April 1, 1890) and subsequent use is established; but no evidence was offered showing an earlier use. Having established these facts, he made a *prima facie* showing of adverse user.

65. This having been established, the burden of showing that such user was not a substantial interference with the rights of others was thereby shifted to the parties questioning such claim: *Gardner* v. *Wright,* 49 Or. 609, 628 (91 Pac. 286). This want of substantial interference, however, was clearly established by proof to the effect that there was no material shortage of water among those below, prior to 1895. For this reason neither he nor any of the parties relying on 10 years' adverse user are in a position to maintain this defense: *Bowman* v. *Bowman,* 35 Or. 279 (57 Pac. 546).

66. Rights to the use of water acquired by prior appropriation and adverse possession are not inconsistent: *Gardner* v. *Wright,* 49 Or. 609, 632 (91 Pac. 286) ; *Davis* v. *Chamberlain,* 51 Or. 304 (98 Pac. 154).

67. Since, therefore, Durand has pleaded an appropriation and use thereof adversely for more than 10 years prior to the institution of this suit, he has alleged

the date of his first diversion and continuous use there-
after since April 1, 1890, the proof of which, although
not sufficient to establish his title thereto by adverse pos-
session and use, is ample to fix the date of his appropri-
ation; and such rights as he may have he takes in the
order of his priority. As an appropriator his rights are
established to the extent of 160 inches, limited to the
irrigation of 480 acres, and date from April 1, 1890.

68. (13) The Occidental Land & Improvement Co. is
the owner of 2,200 acres of land. Of this amount 880
acres are in, and adjacent to, section 2, township 28 S.,
range 14, and have never been irrigated from Silver
Creek. Other lands belonging to this company were irri-
gated from Silver Creek, and are situated upon Bridge
Creek, in section 16, township 28 S., range 14 E., not
exceeding 120 acres, and require 80 inches of water for
the proper irrigation thereof. Two hundred and forty
acres can be irrigated from Silver Creek, of which 120
acres were irrigated, as stated, from Silver and Bridge
Creeks, from May, 1889, to the year 1893. The right to
the use of water by nonuser alone cannot be deemed for-
feited short of the period prescribed by the statute of
limitations for real actions: Dodge v. Marden, 7 Or. 456.

69. But such right may become extinguished by any
act showing an intent to surrender or abandon the right,
after which, if the person having the right ceases its use
for one year, his interest is lost; but the facts essential
to a forfeiture by this company are not established by
the proof. The nonuse from 1893 to 1900 is shown; but
this alone is insufficient. To constitute an abandonment
of a water right, there must be a concurrence of the
intention to abandon it and an actual failure in its use:
1 Cyc. 4. This company should be awarded 80 inches, to
be taken from either Bridge Creek or Silver Creek, the
right to which dates from May 1, 1889.

70. (14) E. D. Lutz appears to be the owner, and in
possession, of the E. ½ of the N. W. ¼ and the N. E. ¼,

of section 15 and the N. E. ¼ of section 10, all in township 28 S., range 14 E., the title to which relates back to 1890. During the summer of that year some of the water was applied by him in the irrigation of the lands in section 15; but three years later he was ousted by Geo. H. Small, who took charge of the irrigation of all these lands, claiming ownership thereof as to all except the east 80 acres, then held by J. C. Harrow as a timber culture claim. Lutz remained out of possession until about the time of the hearing herein, when it seems he prevailed in court, again resuming possession. See *Small v. Lutz,* 41 Or. 570 (67 Pac. 421, 69 Pac. 825). Lutz for a short time irrigated these lands, but was interrupted and prevented from continuing by Small, who, while wrongfully in possession, irrigated the premises and raised crops thereon. The absence of Lutz not having been voluntary, but having been an enforced removal therefrom, he cannot be deemed to have abandoned his rights to the use of the water. An involuntary absence from land does not work a forfeiture of any interest the owner may have therein: *Huffman* v. *Smyth,* 47 Or. 573 (84 Pac. 80: 114 Am. St. Rep. 938).

71. To permit Small to change the use of this quantity to other lands would work an injury to Lutz, as well as to others below on the stream, which should not be permitted. While well settled that a change of use and place of use of water by an appropriator may in some instances be permitted, such right is always limited to changes that do not impair the rights of others interested in the water of the stream. It appears that 100 inches of water is sufficient for the proper irrigation of this land, the right to which quantity attached in May, 1890, when first irrigated by Lutz, and is limited in its use to 200 acres.

(15) F. M. Chrisman's right to the S. E. ¼ of section 12, township 28 S., range 14 E., and water for its irrigation, relates back to May 1, 1891, to which he is entitled to 60 inches for the irrigation of 100 acres. The water

for this purpose may be received through either Bunyard or the Conley Branch, or through both, if necessary.

(16) Mary C. Brown's land, consisting of 100 acres, was settled on in November, 1892, and water appropriated for the irrigation thereof, to the extent of 50 inches, May 1, 1893, to which quantity she is entitled; and her right attaches as of that date.

(17) Mary J. Kittredge's title to her tract of 640 acres is alleged to have been procured from the State; but her interests are not shown to be connected with the State's title. The testimony discloses it to have been first settled upon in 1885; but the proof does not definitely fix the date when the first use of water was made for irrigation purposes, evidently relying upon her claim as a riparian owner, which, owing to the fact that until recent years the land was a part of Pauline marsh, was not clearly established. It appears, however, that it has been irrigated since 1894 by means of dams placed in the channels of the stream, spreading the water over the premises to the extent of 480 acres, which by means of dams and ditches could be properly irrigated with 160 inches of water, which quantity will be allowed her, dating from May 1, 1894. Since the land is low and of a swampy nature, we believe the quantity indicated is ample for its irrigation.

(18) P. W. Jones' right to the land owned by him began in June, 1893, and appropriation of water for the irrigation thereof in June, 1894; the water right therefor dating from that time. Fifty acres of his lands are irrigated from the waters of Buck Creek, not involved here, and 160 acres from Silver Creek, for the irrigation of which he is entitled to 80 inches of the waters of Silver Creek.

(19) C. E. McKune's lands were first acquired in the year 1896, and his right to the use of water for the irrigation of 100 acres thereof, to the extent of 50 inches, began in May of that year. His rights, therefore, attach as of that date.

72. (20)  E. K. Henderson's rights to his lands were acquired through the State of Oregon as swamp land in section 1, township 28 S., range 15 E.  None are riparian to Silver Creek, or to any of its branches.  No proof is offered respecting the character of his land, as to whether it is susceptible of, or needs irrigation, sufficient on which to base any decree.  Nor does it appear that he claims any rights in any of the controverted waters, or that he was a necessary party to this proceeding, for which reason the suit should be dismissed as to him, without prejudice.

73.  Plaintiffs, W. H. Hays, J. M. Hays, John Hays, and A. C. Geyer at the trial took a voluntary nonsuit.  Since the court ordered these parties brought in, it had a right to refuse to dismiss as to them, and, in the event they further declined to appear, to enter such decree against them as would have determined their relative rights with those of the other parties.  Being dismissed, however, and the proof not disclosing that they are necessary parties hereto, the court acted within its discretion in granting the nonsuit.  Their rights will accordingly remain undetermined.

74. As to the defaulting defendants, a decree should be entered in favor of all other parties herein.  It is maintained that, as to the parties named who have not appealed, no decree can be entered here respecting their rights more favorable to them than as entered by the trial court.  It is the general rule that on appeal it will be presumed that as to those not appealing the decree is satisfactory and will not be disturbed: *Seaweard* v. *Duncan,* 47 Or. 640 (84 Pac. 1043).  But for the reasons hereinafter given for the inapplicability of the general rule respecting pleadings, *in re* plaintiffs' and George H. Small's interests, the rule suggested by counsel respecting the rights of parties not appealing is not adapted to suits of this kind, and accordingly will not be invoked.

75. The parties hereto are each limited, in the application of the water adjudged to them, to the specific tracts upon which it has heretofore been applied, except in such instances as where it may be practicable to change the place of use without substantial injury to others whose rights are here determined; that is to say, if by changing the place of use, when the water is needed by others, the quantity returning to the stream after changing the place of use as compared to its previous application is substantially diminished, or if, by reason of such change, the "run off" reverts to the stream or channel below the point diverted by another, thereby reducing the supply at such point, it must necessarily operate to the injury of the rights of such other party, and the change must not be permitted: Wiel, Water Rights (2 ed.), § 47; *Williams* v. *Altnow,* 51 Or. 275 (97 Pac. 539).

76. Again, the use of the water by each, for reasons given in the case last cited, must also be limited in its use to the number of acres of land upon which previously applied, except at such times as the water or some part thereof may not be needed by others; and the owner not requiring its use should not be permitted to complain of its application to a beneficial use by others interested. In other words, at all times that the water is not required by one or more, it must be at the disposal of others in the order of their relative rights thereto: *Mann* v. *Parker,* 48 Or. 321 (86 Pac. 598) ; *Gardner* v. *Wright,* 49 Or. 609, 637 (91 Pac. 286) ; *Williams* v. *Altnow,* 51 Or. 275 (97 Pac. 539).

It is maintained by counsel for Geo. H. Small that since plaintiffs, in their reply as well as at the trial, admitted that Small is prior in time and superior in right to them to the extent of a constant flow of 500 inches of the water, the decree must recognize his rights accordingly. If this were a contest between the plaintiffs and Small only, and a decree could be entered in that manner without prejudicing the rights of others whose interests are involved,

this position might be tenable; but Small came into this suit under the order of the court, issued for the purpose of enabling it to adjust the rights of all, with a view, not only to the entry of a decree that will be effective, but that a multiplicity of suits might be obviated. The trial court having this authority (B. & C. Comp, § 41), it follows that this jurisdiction carries with it all the power essential to the making of such order effective.

77. If, then, some of the parties neglect or refuse to file pleadings asserting their rights, or, having done so, have presented them in such manner that an enforceable decree, or one in harmony with the spirit of the order, cannot be entered, and it appears that the cause has been tried and evidence taken and submitted, the court may, in the exercise of its sound discretion, either direct the pleadings to be amended to conform to the proof, or treat them as amended, and enter a decree accordingly. Such discretion is essential to the effective exercise of the equity jurisdiction in this class of cases. Water suits are, in a sense, *sui generis;* for the complications and many intricacies developed by litigation of this character, of late years, when all available lands are rapidly becoming settled, resulting in most instances in the demand for water exceeding the supply, necessarily give rise to new questions of practice, not covered by the statute nor aided by precedent. The courts, then, are confronted with the dilemma either of exercising their discretion in such matters or of making an exception to that well-known maxim, which is the foundation of all equitable jurisdiction, that "equity will not suffer a right to be without a remedy."

A good illustration of the necessity at times of deviating from the usual course in matters of practice, involving controversies of this kind, may be found in *Kansas v. Colorado*, 185 U. S. 125 (22 Sup. Ct. 552: 46 L. Ed. 838). In that case an attempt was made to state all the facts in the complaint and thereby to secure a determina-

tion of all legal points involved upon demurrer. The defendants, by demurrer, having admitted the facts pleaded, it would seem that the court, if it had followed the usual practice in such cases, would have determined the legal status of the parties without the necessity of taking the testimony. But in considering this phase Mr. Chief Justice FULLER, at page 145 of 185 U. S. (page 559 of 22 Sup. Ct.: 46 L. Ed. 838), in his opinion says: "The general rule is that the truth of material and relevant matters set forth with requisite precision are admitted by demurrer; but in a case of this magnitude, involving questions of so grave and far-reaching importance, it does not seem to us wise to apply that rule, and we must decline to do so." It thus appears that courts of equity are not necessarily bound in all cases by the rules of practice usually invoked. Now, as heretofore held, the court may direct all parties interested, or claiming any interest in, the subject-matter of litigation, to be brought in and require them to interplead with reference to each other: 51 Or. 367 (95 Pac. 732-749) ; but it cannot make them plead any certain facts. It must leave it to them to determine the course to be pursued in that respect. But if, in the exercise of such rights under the order, such parties default, or fail properly to plead or to offer proof, they assume the risk thus incurred, and are necessarily impelled to abide the result to follow; and the court, in the exercise of its discretion, may either enter a decree affecting their interests, or not, as it may deem just and equitable.

78. We can conceive of no case calling for the exercise of discretion of this character stronger than the one under consideration. It was begun in February, 1900, nearly nine years ago. It was first instituted by Hough against S. A. D. Porter, and the testimony taken disclosed that, owing to the interference in the use of the water by Small and others not parties to the suit, a decree between the contestants there would be futile. For

this reason the court below, in the exercise of its sound discretion, directed all persons interested in Silver Creek, its tributaries, and branches, to be made parties, with a view to determine their respective rights as speedily as practicable. The complaint was amended accordingly, and all made parties and served with summons, together with a copy of the order of the court. Of those thus served, some defaulted, others neglected to offer any proof respecting their rights, while the pleadings of some are imperfect, and the plaintiffs, as well as some of the defendants, have neglected properly to frame issues between themselves; and added to this is the greater and more difficult problem developed by the plaintiffs, making the admission alluded to respecting Small's rights, which admission is not only unsupported by the evidence, but it is disclosed that Small is subsequent in time and inferior in right to the plaintiffs Hough and Conley, as well as subordinate to the right of J. C. Porter, and subsequent in right to 150 inches of water to that of S. A. D. Porter. Now if, because no issues are framed between some of the plaintiffs, the court must necessarily refuse to enter a decree determining their relative rights, it would have been within the power of the litigants, after the entry of the order of the court requiring them to be brought into the suit, to have completely defeated its purpose by all joining as plaintiffs and making S. A. D. Porter the sole defendant, the absurdity of which is obvious.

Concerning the second point, if on account of plaintiffs' admissions in aid of Small, a decree must be entered in his favor for 500 inches as a first right against them, and at the same time Hough and Conley must be awarded a prior right as to S. A. D. Porter, and decree that Hough's rights are coincident in time and equal in equity with those of John C. Porter, as must be done under the evidence; then what follows? · John C. Porter must be decreed a first right as against Geo. H. Small to 100 inches

and (after Small's first 40 inches are supplied) S. A. D. Porter must be awarded a superior right as against Small to another 100 inches of the water. Then, pursuing the course urged by Small, on account of plaintiffs' admissions, it would be decreed that after he received his first 40 inches he must let 200 inches flow down to the Porters, but that as against Hough and Conley he may use 500 inches of what is left; but during the low-water season, when there are not more than 500 inches in the stream, Small would be entitled to 300 inches of this quantity. Then, on turning the remaining 200 inches down to the Porters, as soon as they would begin using it, Hough and Conley, under the decree, would demand, and have a right to exact, that the Porters let it flow down to them, and as soon as the water would strike the Hough and Conley farms it would again be rightfully claimed by Small to make his full quota of 500 inches of water allowed. Then, as soon as this request was granted, the Porters would require Small to turn 200 inches loose for them, and so on *ad infinitum.* Such an anomalous condition might have arisen if all the rights had been determined in separate suits; but it would be ludicrous to accede to such demands under the facts disclosed in a case like this, where all the parties are before the court. No admission by plaintiffs in favor of Small can be recognized when such concession would necessarily work to the material injury of others whose interests are involved. Small can insist upon no greater privilege in this respect than if he were a co-plaintiff; and whether he be treated as a plaintiff or defendant, to recognize the admission in his favor, even if only to the extent of awarding a right prior to Hough and Conley, would, as shown, be inimical to the Porters' interests, who are not parties to plaintiffs' concessions.

79. Again, it is pleaded by the Porters, as a defense against plaintiffs and Small, that they are in collusion, in respect to which it is averred that they have entered

into a conspiracy to enable Small to obtain a decree for 500 inches of water as a first right against all on the stream, in such a manner as to permit the water to flow around the headgate of Porter's ditches, through the premises of McCall, and onto those of Hough and Kittredge, and thereby secure to them water for irrigation purposes which they might otherwise be unable to receive. There is cogent testimony tending to support these averments, especially when considered in connection with the showing made in the *ex parte* proceedings in the case of *State ex rel.* v. *Small*, 49 Or. 595 (90 Pac. 1110). From the testimony it appears that Small was diverting much more water than. was required for the irrigation of his lands, the surplus of which was flowing onto the lands of the plaintiffs named, thereby depriving the Porters of the use thereof; and the showing made in the *ex parte* proceedings discloses that this method of diversion and use has been pursued by Small each year since the institution of this suit. But, whether such collusion exists or not, it is clear that to recognize the demands made in plaintiffs' reply as to Small's rights, together with an admission to the same effect made at the trial, would have the result which the Porters insist was intended by the alleged conspiracy. The situation as thus developed not only demonstrates the wisdom of the course pursued by the trial court in requiring all persons interested to be made parties, but that much discretion must be allowed the court in applying the facts to the issues intended by the parties, as well as to those contemplated by the court in making the order under which they are before us. Since the cause is tried *de novo* here, this court necessarily has the same discretionary powers in this respect; and in the exercise of this discretion, therefore, the court may, when all parties are properly before it, deem the pleadings amended to conform to the facts presented by the record.

80. But, owing to the difficulties likely to arise in the enforcement of a decree involving such questions as usually develop in a suit of this class, the court below should, in order to protect the rights of all the parties, or their successors in interest, enter such supplemental decree or decrees as may be necessary for that purpose; and, if at any time deemed necessary by it, the court should require the sheriff, or other officer or person as it may designate for the purpose, including an engineer or other assistant, as may be required, to fix at the points of diversion or other proper places suitable boxes or head-gates, with a view to being able, in accordance with the decree, properly to measure, regulate, and distribute the water between those who, under the decree, may be entitled to the use thereof, the costs for which should be taxed against each in such proportion as the court may deem just and equitable.

81. It is clear, under the evidence, that this suit was made necessary in the first instance by the wrongful interference of Geo. H. Small, who, without right during the low-water season, diverted most of the stream above S. A. D. Porter's premises and to such an extent that, in order for Porter to receive his quota, it became necessary to deprive plaintiff Hough of the quantity to which she was entitled, thereby precipitating the suit originally brought. For this reason we think S. A. D. Porter and John C. Porter, as against defendant George H. Small, are entitled to their costs in both courts, for which they should have judgment. The other parties hereto, we think, are sufficiently benefited by the final adjustment of their rights to justify each in paying his own costs.

It follows that the decree of the court below should be modified, and one entered, as between all the parties hereto, whether plaintiffs or defendants, establishing their relative rights in harmony with the views here expressed.                    MODIFIED.

Decided June 29, 1909.

## ON MOTION FOR REHEARING
(102 Pac. ——)

MR. JUSTICE KING* delivered the opinion of the court.

Geo. H. Small, by his counsel at the former hearing, aided by Benson & Stone, and Lionel R. Webster, whose services have since been procured, petitions for a rehearing, in support of which it is insisted that we are in error, (1) in our findings as to the date of Small's appropriation and the quantity of water awarded him; and (2) that the case was originally tried upon the theory that each of the parties were riparian owners, with reference to which it is suggested that this court, in its construction and application of what is known as the Desert Land Act, promulgated a doctrine heretofore unknown; and that, not anticipating such ruling, the same testimony was not adduced as would otherwise have been, by reason of which it is insisted that the case should be reopened for further taking of testimony, It is announced, however, in the opening of the typewritten argument, that no fault is intended to be found with the law as thus enunciated, making further consideration thereof unnecessary. See also: *Boquillas Land & Cattle Co.* v. *Curtis*, 212 U. S. ——, (29 Sup. Ct. Rep. 493), where *Hough* v. *Porter*, 51 Or. 316, (98 Pac. 1083), is cited on this point with implied approval.

The petition is accompanied by an *ex parte* showing by Small, consisting of his affidavit to the effect that he hired and paid an attorney, there named, to appear for him in this court, who failed to do as agreed, and that not until after the first hearing on appeal did he learn that the attorney thus employed neither appeared here, nor filed a brief for him in this court. It is, therefore, argued that as Small was, at an inopportune time, compelled to employ other counsel, who, on account of the brief time then remaining, and for other reasons given, were not in position to give his interests the

*Appointed Associate Justice February 12, 1909.—REPORTER.

attention essential to a full presentation of his rights; that his claims were not fully presented; and that his interests are, by reason thereof, materially impaired. This point we do not deem well taken. We are aware, however, that by being compelled, while litigation is pending, to make a change in attorneys, often results in much embarrassment to the party thus affected. But such occurrences are not unusual; and it is obvious that to make such inconvenience a basis for granting a rehearing, or for a reopening of a cause for further proceedings, could but result in establishing a precedent which, in place of facilitating business and promoting justice, would too often tend unnecessarily to increase the labor of courts, and in the delay of the always to be desired early determination of legal controversies, without corresponding benefits to the contestants. While at the first argument in this court the petitioner was not represented by counsel, he was, at the re-argument thereof, represented by able counsel, who filed briefs in his behalf asserting, clearly and concisely, upon both the law and facts, his claims under the doctrine of adverse possession and prior appropriation; these being the grounds upon which he still maintains his rights. Again, his situation, with reference to counsel, is not unlike that of practically all others whose interests, with his, have been determined; for, with the exception of W. J. Moore, whose name appears on appellant's brief only, and J. C. Rutenic, who came into the case after the taking of the testimony in the suit as first brought by Annie C. Hough, none of the counsel who appear for the contestants in this court were connected with the trial in the court below. Furthermore, recognizing the disadvantages under such circumstances necessarily accruing as a result of a change in attorneys, together with the voluminous record, and corresponding opportunity for oversights and errors in the preparation of briefs and in the presentation of the cause on appeal,

extraordinary precautions were taken here for the pro-
tection, in this respect, of not only all who appeared by
counsel, but for the safeguarding of the rights of the
numerous parties not represented by counsel (see 51
Or. 366: 98 Pac. 1108), by carefully examining into,
and in the preparation of a synopsis of the testimony
bearing upon the numerous and conflicting claims and
interests, respectively, of all parties to the suit.  But
notwithstanding the thorough investigation made in
this respect, we have, in connection with the petition
for rehearing and points there urged, again carefully
examined the record, with the result hereinafter
indicated.

Counsel for Small maintain that we should have held
him entitled to a greater quantity of water than here
awarded him, in reference to which it is asserted that
he has established title by ten years adverse use thereof,
and that the testimony clearly discloses an appropria-
tion and actual application prior to 1884, of a much
larger quantity of water than the entire amount decreed
him.  The conclusion reached in the main opinion as
to Durand's claim as an adverse user (51 Or. 433: 98
Pac. 1107), including the reasons given therefor, applies
with equal force to, and disposes of Small's contention
on this point.  It is argued in connection with his claim
as to the date of his appropriation that the admission
in Small's testimony relative to the filing of the declara-
tory statement, made in connection with his desert land
entry, should not be taken as having any bearing upon
his testimony fixing the date of his original diversions
and appropriations.  His sworn declaration, filed at the
time, after stating that the land was desert in character,
and would not produce crops without irrigation,. etc.,
adds, "that no portion of said land has ever been
reclaimed by conducting water thereon    *    *    *."
This declaration, it is admitted by Small, was filed by
him in the land office in the spring of 1884, and, when

construed along with the direct and positive testimony
of other witnesses, to the effect that the ditch con-
structed for use on this land was not commenced earlier
than 1884, some fixing it at a later date, can leave but
little doubt upon the subject.

Nor are we able to agree with counsel for petitioner
concerning the second point presented. If all, or even a
large per cent. of those whose interests here involved
were petitioning on that ground for the reopening of
the cause we might feel disposed to acquiesce therein;
but Small is the only party to this proceeding seeking
either a rehearing or reopening thereof. Assuming that
his interests were not properly represented, and that his
cause was tried under the adverse circumstances sug-
gested by his affidavit and argument of his counsel, we
would be impelled, in response thereto, to take into con-
sideration the fact that this suit, when computed with
the effect of the delay incident to the petition under con-
sideration, has been pending in the courts for ten years;
that such delay has not only, to a large extent, resulted,
thus far, in a denial of justice to many whose interests
are involved, but that during the many years which
have elapsed since the testimony was taken, death has
removed not only some of those most vitally interested,
but other important witnesses as well, to say nothing of
those who, during that decade, may have moved to parts
unknown, thereby depriving the litigants satisfied with
the result heretofore announced of the additional testi-
mony likely, in the event the cause should be reopened,
to be desired. It is obvious, therefore, that at this
late date, in the absence of some extraordinary showing
therefor, it would be very inequitable to permit a few
of the parties to the suit remaining in the vicinity of
the property involved, who may be dissatisfied with
the result, to furnish additional testimony on their part,
while others, for the reasons stated, would not have an
equal opportunity to rebut such evidence as may thus

be offered. It is evident, therefore, that less injury will ensue from a decision upon the testimony presented and before us, taken when all parties in interest and their witnesses were living and available, than to reopen the cause.

Under the fundamental law of our land all persons are entitled by due process of law to protection in their property rights, and to a speedy hearing of any controversy in respect thereto: Constitution, Oregon, Article I, § 10. It is clearly manifest, therefore, that after this cause has dragged along through the courts for a decade, to remand it to the court below for another indefinite journey would not only be to disregard the letter and spirit of the section of the Bill of Rights cited, but, in effect, to declare it obsolete. And, in this connection, it should not be overlooked that, during the many years which have elapsed since the institution of this proceeding, some have been deprived of the use of water to which they were entitled, while others, and prominent among them this petitioner, have received much more than their legal quota, for which reason, if for no other, without discovering more than ordinary reasons therefor, we would not be justified in again delaying the final determination hereof.

But there is another and more potent reason why petitioner's demands in this respect should not be granted. The only parties, if any, to which the skillful arguments presented by his counsel can under any system of logic be deemed applicable, are making no complaint as to the result heretofore announced; they do not seek a rehearing or reopening of the cause in any manner, and the reasons presented therefor by counsel for Small can have no application to his situation. The cause was tried by some, it is true, upon the theory that the doctrine of riparian rights, with reference to irrigation, prevailed and was applicable to their lands; but not so with petitioner. He sought to defend as an

51 Or.— 15

adverse user and prior appropriator only, his pleadings being held sufficient for that purpose (51 Or. 424, 433, 438, 439: 98 Pac. 1104, 1107, 1109), and his proof not only went to the question of adverse possession, but to prior appropriation as well; his efforts in this direction being, to say the least, as ably and as fully presented as is usual in cases of this kind. Much testimony was offered on his behalf for the purpose of establishing the dates of his settlements, of his filing, of his final proof, of the initiation of his various rights, the size of his ditches, the quantity and character of land irrigated, including the quantity of water required for the proper irrigation thereof, and it is evident therefrom that he relied in his proof principally upon his claim as a prior appropriator, even to the extent of securing a stipulation to the effect that he was prior in time, and superior in right to the plaintiffs. (See 51 Or. 338, 424: 95 Pac. 737; 98 Pac. 1104, 1109.) The same may be said of the few others who have informally, and not in compliance with any of the rules of this court, presented and signed a statement suggesting that Small's petition should be granted, for which reason their request, even if legally entitled to consideration, is devoid of merit.

In our first opinion, 51 Or., at page 380, (95 Pac. 751), we stated that since the cause was "tried largely on the theory that riparian rights have attached to the lands, the evidence seems inadequate for the purpose of making an equitable distribution under that rule," which statement we supplemented with suggestions as to the character of proof desired in that connection; but we subsequently held the doctrine of riparian rights to be inapplicable to any of the rights involved. Had we held to the opposite view, then, for the reasons there suggested with reference to the proof necessary for distribution among riparian owners, it would probably have resulted, *sua sponte,* in remanding the cause for

the further taking of testimony; but when the question
of riparian rights became eliminated the reasons for
the taking of additional testimony ceased. It is nothing
unusual for litigants to discover on appeal for the first
time that they have tried the cause on a wrong theory
in the court below, and especially is this true in suits
in equity; but whatever may be the hardships occasioned
thereby none by reason thereof have resulted in the case
under consideration. (See 51 Or. 439: 98 Pac. 1109.)
It is evident, however, from an inspection of the record,
that this cause, like most water suits, was tried upon
the theory that each should avail himself of whatever
defense the court after trial might discover he had, and,
as a result, some pleaded all defenses and rights avail-
able, with the apparent hope and expectation that they
might, at least, come within hailing distance of some
of them; and this dragnetic system of pleading and
proof is not unusual in the trial of this class of cases.
Pursuant to such policy, the litigants appear, so far as
deemed essential, to have introduced all evidence at hand
deemed likely to have any bearing upon the case, regard-
less of the claim of right or defense under which their
proof might eventually be classed, the principal defect
in which, as indicated, was that the proof offered was
insufficient to enable this court to make an equitable
adjustment of the rights of the respective parties in
case they were to be determined under the riparian
doctrine, as anticipated by some and as subsequently
attempted by the trial court. True, the showing made
at the trial by some of the parties to the suit, under
the issues subsequently held inapplicable, was very
meager and indefinite, but, as hereinbefore stated, none
of those injured thereby, if any, are complaining, from
which we must infer that they are satisfied with the
result, and certainly Small, who fortunately is not thus
situated, is not in position to complain for them; especi-
ally since their lack of diligence at the trial, it is clear,
in no way works to his prejudice.

It is next maintained in the brief last filed in support of the petition for rehearing that, since the beneficial use and the needs of the user are held to be the limit of his right, and that we have fixed the minimum and maximum quantity reasonably required for the proper irrigation of any of the lands involved, at from one and one-half to three acre feet, such quantity "might be too much for some of this land and not more than half enough for the other," by reason of which it is argued that additional testimony should be taken to clear up, in this respect, the demands and requirements of each, by ascertaining "the actual facts and leave nothing to general conjecture or vague supposition." This contention manifestly overlooks our holding upon this subject, to the effect that when the water is not required by one or more it shall be at the disposal of others: 51 Or. 438 (98 Pac. 1109) ; *Gardner* v. *Wright,* 49 Or. 609, 637 (91 Pac. 286, 297). If, therefore, 1½ acre feet is not required by some for the proper irrigation of their lands, the surplus must be available for others. For example, if one of the parties requires but a half acre foot, or one-third of the minimum quantity awarded, to properly irrigate his land, the supply remaining must be subject to use by others; and again, if after each shall have received the supply of water awarded him (if there is sufficient for that purpose), any surplus shall remain, such surplus, whatever it may be, as between the parties hereto, comes within the same rule and accordingly becomes available for their use in the order of the priorities heretofore determined.

Anticipating the obstacles, from time to time likely to arise in this respect, as climate and soils may change, and also being mindful of the fact that the evidence on some points is not as full and explicit as it might be, to say nothing of the unforeseen difficulties which in time always make their appearance in such cases, ample provision was made in our former opinion (51 Or. 444: 98 Pac. 1111), for the entry of such supplemental

decree, or decrees, not inconsistent with the views
announced, as may, at any time, be found essential to
meet emergencies as they may arise.   The order of
priorities, proportionate interests and limitation of the
rights of each of the litigants is determined; but the
question as to when a water user may be deemed to be
acting within or without the scope of the decree, includ-
ing the best manner and method of its enforcement, may
make it necessary at times, in order to carry the spirit
of the decree into effect, for the court below to require
further evidence upon the disputed points.  For example,
it might become necessary from time to time to gather
information concerning the acreage irrigated, as to
what tracts require water, quantity necessary for the
proper irrigation thereof, the best and most effective
method of distribution, quantity of water available,
amount actually applied, etc., etc.   (See 51 Or. 380,
444: 95 Pac. 751: 98 Pac. 1101, 1111), all of which may
be done by and under the direction of the trial court,
as in other cases, or in the manner recently provided for
by legislative enactment.  See Gen. Laws 1909, p. 319,
Chap. 215, §§ 36, *et seq.*  Evidence for such purposes,
owing to its nature, will always be available, and accord-
ingly is not subject to the objection hereinbefore alluded
to in response to petitioner's demands.  It is obvious,
therefore, that the emergency advanced for reopening
the cause at this time, for the purpose of securing the
class of evidence suggested as desirable, is fully recog-
nized in our former opinion and provision will be made
therefor in the decree to be entered here, making such
proceeding at this time clearly unnecessary.

There is another feature, however, to which our atten-
tion has been directed, with reference to which we are
inclined to adopt counsels' view.  Since filing the main
opinion the Porters' have placed on file with the clerk
of this court, cost bills, taxing against Small and in
their favor the costs alleged to have been incurred by
them in both courts, aggregating the sum of $2046.70,

from an inspection of which it appears there is included the witness fees, including mileage, of nearly all who testified in the case in the court below. This is evidently attempted upon the theory that as all whose fees are thus taxed gave testimony which directly or indirectly had some bearing upon the Porters' interests, their mileage and per diem should be included in the cost bill in his favor. Why the costs incurred in the court below are taxed here does not appear, nor can we surmise a reason therefor, unless it is upon the theory that since the statute provides that suits in equity shall be tried *de novo* on appeal, it implies that the cost bill must be filed in this court. Such is not the usual practice; but whether it is the proper procedure in such cases is not before us, and accordingly will not be determined. But the cost bills filed illustrate the difficulties to be presented if costs are to be taxed in the manner heretofore directed; in fact, it is manifest that the obstacles to be encountered in determining, under our former holding if adhered to, the proportion of costs in the lower court to be taxed against Small, makes an equitable adjustment thereof very difficult, if not impracticable, and would probably result in requiring Small to bear too large a burden in this respect; thus partaking of the nature of a punitive, rather than an equitable, assessment thereof, which was not intended.

Since all the parties to the controversy are materially benefitted, to the extent at least of having their rights finally determined, even though the result in each particular case may not be what he or she have expected or desired, we think, after a careful reconsideration thereof, the court below was fully justified in decreeing that none of the parties recover costs in that court.

Porters' judgment against Small for costs and disbursements will therefore be limited to those incurred in this court.

The petition is denied.

MODIFIED AS TO COSTS: REHEARING DENIED.

MR. JUSTICE EAKIN delivered the following concurring opinion:

Since filing the motion for rehearing we have reviewed the issues and evidence relating to the appropriation of water by Small. Small claims 800 inches of water through three ditches on the west side of Silver Creek. Ditch marked No. 1 on a map not before us, is what is known as the ditch from Bridge Creek, and No. 2 and No. 3 are taken from the Island Branch near the center of the northeast ¼ of section 15. He says ditch No. 1, with a capacity of 200 inches, was constructed in 1881 to take water from Bridge Creek to his desert land claim in sections 9 and 10 (560 acres). He is very indefinite as to the details relative to the construction and use of the ditch, its fall, the particular ground covered by it, and the crops raised. He testifies that ditches No. 2 and No. 3, with 300 inches and 250 inches capacity, respectively, were constructed in 1882, No. 2 being also for the purpose of reclaiming the desert land, but he is equally silent as to details of these two ditches, and his evidence simply amounts to a general statement that, in 1881 and 1882, he diverted through these ditches 750 inches of water. He admits that a large tract of this land was not fenced until 1885. In his answer and in his evidence, he claims to be the owner of 1960 acres of land, all of which was irrigated from this creek, claiming 800 inches of water therefor, and that all has been irrigated since 1882, and that one-half to three-quarters inch of water per acre was sufficient for that purpose. It appears from the evidence and a plat submitted with this motion that he owns only 1400 acres, of which not more than 820 acres are under the three ditches above mentioned. Five hundred and sixty acres of the 820 comprises the desert land claim, for the location of which he did not make application until 1884, and which was not fenced until about 1885. Hence, at the times he states he was claiming 800 inches of water, he

only had a legitimate claim to 260 acres under these ditches, which tends strongly to weaken his evidence as to the time and amount of the appropriation.

S. A. D. Porter testifies, that the first water taken by Small to the desert land claim was in 1886. Jesse and James Porter, in 1886, at Small's request, and jointly with him, measured the quantity of water flowing in ditches No. 2 and No. 3, and the amount did not exceed 50 to 75 inches in both, and the ditches were about half full; Small at that time contending that was all the water he was taking or claimed. He evidently constructed these ditches for the purpose of reclaiming the desert land, though he says he had other land to irrigate. He does not mention what land, or state that he took the water upon any particular land. It also appears that part of this land was swamp land in 1882, and it is not reasonable to suppose that it required irrigation until reclaimed. We think the determination in the original opinion of his interest is fair and just. I have here treated Small's rights exclusively with reference to his title by prior appropriation. He also relies in his answer upon title by adverse possession, but there is no evidence indicating that his use of the water interfered with the other users prior to 1895, and, therefore, such use is not adverse under the rule in *North Powder Co.* v. *Coughanour,* 34 Or. 9, 22 (54 Pac. 223), *Carson* v. *Hayes,* 39 Or. 97, 106 (65 Pac. 814), *Beers* v. *Sharpe,* 44 Or. 286, 394 (75 Pac. 717). The use of the water of a stream for irrigation cannot become adverse to another claimant of it, unless such use infringes upon the right of the other and curtails his use.

Small, therefore, has acquired no title by adverse possession. The motion should be denied.

REHEARING DENIED.